# Exhibit A

PERMIT
6r-30        A

October 2?, ?:

1968
(CR-A66)

Mrs. K. Marazzo

Mr. James K. Rankin

Project No. 32.01:420-451-855; Raritan Bay -
Sandy Hook Bay Cooperative Hurricane and Shore
Protection Project; Madison Township -
Permit 68-30; Sea Land Development Corp.

Your file with notation dated September 9, 1968
requesting report on meeting held September 6, 1968 with Sea
Land Development is attached.

Representation at the September 6, 1968 meeting
was:

State: Messrs. Rankin, Barron, Kelly, Johnson.
Township: Township Engineer John All_air
Sea Land: President J. A. Tri_ounis, Attorney
          A. S. Kleiner

With reference to attached map dated September 11,
1968, the Sea Land case is summarized:

1.  Sea Land purchased the upland area colored
    "Green" from Wilson Avenue east to Margaret
    Creek.

2.  Sea Land proposes to purchase a riparian
    grant for the combined "Red" and "Red
    hatched" area in order to have a total land
    area (upland plus riparian) of 17 acres to
    meet local zoning requirements.

3.  Sea Land proposes to build a seawall composed
    of slag and clay core with stone revetment on
    outshore side and berm.  The heavy black line
    shows the seawall location from Wilson Avenue
    east to Margarets Creek.  The seawall berm is
    to be 15' above mean sea level and Sea Land
    is to fill behind it to same elevation.  The
    seawall would substitute for the protective
    feature of the beachfill placed at this

October 23, 1964

Mrs. E. Marasco

-2-

location by the Army Engineers.

4. If the State conveyed its ownership of
the riparian lands marked "Red" and "Red
hatched", the title in fee would go to Sea
Land, but the grant would reserve to the
State an easement in perpetuity for public
use of the "Red Hatched" area which would
satisfy the public recreation benefits
requirement of the federal beachfill project.

5. Sea Land has been advised that the State
would also require beachfill placement in
front of the seawall so as to establish a
beach in fact. Sea Land has agreed to this
subject to final accord upon establishment
of the cost to the Corporation.

6. Sea Land has been advised that all discussions
are at staff level for the purpose of reporting
to higher authority for decision.

7. Sea Land has been asked to furnish survey data
as the map attached is incomplete and has been
advised that work-up of the riparian data
cannot be made until such information is
submitted.

In addition to the general outline of the case as
noted above, the following specific items were noted at the
September 6,1963 meeting.

1. Sea Land was to fix the exterior grant line
it needs to assemble 17 acres and submit for
review. (This is shown on the attached map).
Mr. Tsigounis said that the seawall location
was fixed and would furnish bearings, distances
and ties. Sea Land, also, would furnish other
necessary survey information required for
riparian investigation. This would include
former riparian grant shown at west end of
frontage which state finds incorrectly located and
in fact outside the frontage under consideration.

October 13, 1966

Mrs. A. Marazzo                    -3-

     Sea Land has indicated a willingness to convey its interest in this former grant to the State in order to remove any future question. This is being investigated.

2.   Mr. Teijonis stated that Sea Land was willing to place a beachfill outshore of the seawall for public recreational use, but the cost based on his information was a considerable item and he asked that the beachfill dimensions be reviewed. He was advised that this would be done.

3.   It was emphasized that further advance in this case would depend on receipt of the survey information from the Sea Land Engineers.

James R. Hamlin
Acting Chief
Navigation Bureau

JKR:ms
attachment

cc: Mr. A. Scoppetuolo
    Mr. F. Kelly
    Mr. J. P. Marron
    Mr. H. W. Bond

# Exhibit B

# MEMORANDUM

DATE  May 20, 1970

TO:          Director K. H. Creveling

FROM:        Mr. James K. Rankin

SUBJECT:     68-131:  Sea Land Development Corp; Riparian Grant,
             Raritan Bay, Madison Township

             32.01:420-156-855 Madison Township Cooperative
             Hurricane and Shore Protection Project (1970)

68-131:  On December 17, 1969, Council approved riparian grant
         to Sea Land with four conditions.

      1.   Applicant to deed back its title to that portion of
           the grant dated December 18, 1922 covered by its deed.

      2.   Applicant to convey a perpetual easement for a
           beach area of 2,808 acres of grant to be conveyed.

      3.   Applicant to create a beach acceptable to the U. S.
           Army Corps of Engineers to replace one constructed under
           its coast protection project.

