ARCHER & GREINER
A Professional Corporation
One Centennial Square
Haddonfield, NJ  08033
(856) 795-2121
Attorneys for Plaintiff,
NL Industries, Inc.

By:    CHRISTOPHER R. GIBSON, ESQUIRE
          PATRICK M. FLYNN, ESQUIRE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NL INDUSTRIES, INC., | Civil Action No. 3:13-cv-03493-MAS-TJB |
| Plaintiff, | |
| vs. | |
| OLD BRIDGE TOWNSHIP, et al., | **Electronically Filed** |
| Defendants. | |

## BRIEF OF PLAINTIFF NL INDUSTRIES, INC. IN OPPOSITION TO
## DEFENDANT RIO TINTO MINERALS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

    A.    Count I of the Complaint States a Claim Against Rio Tinto as Liable for Necessary Response Costs Under CERCLA ........................... 2

    B.    Count V of the Complaint States a Claim Against Rio Tinto as Liable for Cleanup and Removal Costs Under the Spill Act .................... 4

    C.    NL Has Sufficiently Pled a Claim for Successor Liability Against Rio Tinto ................................................................................................ 5

STATEMENT OF FACTS ....................................................................................... 5

    A.    The USACE's Shore Protection Project for the Laurence Harbor Shoreline ............................................................................................... 5

    B.    USACE's, Old Bridge Township's, and the State's Involvement in the Design and Construction of the Seawall Using Lead-Bearing Slag ........................................................................................................ 6

    C.    Decision of the USACE and the Other Public Entity Defendants to Allow Lead-Bearing Slag to Remain Even After Concerns About Environmental Contamination Had Been Raised ..................................... 6

    D.    Old Bridge Township's Acquisition of Ownership of the Site ................. 7

    E.    Listing of the RBS Site on the National Priorities List and NL's Incurrence of Response Costs .................................................................. 8

    F.    Liability of the "Customer Defendants" .................................................. 9

ARGUMENT ......................................................................................................... 10

POINT I    RIO TINTO'S MOTION TO DISMISS NL'S CERCLA § 107(a) COST RECOVERY CLAIM (COUNT I) AND CERCLA § 113(g)(2) DECLARATORY RELIEF CLAIM (COUNT III) SHOULD BE DENIED .............................................................. 10

    A.    Defendants Moving to Dismiss a Complaint Face a Difficult Standard, and Plaintiffs' Pleadings Are Afforded a Liberal Interpretation ........................................................................................... 11

    B.    CERCLA Should Be Interpreted and Applied So As to Accomplish Its Broad Remedial Purposes ................................................................. 12

    C.    NL Has Pled Facts That, If Proven, Would Establish that NL Has Incurred Necessary Response Costs Under CERCLA .......................... 13

    D.    NL's Complaint State Claims for Declaratory Judgment as to Liability for Future Response Costs Under CERCLA ............................. 17

# TABLE OF CONTENTS
(continued)

**Page(s)**

POINT II      RIO TINTO'S MOTION TO DISMISS NL'S SPILL ACT CLAIM (COUNT V) AND ASSOCIATED DECLARATORY JUDGMENT CLAIM (COUNTS III & IV) SHOULD BE DENIED ................................................................................... 18

     A.      The Spill Act Should Be Interpreted and Applied to Meet Its Expansive Remedial Goals ...................................................... 19

     B.      NL Has Sufficiently Pled That It Has Incurred "Cleanup and Removal Costs" Under the Spill Act ......................................... 20

     C.      All "Cleanup And Removal Costs" Do Not Require NJDEP's Advance Written Approval ...................................................... 21

     D.      NL is Entitled to Declaratory Judgment Pursuant to the New Jersey Declaratory Judgment Act ...................................................... 22

POINT III      RIO TINTO'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AGAINST RIO TINTO AS A SUCCESSOR-IN-INTEREST TO CAPPER PASS SHOULD BE DENIED ................. 23

     A.      NL Has Sufficiently Pled a Claim For Successor Liability Against Rio Tinto ................................................................................... 23

CONCLUSION ........................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Analytical Measurements, Inc. v. Keuffel & Esser Co.,
843 F. Supp. 920 (D.N.J. 1993) .......................................................................20

Ashcroft v. Iqbal,
556 U.S. 662 (2009) .................................................................................11, 15

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ............................................................................. *passim*

Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.,
228 F.3d 275 (3d Cir. 2000)...........................................................................16

Bogosian v. Gulf Oil Corp.,
561 F.2d 434 (3d Cir. 1977)...........................................................................25

Bonnieview Homeowners Assoc., LLC v. Woodmont Builders, LLC,
655 F. Supp. 2d 473 (D.N.J. 2009) ....................................................20, 21, 22

Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 487 (D.N.J. 1992) .....................................25

Burlington N. & Santa Fe Ry. Co. v. United States,
556 U.S. 599 (2009)................................................................................12, 13

Christie v. Pub. Serv. Elec. & Gas Co.,
2006 U.S. Dist. LEXIS 9100 (D.N.J. Feb. 23, 2006) ...........................................12

Commander Oil Corp. v. Barlo Equip. Corp.,
215 F.3d 321 (2d Cir. 2000)...........................................................................13

Conley v. Gibson,
355 U.S. 41 (1957)........................................................................................11

Davis v. Scherer,
468 U.S. 183 (1984)......................................................................................12

Decosta v. English,
2012 U.S. Dist. LEXIS 20515 (D.N.J. Feb 16, 2012) ..........................................15

Dowling v. City of Phila.,
855 F.2d 136 (3d Cir. 1988)...........................................................................27

FMC Corp. v. Aero Indus., Inc.,
998 F.2d 842 (1993)......................................................................................13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fowler v. UPMC Shadyside,
  578 F.3d 203 (3d Cir. 2009)...................................................................11, 15, 16, 26

In re G-I Holdings, Inc.,
  380 F. Supp. 2d 469 (D.N.J. 2005) ...............................................................25, 27

Greene v. BMW of N. Am.,
  2014 U.S. Dist. LEXIS 1541 (D.N.J. Jan. 7, 2014) .............................................25

Hedges v. United States,
  404 F.3d 744 (3d Cir. 2005).................................................................................11

Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,
  263 F. Supp. 2d 796 (D.N.J. 2003) ......................................................................22

Johnsrud v. Carter,
  620 F.2d 29 (3d Cir. 1980)...................................................................................21

Jones v. Francis,
  2013 U.S. Dist. LEXIS 147121 (D.N.J. Oct. 11, 2013).......................................15

Keytronic Corp. v. United States,
  511 U.S. 809 (1994).......................................................................................13, 16

Lansford-Coaldale Water Auth. v. Tonolli Corp.,
  4 F.3d 1209 (3d Cir. 1993)...................................................................................13

Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.,
  676 F. 3d 318 (3rd Cir. 2012) ..............................................................................14

Litgo N.J., Inc. v. Martin,
  2010 U.S. Dist. LEXIS 57390 (D.N.J. June 8, 2010) ..........................................16

Lum v. Bank of Am.,
  361 F.3d 217 (3d Cir. 2004).................................................................................16

Malleus v. George,
  641 F.3d 560 (3d Cir. 2011).................................................................................11

Napolitano v. BAE Sys. N. Am.,
  2005 U.S. Dist. LEXIS 45272 (D.N.J. July 20, 2005).........................................24

Network Enters., Inc. v. APBA Offshore Prods., Inc.,
  2002 U.S. Dist. LEXIS 17256 (S.D.N.Y. Sept. 12, 2002)...................................24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

New Jersey Tpk. Auth. v. PPG Indus., Inc.,
    197 F.3d 96 (3d Cir. 1999)...............................................................................12, 19

Newman & Schwarz v. Asplundh Tree Expert Co., Inc.,
    102 F.3d 660 (2d Cir. 1996)..................................................................................12

Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,
    596 F.3d 112 (2d Cir. 2010)..................................................................................13

Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,
    170 F.R.D. 361 (S.D.N.Y. 1997) ..........................................................................24

Pension Benefit Guar. Corp. v. White Consol. Indus.,
    998 F.2d 1192 (3d Cir. 1993)...........................................................................12, 17

Philadelphia Elec. Co. v. Hercules, Inc.,
    762 F.2d 303 (3d Cir. 1985)..................................................................................25

United States ex rel. Pilecki-Simco v. Chubb Institute,
    2010 U.S. Dist. LEXIS 27187 (D.N.J. Mar. 22, 2010)........................................24

Premier Pork, L.L.C. v. Westin, Inc.,
    2008 U.S. Dist. LEXIS 20532 (D.N.J. Mar. 17, 2008)...................................24, 26

Prudential Ins. Co. v. U.S. Gypsum,
    711 F. Supp. 1244 (D.N.J. 1989) ..........................................................................13

Pryor v. National Coll. Athletic Ass'n,
    288 F.3d 548 (3d Cir. 2002)..................................................................................17

Redland, 55 F.3d at 850 ................................................................................................16

Rehabcare Group East, Inc. v. Trenton Convalescent,
    2006 U.S. Dist. LEXIS 67376 (Sept. D.N.J. 20, 2006) ........................................15

San Pellegrino S.P.A. v. Aggressive P'ship, Inc.,
    2009 U.S. Dist. LEXIS (D.N.J. Aug. 10, 2009)...............................................25, 27

Scheuer v. Rhodes,
    416 U.S. 232 (1974)...............................................................................................12

United States v. Alcan Aluminum Corp.,
    964 F.2d 252 (3d Cir. 1992)..................................................................................13

# TABLE OF AUTHORITIES
(continued)

Page(s)

Wade v. Johnson Controls, Inc.,
    693 F.2d 19 (2d Cir. 1982)................................................................12

Watson v. Abington Twp.,
    478 F.3d 144 (3d Cir. 2007)..............................................................23

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001)..............................................................25

**State Cases**

In re Kimber Petroleum Corp.,
    110 N.J. 69 (N.J. 1988)....................................................................19

Pitney Bowes, Inc. v. Baker Indus., Inc.,
    277 N.J. Super. 484 (App. Div. 1994) ..........................................20, 21

State Dep't of Envtl. Prot. v. Ventron,
    94 N.J. 473 (1983) ..........................................................................20

**Federal Statutes**

42 U.S.C. 9606(a) ................................................................................8

42 U.S.C. § 9607(a) ..........................................................................13

42 U.S.C. § 9613(g)(2) ......................................................................17

CERCLA § 106(a) ........................................................................8, 18

CERCLA § 107..................................................................................17

CERCLA § 107(a) ............................................................................10

CERCLA § 113(f)..............................................................................10

CERCLA § 113(g)(2) ................................................................3, 17, 19

**State Statutes**

N.J.S.A. 58:10-23.11b........................................................................21

N.J.S.A. 58:10-23.11f(a)(2) ..............................................................19

N.J.S.A. 58:10-23.11f(a)(2)(a)..........................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

N.J.S.A. 58:10-23.11g(c)(1) ........................................................................................19

N.J.S.A. 58 :10B-2.1 ....................................................................................................21

**Rules**

Fed. R. Civ. P. 8 ..................................................................................14, 15, 20, 26

Fed. R. Civ. P. 8(a) ...................................................................................14, 23, 25

Fed. R. Civ. P. 8(a)(2) .............................................................................11, 14, 23

Fed. R. Civ. P. 9(b) .............................................................................................15

Fed. R. Civ. P. 11 ..........................................................................................24, 25

Fed. R. Civ. P. 12(b)(6).............................................................................11, 12, 26

Fed. R. Civ. P. 56(d) .....................................................................................26, 27

**Regulations**

40 C.F.R. § 300.700(c)(6).....................................................................................16

**Other Authorities**

S. Rep. No. 96-848, at 13 (1980) .........................................................................13

## <u>INTRODUCTION</u>

Plaintiff NL Industries, Inc. ("NL") submits this brief in opposition to the motion to dismiss NL's Second Amended Complaint (the "Complaint") filed by Defendant Rio Tinto Minerals ("Rio Tinto").  Between 1968 and 1972, amidst health and safety concerns, Old Bridge Township, the United States Army Corps of Engineers ("USACE"), and the State of New Jersey, among others, allowed, encouraged, and aided a private developer to construct a seawall (the "Seawall") along the beachfront in Old Bridge Township's Laurence Harbor area using "slag," a waste material generated during the smelting of scrap metals.  During approximately the same time period that the Seawall was being constructed, a stone jetty (the "Western Jetty"), originally constructed by the USACE, was reinforced and supplemented using slag.

In the decades following the construction of the Seawall and the reinforcement of the Western Jetty, the lead-bearing slag used in the respective projects was allowed to sit unprotected in a marine environment, where it was mechanically broken down by wave action and erosion.  The area where the Seawall construction took place and the Western Jetty was supplemented, as well as the surrounding area to which slag particles are alleged to have spread, is now a designated "Superfund" Site.

In 2009, the United States Environmental Protection Agency ("USEPA") added the Raritan Bay Slag Superfund Site ("RBS Site") to its National Priorities List of sites requiring remedial action to address contamination from hazardous substances.  In May 2013, the USEPA issued a Record of Decision ("ROD") designating certain responses actions to be conducted at the RBS Site, with an estimated cost of $79 million.  The USEPA alleged that at least some of the slag in the Seawall originated from NL Industries, Inc.'s ("NL") former secondary lead smelter in Perth Amboy, New Jersey, and that NL therefore is responsible to perform response

actions at the RBS Site.  In fact, on January 30, 2014, the USEPA issued a Unilateral Administrative Order requiring NL to implement the remedy selected in the ROD.

NL filed suit against Old Bridge Township, the State of New Jersey, Middlesex County, and the USACE, as well as numerous private parties, to obtain reimbursement of costs that NL has already incurred, and will in the future incur, to conduct environmental response actions at the RBS Site.  NL named Rio Tinto in the Complaint as a successor-in-interest to Capper Pass & Son, Ltd. ("Capper Pass"), a company that sent metal waste containing lead and other hazardous substances to NL's Perth Amboy facility during the relevant time period, from which the USEPA alleges that at least a portion of the lead-bearing slag found at the RBS Site originated.

Rio Tinto seeks dismissal of all of NL's claims for cost recovery, contribution, and declaratory relief brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.; the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11, et seq.; and the New Jersey and Federal Declaratory Judgment Acts.[1]  However, as discussed below, Rio Tinto's arguments for dismissal of NL's Second Amended Complaint ("Complaint") are without merit.

### A.  Count I of the Complaint States a Claim Against Rio Tinto as Liable for Necessary Response Costs Under CERCLA.

Rio Tinto admits that NL's Complaint alleges that NL has incurred necessary response costs at the RBS Site consistent with the National Contingency Plan (an essential element of NL's CERCLA claim for recovery of past costs – Count I), but labels NL's allegations "conclusory" and argues that NL's allegations lack the specificity necessary to survive a motion to dismiss.  However, NL was not required to itemize its response costs (i.e., its damages) or

---

[1] Defendants EnerSys, Inc., Yuasa Battery, Inc., Middlesex County, and East Penn Manufacturing Co. joined in Rio Tinto's motion.  However, East Penn did not join in Rio Tinto's argument on successor liability.

describe them in detail in its Complaint.  The laws governing pleadings and motions to dismiss do not require the kind of specificity that Rio Tinto urges.  The purpose of a party's initial pleading is only to give the defendants fair notice of the nature of the claim against them and its general grounds.  The Complaint does exactly that.  Rio Tinto will have ample opportunity to conduct discovery as to the details of NL's damages, i.e., the RBS Site response costs for which NL seeks recovery.  NL's decision not to provide all of that detail in its Complaint does not render NL's CERCLA claim invalid or NL's 184-paragraph pleading insufficient.