      4.   Applicant to provide public access over its property to
           proposed beach area.

Meeting was held May 19, 1970 at New York District Office, Corps of
Engineers to obtain Corps views on Conditions Nos. 3 and 4.  Those
present were Mr. Panuzio and Mr. Nersesian of the Corps and Mr.
Wicker and Mr. Rankin of Navigation Bureau.  The results of the
meeting are as follows:

### Condition No. 3:  Beachfill

1.   The new beach to be constructed outshore of the Sea-Land
     Seawall shall be equal in design to the Cooperative Project
     beachfill with 25' wide berm at Elevation 10 mean sea level,
     and frontal slope of 20 horizonal to 1 vertical.  The inshore
     line of the 25' wide berm shall be the "Toe of Slope of Proposed
     Seawall" line as shown on map of proposed Sea-Land grant as
     prepared under Case 68-131.  The beachfill plan shall include
     appropriate fitting of the new beachfill into the existing
     beaches to the east and west of the Sea-Land Seawall.

May 20, 1970

Director K. H. Creveling

-2-

It is considered that the dry beach as measured from the
inshore line of the berm to the project high water line, being
the +2, mean sea level contour, will be equivalent to the
authorized project beach in terms of Project Recreation Benefits.

2.  The Navigation Bureau shall prepare contract drawings and
specifications for the new beachfill and submit them to the Corps
for approval in the same manner as local projects under cooperative
projects are cleared.  The Bureau project will be considered as an
amendment to the Authorized Project and will have to be formalized
by appropriate amendment to the Local Cooperation Assurances of
the Authorized Project.

3.  The State shall obtain and furnish to the Corps the perpetual
easement covering a portion of the new beach area to be given to
the State by Sea-Land as per Condition No. 2 under Case 68-131.
It is understood that the area of this easement shall be the
property owned by Sea-Land after the grant conveyance lying between
the Toe of Seawall Line and the exterior (outshore) line of the
riparian grant as shown on proposed grant map in Case No. 68-131.
In addition, it is considered desirable that the Natural Resources
Council by appropriate action dedicate or otherwise assure the
existence in perpetuity of the portion of the new beachfill
outshore of the proposed Sea-Land grant exterior line as a public
beach with title remaining vested in the State.

4.  When the contract drawings and specifications are approved by the
Corps, the new beach shall be constructed by either the State or
Sea-Land as agreeable to the State without any Federal
participation.  Pursuant to Condition No. 3 of Case 68-131, the
project cost of beachfill construction shall be borne by Sea-Land.
The State's engineering and inspection costs are considered part
of the beachfill project cost and are to be included in the estimated
project cost.

5.  The new beach is to be maintained by the State and Madison Township
as per Local Cooperation Assurances.  The Sea-Land Seawall and the
lands rearward of the seawall are the responsibility of the Owner.

Condition No. 4:  Permanent Access Easement

1.  The State shall obtain from Sea-Land and furnish documentary
evidence of an easement in perpetuity for public access across
the lands of Sea-Land to the new beach at three locations along
the Sea-Land bayfront, such locations being compatible with the
Sea-Land plan for development of the property rearward of the
Sea-land Seawall and subject to Federal and State approval and
acceptance.  The intent is to assure convenient public access

Director K. H. Croveling                                 May 20, 1970

-2-

to the beach and appropriate dispersion of beach population
without inhibiting design for use of Sea-Land property.

### Comments

1.  The Contract Plans and Specifications will be prepared for
    submission to the Corps in order to advance this case.

2.  Sea-Land will be advised of the conclusions reached by
    consultation with the Corps as to the Conditions under Case
    68-131.

3.  Joint field inspection with Corps will be arranged for near
    future to assure full mutual understanding based on direct
    observations in the field.  The inspection will include the
    entire Authorized Project frontage as well as the Sea-Land
    portion.


JKR:ms                                    James K. Rankin, Chief
                                          Bureau of Navigation

cc:  Mr. Frank Kelly
     Mr. A. Sceppetuolo
     Mr. J. P. Marxon
     Mr. H. W. Boud
     Mr. C. F. Wicker

Exhibit C



# MEMORANDUM

DATE    October 19, 1970

TO:    Deputy Commissioner Joseph T. Barber

FROM:    Mr. James K. Rankin

SUBJECT:    68-131:  Sea Land Development Corp.; Riparian Grant,
Raritan Bay, Madison Township

32.01:420-156-855:  Madison Township Cooperative
Hurricane and Shore Protection Project (1970)

On October 15, 1970 you advised that Sea Land has proposed
furnishing $55,000. to reimburse the Federal Government for its
expenditure in connection with placement of beachfill along
the Sea Land bayfront property at Madison Township.  It was
understood that the offer was intended to remove Condition No. 3
of the four stipulated by Council in approving grant.  The
four conditions specified are:

1.  Applicant to deed back its title to that portion of
the grant dated December 18, 1922 covered by its deed.

2.  Applicant to convey a perpetual easement for a
beach area of 2.808 acres of grant to be conveyed.

3.  Applicant to create a beach acceptable to the U. S.
Army  Corps of Engineers to replace one constructed
under its coast protection project.