Rio Tinto also argues that as the USEPA conducted the site investigation preceding its issuance of the ROD announcing the selected remedy, any response costs that NL incurred must be duplicative of the USEPA's costs and, therefore, unnecessary.  Nothing in the Complaint justifies such a conclusion, which inaccurately and inappropriately assumes facts about NL's and USEPA's activities.  In deciding a motion to dismiss, the Court is to accept the facts pled in the Complaint as true, and to grant all reasonable inferences in favor of the plaintiff.  Any merits determination as to whether a particular cost qualifies as "necessary" or is "duplicative" is premature at this stage of the case.  Moreover, to rebut Rio Tinto's unfounded insinuation that NL has not actually incurred any response costs, NL is submitting with this opposition brief an Affidavit and a Declaration that more specifically identifying some of its response costs incurred to date.

Based upon its argument that Count I should be dismissed, Rio Tinto also seeks a dismissal of NL's Count III claim under CERCLA § 113(g)(2) for declaratory judgment as to Rio Tinto's liability for future CERCLA response costs.  Because Rio Tinto's argument for dismissal of NL's Count I CERCLA § 107(a) past cost claim is meritless, Rio Tinto's motion to dismiss NL's Count III CERCLA § 113(g)(2) future cost claim should be denied as well.

**B.**     **Count V of the Complaint States a Claim Against Rio Tinto as Liable for Cleanup and Removal Costs Under the Spill Act.**

In an argument essentially identical to its argument to dismiss NL's CERCLA claims, Rio Tinto claims that NL failed to allege with sufficient specificity the incurrence of any "cleanup and removal costs" as defined under the Spill Act.  This argument fails for the same reason – there is no heightened pleading standard for Spill Act "cleanup and removal costs" or for CERCLA response costs.  Under the liberal federal notice pleading standard, NL was not required to itemize and detail its costs in the Complaint.  NL's Complaint needs only to allege facts that state a plausible claim for relief and give the Defendants fair notice of the nature of NL's claims and the grounds on which those claims rest.  The Complaint does so with respect to NL's Spill Act claim, just as with respect to NL's CERCLA claim.

Rio Tinto also incorrectly asserts that all "cleanup and removal costs" must be approved in advance by the NJDEP.  That argument is based upon a misreading of the statute that fails to distinguish "direct" costs (of the kind incurred by NL as alleged in the Complaint and described in the Affidavit and Declaration accompanying this brief) from "indirect" costs (incurred by a person – typically a government agency or contractor – to oversee another person's work).

As it did with respect to NL's CERCLA claims, Rio Tinto asserts that its arguments for dismissal of NL's Spill Act claim for past costs also require a dismissal of NL's claim for declaratory judgment as to Rio Tinto's liability for future cleanup and removal costs (Counts III and IV).  However, because Rio Tinto's argument for dismissal of NL's Spill Act past cost claim lacks merit, Rio Tinto's motion to dismiss NL's state declaratory judgment claim is without merit as well.

### C.   NL Has Sufficiently Pled a Claim for Successor Liability Against Rio Tinto.

Finally, Rio Tinto asserts that NL's Complaint fails to provide sufficient detail as to the theory and facts upon which NL's allegations regarding Rio Tinto's successor liability are based. Although Rio Tinto argues otherwise, there is no elevated pleading requirement for successor liability and NL has sufficiently pled a plausible claim that Rio Tinto is liable as a successor-in-interest to Capper Pass.

Thus, for the foregoing reasons, and as more fully discussed below, Rio Tinto's motion to dismiss should be denied.

### STATEMENT OF FACTS[2]

### A.   The USACE's Shore Protection Project for the Laurence Harbor Shoreline

In the 1950s, several severe storms (including two hurricanes in 1954) swept through Old Bridge Township (then called Madison Township) that significantly eroded the shoreline of Laurence Harbor and caused damage to the immediately adjacent area.  (NL's Second Amended Complaint, Doc. No. 64 ("Cmpl.") at ¶ 53.)  In or around 1962 or 1963, the USACE, State of New Jersey, and Old Bridge Township entered into one or more agreements relating to the construction and maintenance of shore and hurricane protection for Old Bridge Township ("Shore Protection Project").  (Id. at ¶ 58; Declaration of Christopher R. Gibson, Esq. ("Gibson Decl."), Ex. M at 3-4.)  Shore and hurricane protection structures, including the proposed beachfill protective structure and levee, were constructed in the Laurence Harbor area of Old Bridge Township during 1965 and 1966 as part of the Shore Protection Project.  (Cmpl. at ¶ 59.)  A significant portion of the work was funded by the federal government.  (Id. at ¶ 60.)  In August

---

[2]  Additional factual detail, particularly regarding the roles of the USACE, the State of New Jersey, and Old Bridge Township in the design and construction of the Seawall, can be found in NL's briefs in opposition to the motions to dismiss filed by the USACE and Old Bridge Township.

1970, the USACE issued an Operation and Maintenance Manual for the Shore Protection Project describing USACE regulations for operation and maintenance of the Shore Protection Project. (Id. at ¶ 65; Gibson Decl., Ex. M.)

**B.      USACE's, Old Bridge Township's, and the State's Involvement in the Design and Construction of the Seawall Using Lead-Bearing Slag**

By 1968, a private developer known as Sea-Land Development Corp. ("Sea-Land") had acquired ownership of a portion of what is now the RBS Site and was interested in developing the Laurence Harbor area.  (Cmpl. at ¶ 69; Gibson Decl., Ex. G.)  As part of the anticipated development, Sea-Land proposed to construct the Seawall to substitute for the beachfill protective feature that had been constructed by the USACE through the Shore Protection Project. (Cmpl. at ¶ 70, Ex. A.)

During the late 1960's and early 1970's, in accordance with the plans reviewed and approved by the USACE, State of New Jersey, and Old Bridge Township, Sea-Land engaged in filling activities, resulting in the construction of the Seawall (using lead-bearing slag) and filling of areas behind it.  (Cmpl. at ¶ 89.)  The filling activities took place not only on property then-owned by Sea-Land, but also – in anticipation of receipt of a riparian grant from the State of New Jersey, which had been applied for by Sea-Land and conditionally approved by the State's Natural Resources Council – on the beach property created by the Shore Protection Project, which was owned by the State of New Jersey and subject to continued USACE jurisdiction.  (Id.; Gibson Decl., Ex. O.)

**C.      Decision of the USACE and the Other Public Entity Defendants to Allow Lead-Bearing Slag to Remain Even After Concerns About Environmental Contamination Had Been Raised**

While the Seawall was still being constructed, the USACE, as well as Old Bridge Township and the NJDEP, had knowledge of the potential environmental contamination issues

associated with Sea-Land's use of slag containing lead and other metals in the construction of the Seawall.  (Cmpl. at ¶ 90.)  In 1972, several newspaper articles were published describing the placement of the slag up to and into the waters of the Raritan Bay and discussing the environmental concerns the presence of the slag created.  (Cmpl. at ¶ 93, Ex. E.)  Those newspaper articles included interviews with the Chairman of Old Bridge Township's Conservation Commission.  (<u>Id.</u>)  Then, in early 1973, public meetings were held to discuss issue associated with the presence of the slag at the Laurence Harbor waterfront.  (Cmp. at ¶¶ 99-107, Exs. K-M.)  At those meetings, the USACE, among others, attempted to justify the decision to allow slag to be used for construction of the Seawall.  (<u>Id.</u>)

Despite the knowledge of the USACE, Old Bridge Township, and the State of New Jersey that slag containing lead and other metals were being used in the construction of the Seawall, and that the Seawall was being constructed in an area where it would be subject to mechanical erosion from wave action, they did not prevent construction of the Seawall with slag or take other measures to prevent or remediate any associated release or threatened release of hazardous substances into the environment from the slag.  (Cmpl. at ¶ 108.)