4.  Applicant to provide public access over its property
to proposed beach area.

## Comment

1.  The $55,000. represents only the Federal investment as estimated by
the Corps of Engineers.  The State and Madison Township
would have to be compensated also in amount of $60,000. based
on the Corps computation.

2.  In order to report the offer to the Council for its decision,
it would be necessary for Madison Township to make a formal
request and recommendation.

3.  The Council action, if favorable, would be subject to formal
application to and approval by the Corps of Engineers.

JKR:ms                    James K. Rankin, Chief
                          Bureau of Navigation

# Exhibit D



# Township of Madison

## MIDDLESEX COUNTY, N. J.

Conservation Commission

REPLY TO:    1166 B AMBOY ROAD
                      R. D. 1
             MATAWAN, N. J. 07747

BOX 70-C, R.D. NO. 1
OLD BRIDGE, N.J. 08857

September 29, 1972

Mr. A. W. Price, Chief
Solids Waste Management Div.
Dept. Of Environmental Protection
Box 1390
Trenton, N. J., 08625

Dear Mr. Price,

This is to confirm our telephone conversation regarding the land fill operation being conducted on the Laurence Harbor beach front on Raritan Bay, in Madison Township.

I am enclosing two photographs taken at the site of this operation which show in some detail the problems to which I referred.

Photo No. 1 is of a man recovering lead metal from the recently dumped slag used for the land fill. This slag, probably from the lead melting operation of National Lead in Perth Amboy would also contain other heavy metals and metal sulphates normally associated with the raw material. As can be seen the land fill has passed the high tide mark and the dumping is taking place right into Raritan Bay therefore these metals and their soluble salts pose an additional threat to increasing the pollution in the bay.

Photo No. 2 shows the removal of an ingot of solid lead from this same slag dump. I estimate the ingot weight to be about one half ton. While all the slag is not solid lead there is a substantial amount in almost all the pieces.

I feel that this land fill operation constitutes a series of improper operations, some that I may not have specifically outlined. I would appreciate receiving a copy of any report your office prepares concering the land fill.

Very Truly Yours,

George A. Koehler
Chairman

# Exhibit E

# The News Tribune

WOODBRIDGE, N. J., TUESDAY, OCTOBER 3, 1972   ★★★

# State to probe dumping of lead slag

**By ROBERT WINDREM**
*News Tribune Staff Writer*

MADISON TOWNSHIP — The state Department of Environmental Protection has agreed to send a field representative to the Laurence Harbor beachfront to investigate the dumping of lead slag along the water line.

George R. Koehler, chairman of the township's Environmental Commission, said at last night's township council meeting that the department's Division of Waste Management has promised to send a representative to investigate the practice of trucking lead slag from Perth Amboy to Laurence Harbor, where it is dumped.

Koehler said the slag, large mound-



**CLOSE-UP**—Several mound-shaped lead slag ingots, some weighing up to a half-ton, are shown on the Laurence Harbor beachfront. George Koehler, chairman of the township's Environmental Commission, wants the state to halt the lead dumping.

like, making it unsuitable for recreation.

To substantiate his story, Koehler said he has sent photographs of the dumping to A. W. Price, the division chief.

He said the photographs were taken Sept. 16, and an inspection of the area Sunday showed that more slag had been dumped along the water line at the beachfront, which is privately-owned. It lies just south of the township's public beach in Laurence Harbor.

"This slag, probably from the lead smelting operation of National Lead in Perth Amboy, would also contain other

heavy materials and metal sulphates associated with the raw material," Koehler said, adding that the metals and soluble salts pose an additional threat to increasing pollution in the bay.

"The life expectancy of a fish in lead-polluted waters is 18 to 24 hours," Koehler said, "A micro forms on the gills of the fish and the fish suffocate. This is particularly bad in light of the fact that the bay is cleansing itself, as evidenced by the fact that people are starting to catch fish off Perth Amboy."

Koehler added that environmental

effects aside, the township would be spending wasted money on Green Acres applications if the practice is allowed to continue and the present damage allowed to remain.

He added that the commission, which meets tonight, intends to send a letter on the matter to U.S. Attorney Herbert J. Stern, based on the fact that the bay is an interstate waterway and under jurisdiction of the Refuse Act of 1899.