### D.    <u>Old Bridge Township's Acquisition of Ownership of the Site</u>

In 1983, Old Bridge Township (which had changed its name from "Madison Township" in 1975) acquired by deed the former Sea-Land property on which most of the Seawall construction and filling activities had taken place.  (<u>Id.</u> at ¶ 110; Gibson Decl., Ex. J.)  In the three decades after Old Bridge Township took ownership of the Sea-Land property, the Township took no actions to remove the lead-bearing slag from the water, or to in any way limit the mechanical separation and distribution of lead particles throughout the RBS Site.

**E.     Listing of the RBS Site on the National Priorities List and NL's Incurrence of Response Costs**

In recent years, the NJDEP and USEPA have alleged that leaching of lead and other hazardous substances from the Seawall and a nearby jetty that was augmented with slag similar to that used to construct the Seawall ("the Western Jetty") has occurred.  (Cmpl. at ¶ 124.)  In June 2008, the NJDEP issued to NL a Directive and Notice to Insurers requiring that NL conduct a remedial investigation and then propose and implement a remedial action to address contamination at the Site.  (Cmpl. at ¶ 125; Gibson Decl., Ex. Q.)  The NJDEP subsequently referred the Site to the USEPA.  (Id.)

In April 2009, the USEPA proposed the RBS Site for listing on the National Priorities List and began a sampling program at the RBS Site.  (Cmpl. at ¶ 126.)  The USEPA reported that its sampling detected elevated levels of lead and other metals in soils, beach sand, and sediment in various areas of the RBS Site.  (Id.)  On November 4, 2009, the RBS Site was added to the National Priority List by the USEPA.  On May 23, 2013, the USEPA issued a Record of Decision ("ROD") for the RBS Site.  (Id.; Gibson Decl., Ex. H at 5.)  The ROD identified certain areas within the RBS Site that the USEPA believes require environmental response activities and selected specified response activities for those areas from among several alternatives.  (Id.)  According to the ROD, the estimated present value cost of the selected response activities for the RBS Site is $79 million.  (Gibson Decl., Ex. H at 73.)

On January 30, 2014, the USEPA formally demanded for NL to perform the remedial design and remedial action for the remedy selected in the ROD by issuing a Unilateral Administrative Order ("UAO") pursuant to the USEPA's authority under CERCLA § 106(a), 42 U.S.C. 9606(a).  (See Gibson Decl., Ex. F.)  NL was the only entity named in the UAO – it does not require any other PRP to perform or pay for the cleanup.  (Id.)  The UAO requires that NL

begin compliance by mid-February 2014 or be subject to $37,500/day penalties and treble damages. (Id.)

Since first being notified of its alleged responsibility at the RBS Site, NL has incurred a variety of response costs. These include costs (1) to assist the USEPA with investigation of the RBS Site and characterization of the nature, extent, and sources of contamination; (2) to assist the USEPA with evaluation of various response action alternatives; (3) to assist the USEPA's efforts to keep the local community informed and involved; (4) to identify other PRPs that may be liable to perform and/or pay for response actions; and (5) for studies to develop approaches to implement the remedy selected in the ROD. These response costs are described in more detail in the Affidavit of Christopher T. Reitman, P.E., of Advanced GeoServices Corp., and the Declaration of Christopher R. Gibson, Esq. submitted in support of NL's opposition to the motions to dismiss filed by the Defendants and in support of NL's cross-motion for partial summary judgment as to Defendant Old Bridge Township. (See Affidavit of Christopher T. Reitman, P.E. ("Reitman Aff.") at ¶¶ 3-9; Gibson Decl. at ¶ 2-9.)

### F.      Liability of the "Customer Defendants"

NL purchased the United Lead Company in 1928 and assumed direct operation of a secondary lead smelting facility at 1050 State Street in Perth Amboy, New Jersey (the "Perth Amboy facility"). (Cmpl. at ¶ 140.) NL's lead smelting operations at the Perth Amboy facility continued through 1975. (Id.) The secondary lead smelter at NL's Perth Amboy facility extracted and processed lead from various lead-containing materials, including but not limited to scrap metal, dross, and lead battery plates removed from used lead/acid storage batteries. (Id. at ¶ 141.) The by-products of this process included furnace slag that contained lead and other metals, as well as battery casings that had lead and other metals adhering to them. (Id.)

Customers of NL's Perth Amboy facility sent used batteries, scrap metals, converted antimonial lead, furnace buttons, and other waste materials containing lead and other metals to the Perth Amboy facility for reclamation and disposal.  (Id. at ¶ 142.)  The parties identified in the Complaint as "Customer Defendants" (or their predecessors) – which include Moving Defendant Rio Tinto, among others – are entities that sent such metal waste to NL's Perth Amboy facility during the relevant time period.  (Id. at ¶ 37.)  Rio Tinto is a successor in interest to former Perth Amboy customer, Capper Pass.  (Id.)

NL hired the Liberty Trucking Co. ("Liberty Trucking") of Fords, New Jersey, to dispose of certain waste materials from the Perth Amboy lead smelting operations, including furnace slag generated at the Perth Amboy facility.  (Cmpl. at ¶ 145.)  The USEPA alleges that slag and other waste materials Liberty Trucking removed from NL's Perth Amboy facility were transported to the RBS Site and used to construct the Seawall, reinforce the Western Jetty, and fill areas behind the Seawall.  (Id. at ¶ 146.)

## **ARGUMENT**

### **POINT I**

### **RIO TINTO'S MOTION TO DISMISS NL'S CERCLA § 107(a) COST RECOVERY CLAIM (COUNT I) AND CERCLA § 113(g)(2) DECLARATORY RELIEF CLAIM (COUNT III) SHOULD BE DENIED.**

Defendant Rio Tinto argues that NL failed to plead that it has incurred "necessary response costs", an essential element of NL's past cost recovery claim under CERCLA § 107(a). Rio Tinto also argues that, as a consequence, NL's CERCLA § 113(g)(2) claim for declaratory relief as to future costs must also be dismissed.  These arguments fail because Rio Tinto's basic premise that CERCLA response costs must be pled with specificity and detail is mistaken.[3]

---

[3] Rio Tinto moved to dismiss NL's CERCLA § 113 contribution claim (Count II).  NL's Complaint included CERCLA claims for both cost recovery (§ 107) and contribution (§ 113) out

### A.      Defendants Moving to Dismiss a Complaint Face a Difficult Standard, and Plaintiffs' Pleadings Are Afforded a Liberal Interpretation.

It is well settled that Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds on which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  When a defendant moves to dismiss for failure to state a claim, that "defendant bears the burden of showing that no claim has been presented." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

Courts conduct a three-prong analysis when deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Second, the court must accept all of the plaintiff's well-pleaded factual allegations as true and must interpret the complaint in the light most favorable to the plaintiff.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Only legal conclusions, or unsupported conclusory factual allegations (of the kind that merely state "the-defendant-unlawfully-harmed-me") need not be accepted as true.  Id.; Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  Third, the court must determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'"  Fowler, 578 F.3d at 211 (quoting Iqbal, 556 U.S. at 679).

---

of an abundance of caution.  While NL does not oppose dismissal of Count II of the Complaint *without prejudice*, NL reserves the right to seek reinstatement of that claim in the event a subsequent judicial opinion holds that under circumstances similar to this case a plaintiff should proceed under CERCLA § 113(f) as opposed to CERCLA § 107(a), or if new circumstances arise that would support the existence of a § 113 contribution claim.