Stern used the Refuse Act to halt the sludge-flushing practices of more than 20 Shore municipalities earlier this year.

# Exhibit F



October 5, 1972

Mr. George E. Koehler, Chairman
Township of Madison Conservation Commission
165 B Amboy Road, R. D. #1
Matawan, New Jersey   07747

Dear Mr. Koehler:

Your letter of September 29, 1972 directed to Mr. Arthur W. Price, Chief of the Bureau of Solid Waste Management has been referred to me for follow-up.

This site was inspected on October 4, 1972 by myself and another member of our staff. Because of the nature of this material and where it is being deposited we have asked the cooperation of Mr. Charles K. Pike, Director of Water Resources and Mr. Richard D. Goodenough, Director of Marine Services.

We wish to take this opportunity to thank you for bringing this situation to our attention.

Very truly yours,

Charles E. Gingrich
Principal Environmental Specialist
Bureau of Solid Waste Management

CEG:ls

cc:  Director C. K. Pike
     Director R. D. Goodenough

# Exhibit G

**MEMO**

STATE OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION

TO: Director Charles M. Pike

FROM: Mr. Charles E. Gingrich          DATE: October 5, 1972

SUBJECT: Slag disposal, Laurence Harbor beach front on Raritan Bay / Madison Township, Middlesex County.

Mr. Koehler, Chairman of Madison Township Conservation Commission, has brought to our attention the use of slag containing lead and other heavy metals in the construction of a sea wall along ½ mile of Laurence Harbor beach front and an access road to the sea wall through a tidal swamp. Our Bureau has investigated this and we feel that because of the nature of this material and where it is being deposited that your sections of our Department would be vitally interested.

Attach is a copy of Mr. Koehler's letter and our reply. Also for your information is a copy of a recent newspaper article.

We expect to have lot and block numbers later this week should you require them. A sketch is attached showing general location.

CEG:ls

**RECEIVED**

OCT 9 1972

N.J. STATE DEPT. OF ENVIRONMENTAL PROTECTION
BUREAU OF WATER POLLUTION CONTROL

# Exhibit H



# Township of Madison

RECEIVED MIDDLESEX COUNTY, N.J.

OCT 18  10 23 AM '72

DEPT. ENVIR. PROTECT.
DIV. OF WATER RESOURCES

Conservation Commission

REPLY TO:  168 B AMBOY ROAD
R. D. 1
MATAWAN, N. J. 07747

October 1 RECEIVED

OCT 25 1972

Mr. Charles Pike, Director
Division of Water Resources
Dept. of Environmental Protection
Trenton, N.J., 08625

Dear Mr. Pike,

In a recent communication from Mr. Charles E. Gingrich,
Bureau of Solid Waste Management, I was advised that the matter
of dumping of slag from the lead recovery operation of National
Lead Co., into the beacharea and Raritan Bay at Laurence Harbor,
in Madison Township had been refered to you.

The toxicity of the material to aquatic life is well es-
tablished (Pg. 209 Water Quality Criteria), furthermore the
prohibition against dumping industrial waste into tidal waters
is clear (Allowable Limits, Class TW-1 waters N.J.S.A. 26:2E-1
et seq. and Standards Class SB waters, Official Classifications,
Water Resources Commission)

I have enclosed two photos which I hope will be helpful to
you in the persual of this matter:

Photo #1 is of a man recovering lead metal from the slag,
samples of this material are available as well as documentation
as to the quantity of material recovered.

Photo #2 is of an actual dumping operation by Liberty Trucking.

I feel that this land fill operation constitutes a series
of improper operations, some that I may not have specifically
outlined. I would appreciate receiving a copy of any report
youroffice prepares concerning the land fill.

Very truly yours,

George, R. Koehler
Chairman



# Exhibit I



### In Support of Wetlands Order
# Concern Shown for Environment

The following testimony in favor of the Wetlands Order was given by George R. Koehler, chairman of the Madison Township Environmental Commission at the Middlesex County hearing at Rutgers on Nov. 10.

The Wetlands Order provides for control of development in the tidal areas of the state, with concern given to the environmental consequences of such development. It specifically prohibits the dumping of industrial waste and garbage both of which activities have caused considerable concern in Madison Township.

The importance of the wetlands of New Jersey cannot be overstated, the irreplaceable part they play in the life cycle of so many marine and bird life forms has been proven, and is well documented in such books as "Life and Death" of the Salt Marsh by John and Mildred Teal published in 1969 by the Audubon-Ballantine Book Co. and in timely articles as "Can We Save Our

Salt Marshes" by Dr. Stephen W. Hitchcock which appeared in the June 1972 issue of the National Geographic Magazine. The dependance of man on the abundance of the sea and the air is self evident as is the disaster that would result if man's bungling were to break the life chain that provides for man's sustenance.