The determination of whether the plaintiff's claim for relief is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Plausibility "*is not akin to a 'probability requirement*,' . . . it [merely] asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 545) (emphasis added). The Court should not consider whether it believes the plaintiff ultimately will prevail, but only whether the plaintiff is entitled to offer evidence to support the claims in the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984). Moreover, when a motion to dismiss is made before an answer has been filed and before discovery has begun, a court should be *very hesitant* to dismiss the complaint. See Wade v. Johnson Controls, Inc., 693 F.2d 19, 22 (2d Cir. 1982); Christie v. Pub. Serv. Elec. & Gas Co., 2006 U.S. Dist. LEXIS 9100, at *27 (D.N.J. Feb. 23, 2006) ("The burden of persuasion on a Rule 12(b)(6) motion to dismiss is a heavy one, and factual deficiencies . . . are not sufficient to justify dismissal of a claim before discovery has commenced.").

In conducting its analysis, a court may rely on facts asserted within the four corners of the complaint, as well as documents attached to the complaint as exhibits or documents incorporated into the complaint by reference. See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 96 (3d Cir. 1993); Newman & Schwarz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996).

### B. CERCLA Should Be Interpreted and Applied So As to Accomplish Its Broad Remedial Purposes.

In considering Rio Tinto's motion to dismiss NL's CERCLA claims, the Court should keep in mind CERCLA's broad remedial purposes. CERCLA is a strict liability statute that imposes liability upon responsible parties "for costs associated with [environmental] cleanup and

remediation." New Jersey Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103 (3d Cir. 1999).

Congress enacted CERCLA "to promote the timely cleanup of hazardous waste sites *and to
ensure that the costs of such cleanup efforts were borne by those responsible for the
contamination*." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009)

(internal quotation marks omitted) (emphasis added); see also United States v. Alcan Aluminum

Corp., 964 F.2d 252, 257-58 (3d Cir. 1992); Niagara Mohawk Power Corp. v. Chevron U.S.A.,

Inc., 596 F.3d 112, 120 (2d Cir. 2010) ("CERCLA was designed, in part, to 'assur[e] that those

responsible for any damage, environmental harm, or injury from chemical poisons bear the costs

of their action'" (quoting S. Rep. No. 96-848, at 13 (1980))); Prudential Ins. Co. v. U.S. Gypsum,

711 F. Supp. 1244, 1251 (D.N.J. 1989).

Additionally, "CERCLA is designed to encourage private parties to assume the financial

responsibility of cleanup *by allowing them to seek recovery from others.*" Keytronic Corp. v.

United States, 511 U.S. 809, 819 (1994) (quoting FMC Corp. v. Aero Indus., Inc., 998 F.2d 842,

847 (1993)) (emphasis added); see also Burlington N., 556 U.S. at 608-09 (citing 42 U.S.C. §

9607(a)). Thus, CERCLA encourages parties to undertake early cleanups of sites in need of

remediation knowing that the statute will be broadly construed to allow them to seek recovery

from other responsible parties. CERCLA is to be interpreted so as to effectuate its remedial

purposes, including those listed above. See, e.g., Lansford-Coaldale Water Auth. v. Tonolli

Corp., 4 F.3d 1209, 1221 (3d Cir. 1993); Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d

321, 327 (2d Cir. 2000).

### C.    NL Has Pled Facts That, If Proven, Would Establish that NL Has Incurred Necessary Response Costs Under CERCLA.

As Rio Tinto observes in its brief, one element that a CERCLA plaintiff must plead is

that it incurred "necessary costs of response" that are consistent with the National Contingency

Plan ("NCP").  (See RT Br. at 7-8.)  Rio Tinto admits that NL expressly pled in the Complaint

that it has incurred and will incur "necessary costs of response consistent with the [NCP]."  (See

Cmpl. at ¶¶ 130, 155-160 (cited in RT Br. at 8-9).)  Rio Tinto contends, however, that NL's

allegations are "conclusory", and are insufficient to state a valid claim for the incurrence of

necessary response costs under CERCLA.  (See RT Br. at 8-9.)  Essentially, Rio Tinto argues

that NL was obligated to plead specific facts identifying and detailing the circumstances of each

particular response cost that has been and will be incurred.  However, NL need not prove its

response costs at this early stage of the case, but need only allege facts that make NL's claim

regarding the incurrence of costs plausible – which NL has done.  See Twombly, 550 U.S. at

570.

      Under Rio Tinto's proposed pleading standard, NL would be required to provide a

detailed itemization of its alleged response costs in the Complaint.   But the controlling federal

"notice pleading" standard requires only that a complaint contain "a short and plain statement of

the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); Liberty Lincoln-

Mercury, Inc. v. Ford Motor Co., 676 F. 3d 318, 326 (3rd Cir. 2012) ("The well-established

notice pleading standard under Federal Rule of Civil Procedure 8(a) requires that the complaint .

. . give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests.") (internal quotations omitted).  The purpose of this requirement is to provide the

defendant with fair notice of the basis of the plaintiff's claim in order to allow the defendant to

respond.  See Twombly, 550 U.S. at 565.  Recent Supreme Court precedent (i.e., Twombly) has

simply *reinforced* the basic requirements of Rule 8, *not redefined* them.  As the Supreme Court

explained: "*we do not require heightened fact pleading of specifics, but only enough facts to*

*state a claim to relief that is plausible on its face*."  Twombly, 550 U.S. at 570 (emphasis

added).  NL's 37-page /184-paragraph Complaint provides sufficient factual allegations that NL

has incurred necessary response costs.  NL's pleading has afforded Rio Tinto more than fair

notice of the nature of NL's claims against them.

Rio Tinto's proposed heightened pleading standard is more akin to Rule 9 of the Federal

Rules of Civil Procedure, which requires a party to "state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This is not a fraud case and Rio Tinto has

not identified any statutory provision, rule, or judicial opinion that identifies claims for response

costs under CERCLA as falling into an exception to the general application of the "notice

pleading" standard.  Rio Tinto will have the opportunity to inquire into the details of NL's

necessary response costs claim (essentially NL's damages) during the discovery phase.  But Rio

Tinto is not entitled to a dismissal of the Complaint because NL did not include, in its initial

pleading, a list that specifically indentified all of its costs (i.e., damages) and the circumstances

in which they were incurred.  Indeed, nothing in Twombly, Iqbal, or their progeny refers to

pleading requirements for damages.  See Jones v. Francis, 2013 U.S. Dist. LEXIS 147121, at *5

(D.N.J. Oct. 11, 2013) ("once a civil complaint shows a claim to be 'facially plausible,' Fowler,

578 F.3d at 210, nothing in Rule 8 or its judicial gloss suggests, let alone requires, that this Court

scrutinize the damages requested by plaintiff as redress for that claim."); Decosta v. English,

2012 U.S. Dist. LEXIS 20515, at *20 (D.N.J. Feb 16, 2012) ("at this stage of the litigation, 'the

Federal Rules do not require the Plaintiff to . . . specify damages that were incurred.'") (quoting

Rehabcare Group East, Inc. v. Trenton Convalescent, 2006 U.S. Dist. LEXIS 67376, at *4

(D.N.J. Sept. 20, 2006)).

Rio Tinto reasons that as the USEPA conducted the site investigation preceding its

issuance of the ROD announcing the selected remedy, any response costs that NL incurred must

be duplicative of the USEPA's costs and, therefore, unnecessary.  (See RT Br. at 9-11.)  This argument ignores that a motion to dismiss (1) must be based upon the allegations in the complaint, and (2) all of the factual allegations in the complaint must be assumed true.  See Fowler, 578 F.3d at 211 (recognizing that on a motion to dismiss, the allegations in the Complaint are "of course, are assumed to be true."); Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).  There is absolutely no basis in the Complaint to assume that NL did nothing but repeat or review work done by the USEPA.  Such an assumption is not supported by any Complaint allegation or any evidence.  Rio Tinto's argument inappropriately assumes facts in favor of the *moving party* (Rio Tinto) instead of the non-moving party (NL) as required.  Furthermore, any merits determination as to whether a particular cost qualifies as "necessary" or is "duplicative" is premature at this stage of the case.  The Court's inquiry should be limited to whether NL pled facts that, if ultimately proven to be true, would give rise to a cause of action – which NL has done.