Also necessary for man is the recreational values associated with these tide and marsh lands.

Both of these important aspects are evidenced in Madison Township — where along the stretch of coast of

Madison Township on Raritan Bay tide marsh as well as beach area exist. The delicate blance of these lands and the rapidity with which these fruitful areas can be destroyed is also very evident as current sanitary landfill operations and industrial waste dumping have made serious inroads into the biotic health of the tidal marsh and the utility of the beach front.

It is the purpose of this testimony to support the Wetlands order by showing that these important areas are in jeopardy due to man's unthinking

(Continued on Page 2)



# —Concern for Environment

(Continued from Page 1)

negligence and need the protection offered by the control proposed in the Wetlands Order.

The first item is a sample of lead metal and lead slag removed from a so called landfill operation, but which has become an industrial waste dump, on the shore of Raritan Bay in Laurence Harbor. The lead slag contains lead sulfate and other lead salts. The toxic nature of this material is well known as described in a copy of toxicity data taken from the Water Quality Criteria, published by the U.S. Government Printing Office. While this publication dwells on the vital statistics of morbidity, a very recent article appearing in the New York Times, dated Nov. 9, shows that even slight amounts of this material ingested unknowingly can cause serious harm to young and old.

The extent to which this material has been placed in the dump on the shore of Raritan Bay is shown in the lower photograph on page 1. This photograph, taken on Sept. 9, at the Laurence Harbor beach front shows a slug of what proved to be solid lead being removed by a scavenger from the dump. The slug being dragged out by the chain was later sold for its lead value and had a weight of 500 pounds.

Compounding the problem of the placement of this material in the tide and marsh lands is the unknown affect of changing the contour of the shore line. Another photograph, shows such dumping taking place at the

Laurence Harbor beach front on Sept. 9. The permit for this dumping expired in December 1970, yet the dumping continued only till recently, demonstrating the need for the permit system proposed in the Wetlands Order.

The permit described in the paragraph above indicated that the purpose of the land fill operation was the creation of a bathing beach for use by the public. The top photograph, taken at the base of the land fill, shows not only that the fill, including lead slag has been dumped directly into the waters of Raritan Bay but also shows the condition that has resulted there. This area once important for its recreational value has been turned into a rubble filled dump, dangerous, toxic and hideous.

The Madison-Township Environmental Commission sought assistance in this matter from the Department of Environmental Protection. This assistance was given and the commission has been advised that a stop order has been issued by the Bureau of Navigation on this land fill. The commission feels, however, that the only long term solution to the problem of despoiling these important areas is adoption of the Wetlands Order.

Other important wetlands in the township are being threatened by the unknowing disposal of harmful materials. The Cheesequake Marsh

area of Madison Township near the Global Landfill operation shows destruction of this important marsh. Apparently disposal of industrial wastes some years ago in this area is adding to the destruction of the marsh, as proven by an analysis of a liquid sample of substances bubbling up from the ground at the site of an older land fill operation. This noxious material then seeps its way into the Cheesequake marsh further poisoning the life in these tidal lands.

The concern of Madison Township for the preservation of the tide lands and the protection of the beach front is evidenced by the application made for it under both Green Acres and the PNRS-HUD Open Space and Recreation Grant.

The Madison Township Environmental Commission wishes to see these areas protected from the attacks being made on them and also wishes to see these lands returned to their full and balanced state. The commission feels that this can best be accomplished by the full and immediate implementation of the proposed Wetlands Order, with the regulatory provisions of the order implemented in their entirity, without change and applied to all engaging in activities on the wetlands affected by the proposed order.

This statement was adopted at the regular meeting of the Madison Township Environmental Commission on Nov. 9.

# Exhibit J

NOTIFICATION OF BEACHFRONT MEETING _MARCH 1, 1973 SENT TO:

Corp of Engineers

Mr. F. Pagano
Chief, Engineering Division
26 Federal Plaza - 21st Floor
New York, N. M. 10007

Mr. Gilbert Nersesian
Chief, Beach Erosion & Hurricane
26 Federal Plaza - 21st Floor
New York, N. Y. 10007

Mr. John Falkenbury
Regulatory Beach Permits
26 Federal Plaza
New York, N. Y. 10007

Mr. Pinata
Asst. Chief of Operation Division
26 Federal Plaza
New York, N. Y. 10007

State

Mr. James K. Rankin, Chief
Department of Environmental Protection
Division of Marine Services
Bureau of Navigation
P.O. Box 1889
Trenton, N. J. 08625