Although not necessary to defeat Rio Tinto's motion to dismiss, NL has provided an Affidavit and a Declaration identifying with more specificity some of the necessary response costs NL has incurred at the RBS Site.  Response costs have been generally described as "monies . . . expended to clean up sites or to prevent further releases of hazardous chemicals."  Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 294 (3d Cir. 2000) (quoting Redland, 55 F.3d at 850)).  Response costs include a wide array of expenses from costs incurred for site investigation, remedial design, and implementation of a cleanup, Litgo N.J., Inc. v. Martin, 2010 U.S. Dist. LEXIS 57390, at *73 (D.N.J. June 8, 2010), to costs for tracking down other PRPs, Keytronic, 511 U.S. at 820-21.  Costs incurred relating to community involvement

16

are also recoverable response costs.  See 40 C.F.R. § 300.700(c)(6) (providing that private

parties undertaking of response actions should provide an opportunity public participation).

NL has included an Affidavit from its environmental consultant, Christopher T. Reitman,

P.E. of Advanced Geoservices Corp., and the Declaration of Christopher R. Gibson, Esq.,

relating to the response costs that NL has incurred to date at the RBS Site.  These include costs

(1) to assist the USEPA with investigation of the RBS Site and characterization of the nature,

extent, and sources of contamination; (2) to assist the USEPA with evaluation of various

response action alternatives; (3) to assist the USEPA's efforts to keep the local community

informed and involved; (4) to identify other PRPs that may be liable to perform and/or pay for

response actions; and (5) for studies to develop approaches to implement the remedy selected in

the ROD.[4]  (See Reitman Aff. at ¶¶ 3-9; Gibson Dec. at ¶ 2-9.)  These costs are provided as

*examples* of some of the cleanup and removal costs NL has incurred, and NL reserves the right

to recover additional costs beyond those described in the Reitman Affidavit, the Gibson

Declaration, and this brief.

In short, Rio Tinto's arguments that NL either has not incurred necessary response costs,

or has not sufficiently pled that it has incurred such costs, are without merit and do not provide

any basis to dismiss NL's CERCLA claims.

### D.   NL's Complaint State Claims for Declaratory Judgment as to Liability for Future Response Costs Under CERCLA.

In addition to moving to dismiss NL's CERCLA § 107(a) claim for past response costs

(Count I), Rio Tinto moves to dismiss NL's CERCLA § 113(g)(2) claim seeking a declaration of

---

[4]  As Rio Tinto acknowledges, in considering a motion to dismiss the Court may consider not only the Complaint, attached exhibits, and matters of public record, but also other indisputably authentic documents attached to the briefs on the motion to dismiss if the Plaintiff's claims are based on those documents.  (See RT Br. at 10 n.5 (citing Pryor v. National Coll. Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).)

Rio Tinto's liability for future response costs (Count III).  (RT Br. at 13.)  CERCLA § 113(g)(2)

provides that in any action for recovery of costs pursuant to § 107, "the court shall enter a

declaratory judgment on liability for response costs or damages that will be binding on any

subsequent action or actions to recover further response costs or damages."  42 U.S.C. §

9613(g)(2).  Less there be any question that NL faces the prospect of substantial additional

response costs in the future, on January 30, 2014, the USEPA issued a UAO, pursuant to Section

106(a) of CERCLA, requiring NL's performance of the remedial design and remedial action for

the RBS Site.  (Gibson Decl. at ¶ 11.)  Nevertheless, Rio Tinto argues that if Count I is dismissed

on the grounds that NL has not pled a CERCLA past cost recovery claim in sufficient detail, then

Count III alleging a declaratory judgment claim for future CERCLA response costs must be

dismissed as a consequence.  (See RT Br. at 13-14.)  However, as discussed above, Rio Tinto's

arguments for dismissal of NL's CERCLA § 107(a) past cost recovery claim are meritless.

Therefore, Rio Tinto's argument provides no basis to dismiss Count III of NL's Complaint.

## POINT II

### RIO TINTO'S MOTION TO DISMISS NL'S SPILL ACT CLAIM (COUNT V) AND ASSOCIATED DECLARATORY JUDGMENT CLAIM (COUNTS III & IV) SHOULD BE DENIED.

Rio Tinto makes the same argument for dismissal of NL's Spill Act claim (Count V) that

it made for dismissal of NL's CERCLA claim.  Rio Tinto argues that NL failed to plead its

incurrence of "cleanup and removal costs" with sufficient specificity, but instead only provided

conclusory allegations.  As discussed above, under the liberal federal "notice pleading" standard,

NL was not required to itemize all of its "cleanup and removal costs" in the Complaint.

Rio Tinto also argues that NL failed to state a claim for relief under the Spill Act because

any costs that NL may have incurred were not incurred under the written approval of the NJDEP.

Therefore, Rio Tinto concludes, NL has not incurred any "cleanup and removal costs" so as to

give rise to a right to contribution.  In other words, Rio Tinto incorrectly asserts that all cleanup and removal costs must be approved in advance by the NJDEP.  That argument finds no support in the plain language of the Spill Act nor in the decisions of New Jersey courts that have interpreted and applied the Spill Act contribution provision.

Finally, just as Rio Tinto argued that NL's future cost declaratory judgment claim under CERCLA § 113(g)(2) should be dismissed as a consequence of Rio Tinto's argument for dismissal of the CERCLA past cost claim, Rio Tinto moves to dismiss NL's declaratory judgment claims under the Federal and New Jersey Declaratory Judgment Acts (Counts III and IV, respectively) as to future Spill Act costs based on an assumption that NL's Spill Act past cost claim will be dismissed.  Because Rio Tinto's argument for dismissal of NL's Spill Act claim is meritless, Rio Tinto's motion to dismiss NL's state declaratory relief claim also should be denied.

## A.    The Spill Act Should Be Interpreted and Applied to Meet Its Expansive Remedial Goals.

In considering Rio Tinto's motion to dismiss NL's Spill Act claims, the Court should be reminded that, like CERCLA, the Spill Act has broad remedial goals.  Enacted in 1976, "[t]he Spill Act is the New Jersey environmental protection act that resembles CERCLA in its purpose, although it sets forth a distinct strict liability scheme."  PPG, 197 F.3d at 105.  The Spill Act provides that "[a]ny person who has discharged a hazardous substance, *or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs, no matter by whom incurred*."  N.J.S.A. 58:10-23.11g(c)(1) (emphasis added).  In fact, "[t]he Supreme Court of New Jersey has determined that a party 'even remotely responsible for causing contamination will be deemed a

responsible party under the Act.'" PPG, 197 F.3d at 106 (quoting In re Kimber Petroleum Corp., 110 N.J. 69, 85 (N.J. 1988)).

The Spill Act was amended to explicitly provide a private right of contribution against persons "in any way responsible for a discharged substance who are liable for the cost of the cleanup." N.J.S.A. 58:10-23.11f(a)(2).  The contribution cause of action seeks "to encourage prompt and effective remediation by any responsible party who might otherwise be disinclined to do so because of the risk and burden of bearing the entire cost despite the responsibility of others for the creation and continuation of the problem."  Pitney Bowes, Inc. v. Baker Indus., Inc., 277 N.J. Super. 484, 487 (App. Div. 1994).  Moreover, as New Jersey's Supreme Court has acknowledged, the Spill Act "is quite comprehensive in its scope", State Dep't of Envtl. Prot. v. Ventron, 94 N.J. 473, 496 (1983), and "is to be liberally construed", Analytical Measurements, Inc. v. Keuffel & Esser Co., 843 F. Supp. 920, 928 (D.N.J. 1993).