Mr. Harold J. Barker Jr., Chief
Dept of Environmental Protection
Division of Marine Services
Bureau of Marine Lands Management
P.O. Box 1889
Trenton, N. J. 08625

Mr. D. Graham
Supervisor of Permits & Licenses
Bureau of Navigation
P.O. Box 1889
Trenton, N. J. 08625

Mr. Ginridge,
Principal Environmental Specialist
Bureau of Solid Waste Management
Department of Environmental Protection
P.O. Box 1390
Trenton, N. J. 08625

Mr. Richard Dealy, Chairman
Madison Township Planning Board

Mr. Richard Plechner
Madison Township Attorney

Mr. George R. Koehler, Chairman
Conservation Commission
168 B Amboy Road R.D. 1
Matawan, N. J. 07747

Mr. Ken Sandor,          (County)
Director of Environmental
Health & Protection
37 Oakwood Avenue
Edison, N. J.

Citizens

Mrs. Rita Van Orden
78 Roosevelt Avenue
Laurence Harbor, N. J.

Mrs. Mary Jacques
58 Boulevard East
Cliffwood Beach, N. J.

Mrs. Helen Ver Strate (L.W.V.)
25 Balmoral Avenue'
Matawan, N. J.

Mrs. Dorothy Instrip
81 Roosevelt Avenue
Laurence Harbor, N. J.

000140

# Exhibit K



BOX 684
OLD BRIDGE, N. J. 08887

# Township of Madison

MIDDLESEX COUNTY, N. J.

OFFICE OF THE ENGINEER
18 THROCKMORTON LANE
TEL. (201) 879-5120

February 23, 1973

     Pursuant to our letter of February 21, 1973, we are forwarding herewith a tentative agenda for the meeting of March 1, 1973.  This agenda covers the general areas of questions which have arisen in the past and we shall endeavor to follow the agenda.

Very truly yours,

Harvey P. Goldie, P.E.
Township Engineer

HPG:ab
Encl.

A G E N D A

INFORMAL CONFERENCE

Informal conference of interested parties to determine the Township's rights, responsibilities and options with regards to public and private beachfronts and hurricane projects, also to discuss past and present land fills along the beachfront.

1. Call meeting to order 8:30 P.M.

2. Introduction by Manager (agencies present and purpose of meeting)

3. Beachfront Filling

    A. Authorized by permit (federal and/or state)

        1) permits issued, duration of permits
        2) agency issuing permit
        3) permits required
        4) operations not requiring permit

    B. Encroachments

        1) encroachments beyond wetland boundaries
        2) encroachments on riparian lands
        3) encroachments on areas considered navigable waters

    C. Riparian grants

        1) riparian grants issued
        2) riparian grants applied for
        3) do riparian grants require permits under Wetlands Act?

    D. Environmental aspects

        1) state requirements for land fill
        2) does material in land fill endanger environment or ecology of area?

4. Beach Erosion

    A. Hurricane project

        1) explanation of federal, state and municipal contract

            a) Township's responsibility and obligations under contract
            b) State's responsibility and obligations under contract

        2) are bench marks available, and when have cross sections of beachfront been taken?

4.   <u>Beach Erosion</u>  - Continued

A.   Hurricane project

3)  Explanation of Corp of Engineers recommendation for
    immediate maintenance (estimate $41,000.00)

4)  Attorney to explain easements - rights of township
    and rights of property owners.

B.   Maintenance and erosion control beyond limits of
     hurricane projects

1)  funding available?
2)  Federal and/or state participation

C.   Available funding

1)  Federal aid programs for beach erosion and shore
    protection
2)  State programs for shore protection

a)  Township applications for last ten years
b)  Funds granted over last ten years
c)  Disposition of present application for shore
    protection funds

NOTE -  Preliminary meeting with Township Council at 8:00 P.M.
        to discuss legal aspects with regards to present
        applications pending before state agencies.

# Exhibit L



**State of New Jersey**
DEPARTMENT OF ENVIRONMENTAL PROTECTION
DIVISION OF ENVIRONMENTAL QUALITY
JOHN FITCH PLAZA, P. O. BOX 1390, TRENTON, N. J. 08625

February 23, 1973 RECEIVED

FEB 26 1973

MADISON TOWNSHIP
ENGINEERING DEPT.

Mr. Harvey P. Goldie, P.E.
Township Engineer
Office of the Engineer
18 Throckmorton Lane
Box 684
Old Bridge, New Jersey   08857

Dear Mr. Goldie:

This is in response to your letter dated February 21, 1973.