### B.   NL Has Sufficiently Pled That It Has Incurred "Cleanup and Removal Costs" Under the Spill Act.

A required element under the Spill Act for a private plaintiff to recover costs from other PRPs is that the plaintiff must have incurred "cleanup and removal costs".  See N.J.S.A. 58:10-23.11f(a)(2)(a).  Rio Tinto's motion to dismiss erroneously argues that NL's Complaint fails to satisfy this required element.  (See RT Br. at 8-11.)  The Complaint expressly pleads that NL incurred "cleanup and removal costs" within the meaning the Spill Act.  (See, e.g., Cmpl. at ¶¶ 180-81.)  Rio Tinto argues that the allegations of the Complaint are "conclusory" and insufficient to satisfy NL's pleading obligations under Rule 8.  (See RT Br. at 14-16.)  This is the same argument that Rio Tinto made with respect to NL's pleadings that NL incurred "response costs" within the meaning of CERCLA.  And, Rio Tinto's argument fails for exactly the same reason – under the prevailing "notice pleading" standard of Rule 8, NL was only required to allege facts

that make NL's claim regarding the incurrence of costs plausible – which NL has done.  See Twombly, 550 U.S. at 570.  Indeed, the same costs that qualify as "response costs" under CERCLA qualify as "cleanup and removal costs" under the Spill Act.  See Bonnieview Homeowners Assoc., LLC v. Woodmont Builders, LLC, 655 F. Supp. 2d 473, 504 (D.N.J. 2009) (considering "response costs" and "cleanup and removal costs" to be the same).  Thus, for the same reasons as discussed above in reference to Rio Tinto's argument for dismissal of NL's CERCLA claim, Rio Tinto's argument that NL's Spill Act claim must be dismissed for lack of sufficient detail as to "cleanup and removal costs" (i.e., damages) is without merit.[5]

### C.   All "Cleanup And Removal Costs" Do Not Require NJDEP's Advance Written Approval.

Rio Tinto also claims that in order to be recoverable, "cleanup and removal costs" must be approved in writing by the NJDEP.  (See RT Br. at 15-16.)  This assertion is inconsistent with both the plain language and the goals of the Spill Act.

"Cleanup and removal costs" are defined as "all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to [N.J.S.A. 58 :10B-2.1] associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department . . . ."  N.J.S.A. 58:10-23.11b.  Thus, the plain language of the statute creates two distinct categories of costs: (1) direct costs associated with a discharge; and (2) indirect costs imposed by the department that are incurred with written permission from the department.  This straight-forward interpretation that only indirect costs require written approval has been adopted by this Court.  See Bonnieview, 655 F. Supp. 2d at 504 ("The Spill Act defines 'cleanup and removal costs' to include both 'direct costs

---

[5] In the unlikely event that the Court determines that any portion of NL's Complaint lacks sufficient specificity, NL requests leave to amend to amend its pleadings so as to avoid summary disposition on the merits.  See Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980).

associated with a discharge' and 'indirect costs' imposed by the NJDEP. ").  Requiring written approval for indirect costs (such as oversight or monitoring), while permitting the recovery of direct costs (such as site investigation and remediation) without the need for advanced approval, serves as a mechanism to control site costs while encouraging the Spill Act's goals of prompt and effective remediation of contaminated sites.  See Pitney Bowes, 277 N.J. Super. at 486.  The interpretation Rio Tinto urges would serve only to hinder the initiation of new cleanups and delay those already in process.

Rio Tinto's cases do not support its argument that all costs must be approved.  In fact, the Bonnieview case supports the opposite position.  See Bonnieview, 655 F. Supp. 2d at 504 (finding Plaintiffs had not incurred direct costs and stating that "[w]ere the Plaintiffs to argue that they have incurred 'indirect costs' under the Spill Act, this argument would fail because, in order for a private party to obtain reimbursement for such costs, he must obtain written approval from the NJDEP.").  Rio Tinto's other case, Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 867 (D.N.J. 2003), is no more helpful.  In Interfaith, the Court simply found that certain cleanup and removal costs were "approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act."  Interfaith, 263 F. Supp. 2d at 867.  The Court did not hold, or even suggest, that all costs must be approved in order to be recoverable.

In sum, NL's Complaint includes factual statements that support a plausible claim that NL has incurred "cleanup and removal costs" under the Spill Act.  Therefore, Rio Tinto's motion to dismiss Count V of NL's Complaint should be denied.

**D.**   **NL is Entitled to Declaratory Judgment Pursuant to the New Jersey Declaratory Judgment Act.**

In addition to moving to dismiss NL's Spill Act claim for past response costs (Count V) Rio Tinto moves to dismiss NL's New Jersey Declaratory Judgment Act claim seeking a

declaration of Rio Tinto's liability for future cleanup and removal costs under the Spill Act

(Count IV).  (RT Br. at 16.)  Mirroring its CERCLA declaratory judgment argument, Rio Tinto

argues that if Count V is dismissed on the grounds that NL has not pled, and cannot plead, a Spill

Act contribution claim, then the state law declaratory judgment claim for future costs must be

dismissed as well.  (See id.)  As discussed above, Rio Tinto's arguments for dismissal of NL's

Spill Act cost recovery claims are meritless.  Therefore, for the same reasons, NL has sufficiently

pled a cause of action for declaratory judgment under the New Jersey Declaratory Judgment Act

and Rio Tinto's motion to dismiss Count IV of NL's Complaint should be denied.

**POINT III**

**RIO TINTO'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AGAINST
RIO TINTO AS A SUCCESSOR-IN-INTEREST TO CAPPER PASS SHOULD BE
DENIED.**

Rio Tinto argues that NL's allegations in the Complaint regarding Rio Tinto's successor

liability do not provide sufficient detail as to the theory and facts upon which NL's allegations

are based.  In other words, Rio Tinto once again seeks to improperly raise the bar for pleadings

in federal court.  There is no elevated pleading requirement for successor liability and NL has

sufficiently pled a plausible claim that Rio Tinto is liable as a successor-in-interest to Capper

Pass.  Thus, Rio Tinto's motion to dismiss should be denied.

**A.**   **NL Has Sufficiently Pled a Claim For Successor Liability Against Rio Tinto.**

Rio Tinto, joined by EnerSys and Yuasa, argue that the pleadings in NL's Complaint are

deficient because they do not detail NL's specific successor liability theory or provide supporting

facts.  (See RT Br. at 5-6.)  However, as previously discussed, the Federal Rules of Civil

Procedure do not require that the plaintiff set forth its legal theories with particularity, or advance

legal arguments in its pleadings.  See Fed. R. Civ. P. 8(a)(2).  The Supreme Court has found that

Rule 8(a) "**do[es] not require heightened fact pleading of specifics**, but only enough facts to

23

state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570 (emphasis added). Thus, the question for the Court at this stage is not (as Rio Tinto would have it) whether NL will ultimately prevail on the successor liability issue, but whether NL has stated a claim for such relief that is plausible on its face.  Watson v. Abington Twp., 478 F.3d 144, 150 (3d Cir. 2007)

There is no heightened pleading requirement for successor liability claims.  New Jersey courts have found that "*a plaintiff's claim of successorship liability is satisfied by general allegations of successorship*."  Premier Pork, L.L.C. v. Westin, Inc., 2008 U.S. Dist. LEXIS 20532, at *11 (D.N.J. Mar. 17, 2008) (emphasis added) (holding that pleading was sufficient for successor liability claim because the amended complaint alleged that "WPM is CCC's successor."); Napolitano v. BAE Sys. N. Am., 2005 U.S. Dist. LEXIS 45272, at *8, 10 (D.N.J. July 20, 2005) (finding pleading sufficient for successor liability claim where allegation was that defendant was the "successor-in-interest.").  Thus, as this Court has held, "general allegations of successorship", which include an allegation that the defendant is a successor in interest, are sufficient "to state a claim a claim for relief that is plausible on its face."  See Premier Pork, 2008 U.S. Dist. LEXIS 20532, at *10 (quoting Twombly, 550 U.S. at 570).