To be brief, we do not feel that the Bureau of Solid Waste
Management is involved in the construction of the sea wall
along Cliffwood Beach front, as this construction is being
made of inert inorganic material.  It is possible that the
Division of Water Resources of the Department of Environmental
Protection may have some interest.

Under these conditions we will not have a representative
present at your meeting of March 1, 1973.

Very truly yours,

Charles E. Gingrich
Bureau of Solid Waste Management

CEG:pm

000145

# Exhibit M

# ●Township of Madison

*Mr. Goldie*

### MIDDLESEX COUNTY, N. J.

RECEIVED

MAR 13 1973

MADISON TOWNSHIP
ENGINEERING DEPT.

BOX 684
OLD BRIDGE, N.J. 08857

## MINUTES OF MEETING
## RE: BEACHFRONT PROPERTY – March 1, 1973

Present:    From the Township:
Mayor English; Councilmen Fuhrman, Murphy, and Wenng;
Manager L. A. Kenyon; Attorney R. Plechner, Engineer
H. Goldie; G. Koehler, Chairman, Conservation Commission
From the Corps of Engineers (New York District):
P. McGrade, Acting Chief, Construction Permit Section;
T. Maisano, Chief of Discharge Section
S. Maisel, Chief of Planning, Engineering Division

Also present from the Township were:
Mrs. Jacques, Mrs. Van Orden, Mrs. Ver Strate & Mr. Fagan

Mr. McGrade reported that ever since the 27 of May, 1970, the Corps of

Engineers required permits for any work beyond the line of the average mean

high tide.  Previous to this, no permit was required for fill to the bulkhead

line or pier type structures to the pier line.  Neither were ongoing projects

on this date required to get a permit, and this would apply to Sealand's

project; therefore, no permit is required for their continuing fill operations

out to the bulkhead lines.  He emphasized that the enforcement of any

of these regulations had to be done by the Corps and that local

authorities should not act in their behalf on enforcement.  They should

merely report any suspected violations and the Corps would send an

inspector.  He was going to determine if there were any pending or current

permits in effect at this time in our Township and let us know.

000139

Mr. Maisel pointed out that the Sealand project actually improves the
effectiveness of the Hurricane Project, rather than endangering it;
therefore, they would not have required a permit in connection with the
Township's and State's contractual obligations to maintain and protect
this project once it was built. He indicated that, while the rubble in the
fill used by Sealand might not be proper material for a beach recreational
area, there was no indication that the Township's Hurricane Project was
done for recreational purposes or that there was any contractual obligations
in this respect. Mr. Maisel also emphasized that this contractual obliga-
tion was entirely separate from any federal regulations covering navigable
waters. He asked that he be invited to the meeting with State officials
when it is set up.

Mr. Maisel explained that the State had applied for federal funds under
Public Law #99, which is the "Emergency Restoration of Endangered
Projects." As indicated in the excerpts of the Corps of Engineers inspection
report read by the Manager, our Hurricane Project was in no way endangered
and therefore we were not eligible for these funds.

The Manager stated that we had good reasons to believe that the outfalls
had not held up for more than a year or two and were now twisted and out
of alignment and were not operating. Mr. Maisel said that this might
be a better avenue of approach for federal funds because the Corps WAS
obligated to turn over a completed project with minimum or normal
maintenance costs.

-2-

The Manager and Engineer explained that the Township had been doing everything it could to get maintenance work performed on the Shore Protection Project and the Township had put in applications for matching funds in 1965, 1968, 1970 and 1972.  The 1972 application is pending at this time for some $56,000 worth of work.

The Manager read from copies of the easements obtained by the Township for the construction of this project, indicating that our only rights were for ingress and egress at all times, but only for the purpose of depositing earth materials for the construction and presumably maintenance of the Shore Protection Project.

The Mayor read a letter from Richard Plechner, dated May 12, 1971, returning Sealand's check in the amount of $7,500 on order of the Council. The previous Town Council on August 7, 1967 had adopted a Resolution agreeing to return the Township Easement to Sealand Corporation for this amount.

One of the primary questions asked by Mrs. Jacques and Mrs. Van Orden was what the February 1968 entry in the Chronological History of Riparian Grant Case #68-131, Sealand Development Corp. implied, which states:

> "Representatives of Sealand discovered that the easement
> which Madison Township had acquired should have
> contained the provision that the beach was to be used
> for public purposes in perpetuity."

They indicated this history had been received from Col. Barker, and Mrs. Van Orden promised to deliver copies of the cover letter in connection with this history and other material to the Township Engineer within a few days.

-3-

On the Mayor's request, Mrs. Jacques agreed to submit a written list of her questions so that Township officials could get answers from the state at the forthcoming meeting in Trenton.