The cases Rio Tinto relies upon are readily distinguishable.  See United States ex rel. Pilecki-Simco v. Chubb Institute, 2010 U.S. Dist. LEXIS 27187, at *52-53 (D.N.J. Mar. 22, 2010) (rejecting plaintiff's successor pleading because it was contradicted by plaintiff's own opposition brief); Network Enters., Inc. v. APBA Offshore Prods., Inc., 2002 U.S. Dist. LEXIS 17256, at *21-22 (S.D.N.Y. Sept. 12, 2002) (finding the only allegation of successor liability was in a brief, "[b]ut, argument in a brief is not the equivalent of a pleading."); Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 367 (S.D.N.Y. 1997) (observing that plaintiff failed to allege that any particular defendant was a successor to a previously existing entity).

Here, unlike the plaintiffs in Rio Tinto's cases, NL expressly alleges, without contradiction, that Rio Tinto is the successor-in-interest to Capper Pass.  (See Cmpl. at ¶¶ 37, 143.)

Rio Tinto's suggestion that NL's allegations regarding successor liability are insufficient because they are based on "information and belief" also fails.  Rule 11 permits a pleader, after reasonable inquiry, to set forth allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11.  Successor liability theories require highly fact-intensive inquiries.  See In re G-I Holdings, Inc., 380 F. Supp. 2d 469, 475 (D.N.J. 2005) ("successor liability is a factual determination . . . ."); Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 487 (D.N.J. 1992) ("In determining whether or not successor liability should be imposed, '*it is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent*.'") (quoting Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 310 (3d Cir. 1985) (emphasis added)).  The specific factual information necessary to prove successor liability is often solely in the defendant's possession.  Thus, the federal rules allow plaintiffs to plead their allegations based on "information and belief" and then engage in discovery to obtain the facts necessary to prove those allegations.  See Greene v. BMW of N. Am., 2014 U.S. Dist. LEXIS 1541, at *8 (D.N.J. Jan. 7, 2014) (recognizing that the "Twombly plausibility standard", does not prevent a plaintiff from pleading facts on information and belief); San Pellegrino S.P.A. v. Aggressive P'ship, Inc., 2009 U.S. Dist. LEXIS, at *7-8 (D.N.J. Aug. 10, 2009) (finding pleading on information and belief was sufficient to survive 12(b)(6) motion because "the alleged conduct can reasonably be expected to be revealed in discovery.").

NL's allegations that Rio Tinto is a successor-in-interest to Capper Pass, a former customer of NL's Perth Amboy smelting facility that sent waste to NL for disposal, is sufficient

to put Rio Tinto on notice that NL intends to pursue Rio Tinto for liability associated with the RBS Site based upon the historic activities of Capper Pass.  (Cmpl. at ¶¶ 37, 143.)  Rule 8(a) is satisfied where, as here, the Complaint provides a "statement sufficient to put the opposing party on notice of the claim."  Weston v. Pennsylvania, 251 F.3d 420, 428 (3d Cir. 2001).  Contrary to Rio Tinto's assertion, it is not necessary for NL's Complaint to plead evidence.  See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).  By alleging that Rio Tinto is the "successor in interest" to Capper Pass (a Customer Defendant of NL's Perth Amboy facility from which the USEPA claims at least some of the waste at the RBS Site originated), the Complaint provides a "general allegation of successorship" necessary to place Rio Tinto on notice that NL intends to pursue claims related to Capper Pass.  See Premier Pork, 2008 U.S. Dist. LEXIS 20532, at *11. The Complaint provided Rio Tinto with adequate notice, as evidenced by the letter counsel for Rio Tinto sent to counsel for NL (which included 16 pages of exhibits) *challenging the allegations in NL's Complaint* regarding Rio Tinto's successor liability.  (See Certification of Alexa Richmond-LaLonde ("Richmond-LaLonde Cert."), Nov. 18, 2013, Doc. No. 124-2, at Ex. B.)

Based on the highly factual nature of the successor liability analysis, it is an issue ill-suited to resolution through a motion to dismiss.  The facts alleged in the Complaint are, at a minimum, sufficient to satisfy NL's pleading obligations under Rule 8.  To require anything more of NL at this stage of the proceedings would be inappropriate.  For purposes of a motion to dismiss a plaintiff's complaint, the facts and circumstances alleged in the complaint are assumed to be true – the plaintiff is not required to provide supporting evidence.  See, e.g., Fowler, 578 F.3d at 210-11.  Moreover, at the request of most Defendants, including Rio Tinto, discovery has been stayed in this matter – the stay coming before NL had the opportunity to conduct any

discovery.  Such discovery is essential so that all of the facts relating to Rio Tinto's ownership and control of Capper Pass during the relevant time period, as well the subsequent passage of Capper Pass's liabilities to successor companies, can be understood.

Although Rio Tinto moved to dismiss pursuant to Rule 12(b)(6) and not for summary judgment, the provisions of Rule 56(d) – titled "When Facts Are Unavailable to the Nonmovant" – are nonetheless instructive.  Rule 56(d) makes clear that a plaintiff's claims are not to be dismissed when the plaintiff has not yet had the opportunity to conduct discovery to obtain facts necessary to support the plaintiff's claims.  See, e.g., Dowling v. City of Phila., 855 F.2d 136, 139 (3d Cir. 1988).  With NL not yet having had the opportunity to conduct discovery against Rio Tinto, it would be inappropriate to dismiss NL's claims on the premise that NL will not be able to identify facts sufficient to satisfy the requirements for successor liability.

Keeping in mind that no discovery has been taken in what is recognized as a fact-intensive issue, In re G-I Holdings, Inc., 380 F. Supp. 2d at 475, and that information related to Rio Tinto's successor liability is likely held by Rio Tinto alone, San Pellegrino, 2009 U.S. Dist. LEXIS, at *7-8, several facts in the record support NL's allegation of successor liability: (1) Capper Pass was owned by a Rio Tinto entity and sent waste material to NL's Perth Amboy facility during the relevant time period (see Ex. B to Richmond-LaLonde Cert. at 10-11 (news release); Ex. C.); and (2) although Capper Pass was sold in 1995, a Rio Tinto entity continued to deal with at least some claims brought against Capper Pass after the sale.[6]  (See Ex. B to Richmond-LaLonde Cert. at 10-11 (news release).)

_____

[6] Rio Tinto misrepresents that NL "acknowledges that [Rio Tinto] is not the proper successor . . . ."  (See RT Br. at 6 n.3.)  Upon receipt of Rio Tinto's letter, NL *did not* acknowledge that Rio Tinto was not the proper Defendant in the case, as Rio Tinto asserts.  Rather, NL responded that *if* the factual assertions in Rio Tinto's letter were true (which remains to be seen), then Rio Tinto's corporate parent might be the proper successor-in-interest to Capper Pass.  (See Ex. C to

In sum, under the federal notice pleading standard, NL has pled facts that state a plausible claim for relief.  Moreover, as discussed, successorship issues are highly fact-specific and, given the fact that NL has not had the benefit of engaging in discovery, Rio Tinto's motion to dismiss is premature and should be denied.

## **CONCLUSION**

For the foregoing reasons, NL respectfully requests that the Court deny Defendant Rio Tinto's motion to dismiss.

                                        Respectfully Submitted,

                                        Archer & Greiner, P.C.
                                        Attorneys for Plaintiff NL Industries, Inc.


                                        */s/ Christopher R. Gibson*_____
                                        CHRISTOPHER R. GIBSON
Dated:  January 31, 2014                PATRICK M. FLYNN

10661748v1

---

Richmond-LaLonde Cert.)  In the event discovery reveals that NL's Complaint lists the incorrect Rio Tinto entity, that issue is readily resolved through the substitution of parties and/or amendment of NL's Complaint.