Mr. Fagan suggested the State be asked the following questions in respect to the Sealand property:

a) Who owns the artificially-created beach that was formed 100 or more yards in width as a result of the Hurricane Protection Project?

b) Aren't our outfalls protected by our easement against damage?

(In other words, what right did Sealand have to pile rubble on top of these outfalls, which, he maintains, has damaged them).

c) Did Sealand begin filling without the necessary Riparian Rights?

The Clerk's office is keeping a copy of the tape of this meeting, which lasted from 8:30 to 11:30 p.m.

# Exhibit N

*Green Acres*
*Bay Front*
*Copy for Sea Land*

*Mr. Goldie*

BEACHFRONT PROPERTY MEETING
Trenton, N.J., March 27, 1973, 1:30 p.m.
Room 801, Building of Labor and Industry
Commissioners of the Department of Environmental Protection

Present:   James K. Rankin, Chief Liaison Officer, Divn. Marine Services
           Bernard J. Moore, Supervisor, Shore Protection
           Stanley Maisel, Army Engineers, New York District
           Peter C. Newson, Supervisor, Wetlands
           John P. Marron, Divn. of Marine Services
           Donald T. Graham, Supervisor, Permits & Licenses
           James R. Tolinson, Supervisor, Riparian Section
           Harold Barker, Chief, Marine Lands Mgt.

           From the Township:
           Messrs. Kenyon, Fuhrman, Plechner, Goldie, Koehler and Quail

Representatives of the state informed us:

(1) The only application in Madison Township for riparian grant pending before the N.R.C. was by Sea Land and it had been tabled indefinitely, awaiting word from Madison Township on our proposed acquisition of this property through Green Acres.

They further indicated that the sale of riparian property, in addition to being approved by the National Resource Council, must be approved by the Department of Environmental Protection, the Attorney General's Office, and the Governor's Office.  It is not a pro forma approval – each department has a reviewing staff to see if it is in the public interest.

(2) The most important piece of information  was that the new beach which had accrued as a result of our Shore Protection Project was the property of the State of New Jersey, as it was artificially created.  Under riparian laws, only slow, natural accretion belong to the abutting property owners. Therefore, Sea Land, as well as others, only owns to the old high water line, not the new one formed by the new beach.

000137

More important, they indicated the Township could make application for a riparian grant on this new beach property, preserving our shore line for the public. The Township would have to pay fair market value but could use State Green Acres money or other state funds.

(3) They indicated we would get the money for the beach restoration project and further agreed under Mr. Maisel's urging to send a letter to the Corps of Engineers to participate financially in restoration of the outfalls, on the presumption they were not originally constructed sufficiently well to entail only ordinary maintenance obligations on the State and Township.

(4) Harold Barker agreed to correct the chronological history which indicates that the Township had sold property or easement to Sea Land or others which is not the case, and received from us a copy of Mr. Plechner's letter of May 12, 1971 returning Sea Land's $7,500 check and informing them their offer had been rejected by the Township.

(5) They also promised us a letter concerning the meeting and a report from the Bureau of Water Pollution Control re: lead slag dumped by Sea Land.

They answered all the questions submitted by concerned residents to the extent possible, as well as covering the Township prepared agenda; and again stated they did not feel a public hearing away from their files could be profitable, indicating that they had offered and were always ready to meet with citizens and officials at their office on any of these matters.

Mr. Barker personally told the concerned citizens by phone they could go down and review the records with a representative of the Attorney General's office present to help answer legal matters.

-2-

Previous to Governor Cahill's 1970 establishment of a review board, riparian grants were practically automatic, and deposit by the applicant of one-half the consideration plus permit fee allowed him to begin construction or filling operations.

(See Cease and Desist Order of October 31 from Mr. Rankin to Sea Land in file).

L. A. Kenyon/ms

-3-

3-27-73

James K Rankin — Chief Liaison Officer - Div. Marine Serv.
Bernard J. Moore — Supervisor - Shore Protection
George R. Koehler - Madison Twp. Environmental Comm.
Bernard Feibisman - Counsulman - Madison Twp
Stanley Maxwell - Army Engr. New York Dist.
Joseph P. Duval Health Administrator Madison Twp
Richard F. Plechner — Township Atty. Madison Twp.
Harvey P. Goldie - Township Engineer, Madison Twp
L. A. Kenyon - Madison Twp Mgr
Peter C. Newson - Supervisor - Wetlands.
John P. Marron - Div. Marine Services
Donald T. Graham - Supervisor - Permits & Licences
James R. Johnson - Supervisor - Riparian Section
Harold Barker Chief - Marine Lands Mgt

C00138