EXHIBIT F



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

<u>**URGENT LEGAL MATTER**</u>
<u>**PROMPT REPLY NECESSARY**</u>
<u>**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**</u>

January 30, 2014

NL Industries, Inc.
Three Lincoln Centre
5430 LBJ Freeway
Suite 1700
Dallas, Texas 75240-2697
Attn: Courtney Riley, Esq.

Dear Ms. Riley:

Enclosed is a Unilateral Administrative Order, U.S. EPA. Index No. CERCLA-02-2014-2012 ("Order") issued to NL Industries, Inc. The Order was issued on January 30, 2014 by the United States Environmental Protection Agency ("EPA") pursuant to Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9606(a). The Order requires performance of the remedial design and remedial action for the Raritan Bay Slag Superfund Site located in Old Bridge Township and Sayreville Borough, New Jersey.

As provided by Section XXVII of the Order, you or your representatives may request a conference with EPA to discuss the Order prior to its effective date.

Please note that the Order shall become effective on February 6, 2014 unless you or your representatives request a conference in which case the Order shall become effective pursuant to the terms of Section XXVI of the Order. The Order requires that you provide written notice of your intent to comply with its terms within 5 days of the effective date. This written notice must be sent to Walter Mugdan, Director, Emergency and Remedial Response Division, 290 Broadway, 19th Floor, New York, NY 10007-1866, with copies to the Remedial Project Manager, Tanya Mitchell, 19th Floor, and Assistant Regional Counsel, Frank X. Cardiello, 17th Floor at the same address.

Please contact me by telephone at 212-637-3148 or e-mail at cardiello.frank@epa.gov if you need further information.

Sincerely yours,

Frank X. Cardiello
Assistant Regional Counsel


cc:     Christopher Gibson, Esq.
        Tanya Mitchell, EPA
        Kenneth Kloo, NJDEP (Overnight Mail)

2

IN THE MATTER OF:                    )
                                     )
                                     )
Raritan Bay Slag Superfund Site      )
Middlesex County, New Jersey         )      U.S. EPA Index No.
                                     )      CERCLA – 02-2014-2012
                                     )
NL Industries, Inc.,                 )
                                     )
        Respondent                   )
                                     )

## ADMINISTRATIVE ORDER

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION AND JURISDICTION | 1 |
| II. | DEFINITIONS | 1 |
| III. | FINDINGS OF FACT | 3 |
| IV. | CONCLUSIONS OF LAW AND DETERMINATIONS | 5 |
| V. | NOTICE TO THE STATE | 6 |
| VI. | ORDER | 6 |
| VII. | NOTICE OF INTENT TO COMPLY | 6 |
| VIII. | PARTY BOUND | 6 |
| IX. | WORK TO BE PERFORMED | 7 |
| X. | FAILURE TO ATTAIN PERFORMANCE STANDARDS | 8 |
| XI. | EPA PERIODIC REVIEW | 8 |
| XII. | ADDITIONAL RESPONSE ACTIVITIES | 8 |
| XIII. | ENDANGERMENT AND EMERGENCY RESPONSE | 9 |
| XIV. | EPA REVIEW OF SUBMISSIONS | 10 |
| XV. | PROGRESS REPORTS | 11 |
| XVI. | COMPLIANCE WITH APPLICABLE LAWS | 11 |
| XVII. | REMEDIAL PROJECT MANAGER | 11 |
| XVIII. | ACCESS TO SITE NOT OWNED BY RESPONDENT | 12 |
| XIX. | SITE ACCESS AND DATA/DOCUMENT AVAILABILITY | 13 |
| XX. | RECORD PRESERVATION | 13 |
| XXI. | DELAY IN PERFORMANCE | 14 |
| XXII. | ASSURANCE OF ABILITY TO COMPLETE WORK | 14 |
| XXIII. | UNITED STATES NOT LIABLE | 17 |
| XXIV. | ENFORCEMENT AND RESERVATIONS | 18 |
| XXV. | ADMINISTRATIVE RECORD | 20 |
| XXVI. | EFFECTIVE DATE AND COMPUTATION OF TIME | 20 |
| XXVII. | OPPORTUNITY TO CONFER | 20 |
| XXVIII. | TERMINATION AND SATISFACTION | 20 |

APPENDICES:

Appendix A:  Record of Decision

Appendix B:  SOW

Appendix C:  Map of Site

## I.   INTRODUCTION AND JURISDICTION

1.      This Order directs NL Industries, Inc. (the "Respondent") to perform work in accordance with this Order and all attachments that is necessary to complete the remedial design of and implement the remedy described in the Record of Decision for the Raritan Bay Slag Superfund Site ("Site") located in Old Bridge Township and Sayreville Borough, Middlesex County, New Jersey. This Order is issued to the Respondent by EPA pursuant to the authority vested in the President of the United States by Section 106(a) of CERCLA, as amended, 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of EPA by Executive Order 12580, dated January 23, 1987, and was redelegated to EPA Regional Administrators on September 13, 1987 by EPA Delegation No. 14-14-B. This authority was further redelegated on November 23, 2004, by the Regional Administrator of EPA, Region 2 to the Director of the Emergency and Remedial Response Division by EPA Region 2 Delegation R-1200.

## II.   DEFINITIONS

2.      Unless otherwise expressly provided in this Order, terms used in this Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Order or in its appendices, the following definitions shall apply:

     a.      "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § § 9601-9675.

     b.      "Day" shall mean a calendar day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or federal or state holiday, the period shall run until the close of business of the next business day.

     c.      "Effective Date" shall mean the Effective Date as provided in Section XXVI.

     d.      "EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies or instrumentalities.

     e.      "Lead containing materials" or "LCM" shall mean any material(s) containing lead at any concentration, including, lead slag, mattes from smelting furnace operations, lead battery plates, lead battery casings, lead/acid batteries and any components thereof.

     f.      "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

     g.      "NJDEP" shall mean the New Jersey Department of Environmental Protection or any successor departments or agencies of the State.

h.     "Paragraph" shall mean a portion of this Order identified by an Arabic numeral or an upper or lower case letter.

i.     "Performance Standards" shall mean cleanup levels and other measures of achievement of the goals of the remedy selected in the ROD and the SOW, including the standards and other measures of achievement set forth or referenced in Section 8.5, Section 12.4 and Table 5-2 of the ROD and/or in Sections 1.2 and 1.3 of the SOW.

j.     "Project Coordinator" shall mean the person designated by the Respondent who will be charged with the duty of being at all times knowledgeable of the performance of all Work performed pursuant to this Order.

k.     "ROD" shall mean the EPA Record of Decision relating to the Raritan Bay Slag Superfund Site which EPA signed on May 23, 2013 and all attachments thereto. The ROD is incorporated into this Order and is an enforceable part of this Order. The ROD is attached to this Order as "Appendix A."

l.     "ROD Remedy" shall mean the remedy selected in the ROD, including the remedial design and the remedial action associated with the remedy selected in the ROD.

m.     "Remedial Project Manager" shall mean the person designated by the EPA who will be charged with the duty of being at all times knowledgeable of the performance of all Work performed pursuant to this Order.

n.     "Respondent" shall mean NL Industries, Inc., and includes its officers, employees, agents, subsidiaries, assigns and successors.

o.     "Section" shall mean a portion of this Order identified by a Roman numeral and includes one or more Paragraphs.

p.     "Site" shall mean the Raritan Bay Slag Superfund Site located in Old Bridge Township and in Sayreville Borough, Middlesex County, New Jersey.  A map showing the Site is attached to this Order as "Appendix C."

q.     "Statement of Work" or "SOW" shall mean the statement of work which is attached to this Order as "Appendix B."  The SOW is incorporated into this Order and is an enforceable part of this Order as are any modifications made thereto in accordance with this Order.

r.     "State" shall mean the State of New Jersey.

s.     "Supervising Contractor" shall mean the principal contractor retained by the Respondent to supervise and direct the implementation of the Work under this Order.

t.     "United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

u.     "Waste Material" shall mean: (i) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (ii) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (iii) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

v.     "Work" shall mean all work and other activities that Respondent is required to perform under this Order, including, but not limited to, tasks described in the SOW and any activities required to be undertaken pursuant to this Order.

## III.   FINDINGS OF FACT

3.     The Site is located in Middlesex County, New Jersey. The Site includes, among other areas, a 2,200 foot long seawall along the shoreline of Raritan Bay in Old Bridge Township (the "Seawall"), an 800 foot long jetty on the western side of the Cheesequake Creek Inlet in Sayreville Borough (the "Western Jetty") and Margaret's Creek, a 47 acre undeveloped wetland in Old Bridge Township (the "Margaret's Creek Sector"). (See Appendix C)

4.     On September 21, 2009, the Site was placed on the National Priorities List ("NPL").

5.     In 2013, EPA completed a Remedial Investigation and Feasibility Study ("RI/FS") for the Site. Among other findings, the RI/FS concluded that lead was the primary contaminant of concern at the Site and that lead, at concentrations higher than human health and ecological risk-based levels, existed in the Seawall, in the Western Jetty, in Margaret's Creek and in the soil and sediment throughout the Site.

6.     On May 23, 2013, EPA issued a Record of Decision ("ROD") which selected a remedy (the "ROD Remedy") for the Site.

7.     The State of New Jersey concurred on the EPA selection of the ROD Remedy by letter dated May 8, 2013.

8.     Lead is the primary hazardous substance of concern detected in the soils, sediments, and surface water at the Site.

9.     The hazards posed by lead at the Site include, but are not limited to, the threat of dermal contact with, inhalation, and/or ingestion of lead at the Site and the threat of migration of lead at and from the Site. Exposure to the lead present at the Site by direct contact, incidental ingestion of contaminated media and ingestion of contaminated food items may present an unacceptable risk to ecological receptors (*i.e.*, impaired growth, compromised reproduction and reduced survival of organisms, such as invertivorous shore birds and herbivorous shore birds, which may incidentally ingest contaminated media). Lead in soil and sediment may pose a risk to aquatic receptors and terrestrial receptors present at the Site, such as the Semipalmated plover and the American robin. Exposure to the lead present at the Site by ingestion may cause a variety of adverse human health effects including severe damage to the brain and kidneys in adults and children and damage to the reproductive functions in adults.

3

10.     In the late 1960s and/or early 1970s, Sea Land Development Corp., a now defunct corporation, used lead containing materials ("LCM"), and other materials to construct the Seawall.

11.     In or about the late 1960s and early 1970s, one or more persons added LCM to the Western Jetty.

12.     From approximately1960 to approximately1980, the Respondent owned and operated a lead smelting facility in Perth Amboy, N.J. (the "NL Facility").

13.     The operations at the NL Facility entailed extracting lead from a variety of items, including scrap metal, dross and other LCM. These operations resulted in the generation of Waste Material containing LCM, such as furnace slag and hemispherical-shaped furnace mattes. The furnace mattes generated at the NL Facility contained lead at concentrations of approximately 6 to 8% lead by weight. The furnace slag generated at the NL Facility contained lead at concentrations of approximately 2 to 3% lead by weight.

14.     From about 1969 to 1972, Respondent arranged with and/or permitted private contractors, including an entity named Liberty Trucking Company ("LTC"), to remove LCM, including furnace slag and furnace mattes from the NL Facility.

15.     LTC transported LCM it received from the NL Facility to the real property which LTC or LTC's principal, Charles Ludwig, owned near Route 35 in Old Bridge Township and in Sayreville Borough. The property LTC owned in Old Bridge was in the Margaret's Creek Sector and was located immediately adjacent to the Seawall. The property LTC owned in Sayreville was located immediately adjacent to the Western Jetty.

16.     In September 1972, an official of Madison Township (later renamed Old Bridge Township), wrote to NJDEP complaining of a lead slag land filling operation being conducted on the beach front on the Raritan Bay, in Madison Township. The official said that the land filling had passed the high tide mark and the dumping was taking place directly into the Raritan Bay. The official described the slag as large mound-shaped blocks of lead residue that were being dumped indiscriminately along the water line, making the beachfront unusable for recreation. The Madison official enclosed two photographs taken on September 16, 1972 of the slag waste at the Site. A Woodbridge News Tribune article reported the official saying that a later inspection of the area revealed that more slag had been dumped in that section of the beachfront. On October 16, 1972, the Madison official again wrote to the NJDEP and enclosed a photograph of what he alleged was "an actual dumping operation by Liberty Trucking Company."

17.     LCM, including large hemisphere-shaped pieces of LCM, and lead battery casings, were found in and near the Seawall, in and near the Western Jetty and in and near the Margaret's Creek Sector.

18.     The operations at the NL Facility generated large hemisphere-shaped pieces of LCM, lead battery casings and other LCM.

19.     LTC removed various types of LCM from the NL Facility and transported that LCM to the Site and disposed of it at the Site.

20.     The Seawall, the Western Jetty and the Margaret's Creek Sector contain LCM that was generated by the Respondent's operations at the NL Facility.

21.     By letter dated February 9, 2012, EPA informed Respondent that EPA considered the Respondent to be a potentially responsible party for the Site.

## IV.     CONCLUSIONS OF LAW AND DETERMINATIONS

22.     Lead is a hazardous substance under Section 101 of CERCLA, 42 U.S.C. § 9601.

23.     The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

24.     Respondent is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

25.     Respondent is a responsible party under Section 107 (a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), for conditions at the Site and is subject to this Order under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

26.     Lead, LCM and other substances found in the Seawall, the Western Jetty, the Margaret's Creek Sector and in the soil and sediment at the Site are "hazardous substances" within the meaning of that term as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

27.     The presence of lead, LCM and other hazardous substances at the Site or the past, present or potential migration of lead, LCM and other hazardous substances currently located at or emanating from the Site, constitute actual and/or threatened "releases" as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

28.     The potential for further migration of hazardous substances from the Site, including lead, poses a ". . . threatened release of a hazardous substance from a facility" as that phrase is used in Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

29.     Based upon the FINDINGS set forth above and in the documents found in EPA's administrative record for the Site, EPA has determined that the release and threatened release of lead, LCM and other hazardous substances into the environment at and from the Site may present an imminent and substantial endangerment to the public health or welfare or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a)

30.     The response actions set forth in the ROD are required to prevent and/or mitigate any actual and/or potential threat of harm to human health or welfare or the environment caused by the release and threatened release of lead, LCM and other hazardous substances from the Site.

## V.    NOTICE TO THE STATE

31.    Notice of this Order was given to the State of New Jersey Department of Environmental Protection on January 13, 2014 pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

## VI.    ORDER

32.    Based on the foregoing FINDINGS, CONCLUSIONS and DETERMINATIONS, Respondent is hereby ordered to comply with the following provisions, including but not limited to, all attachments, documents, schedules and deadlines in this Order, attached to this Order, or incorporated by reference into this Order.

## VII.    NOTICE OF INTENT TO COMPLY

33.    Respondent shall provide, not later than 5 Days after the Effective Date, written notice to EPA's Remedial Project Manager ("RPM") and Assistant Regional Counsel for the Site at the address specified in Section XVII, stating whether Respondent will comply with the terms of this Order. If Respondent does not unequivocally commit to perform or finance the Work as provided by this Order, it shall be deemed to have violated this Order and to have failed or refused to comply with this Order. If applicable, Respondent's written notice shall describe, using facts that exist on or prior to the Effective Date, any "sufficient cause" defenses asserted by Respondent under Sections 106(b) and 107(c)(3) of CERCLA, 42 U.S.C. § 9606(b) and § 9607(c)(3). The absence of a response by EPA to the notice required by this Paragraph shall not be deemed to be acceptance of Respondent's assertions.

## VIII.    PARTY BOUND

34.    This Order shall apply to and be binding upon the Respondent, its principals, officers, employees, agents, directors, subsidiaries, assigns and successors. Respondent is responsible for completing the Work and all applicable requirements of this Order. No change in the ownership, corporate status, or other control of the Respondent shall alter any of the Respondent's responsibilities under this Order.

35.    Respondent shall provide a copy of this Order to any prospective owners or successors before a controlling interest in Respondent's assets, property rights, or stock are transferred to the prospective owner or successor. Respondent shall provide a copy of this Order to each contractor, subcontractor, laboratory, or consultant retained to perform any Work under this Order, within 5 Days after the Effective Date or on the date such services are retained, whichever date occurs later. Respondent shall also provide a copy of this Order to each person representing Respondent with respect to the Site or the Work and shall condition all contracts and subcontracts entered into hereunder upon performance of the Work in conformity with the terms of this Order. With regard to the activities undertaken pursuant to this Order, each contractor and subcontractor shall be deemed to be related by contract to the Respondent within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3). Notwithstanding the terms

6

of any contract. Respondent is responsible for compliance with this Order and for ensuring that its contractors, subcontractors and agents comply with this Order, and perform any Work in accordance with this Order.

## IX.  WORK TO BE PERFORMED

36.  The Work to be performed consists of all actions required in the ROD and the SOW.

37.  The Work performed by Respondent pursuant to this Order shall, at a minimum, achieve the Performance Standards specified in the ROD. Notwithstanding any action by EPA, Respondent remains fully responsible for achievement of the Performance Standards in the ROD. Nothing in this Order, or in EPA's approval of any submission, shall be deemed to constitute a warranty or representation of any kind by EPA that full performance of the SOW will achieve the Performance Standards set forth in the ROD. Respondent's compliance with such approved documents does not foreclose EPA from seeking additional work to achieve the applicable Performance Standards.

38.  Within 7 Days of the Effective Date, the Respondent shall commence all activities specified in the SOW in accordance with the time frames specified therein.

39.  Selection of Supervising Contractor.

a.  All aspects of the Work to be performed by Respondent pursuant to the Order shall meet any and all requirements of applicable federal, state and local laws and be performed under the direction and supervision of a Supervising Contractor, the selection of which shall be subject to disapproval by EPA. The Supervising Contractor shall be a qualified licensed professional engineering firm and must have a quality assurance system that complies with the Uniform Federal Policy for Implementing Quality Systems ("UFP-QS"), (EPA/505/F-03/001, March 2005). Within 21 Days after the Effective Date, Respondent shall notify EPA in writing of the name and qualifications of the proposed Supervising Contractor, including primary support entities and staff, proposed to be used in carrying out work under this Order and provide a copy of the contractor's quality management plan to demonstrate compliance with UFP-QS. EPA will issue a notice of disapproval or an authorization to proceed regarding hiring of the proposed contractor. If at any time thereafter, Respondent proposes to change a Supervising Contractor, Respondent shall give such notice to EPA and must obtain an authorization to proceed from EPA before the new Supervising Contractor performs, directs, or supervises any Work under this Order.

b.  If EPA disapproves a proposed Supervising Contractor, EPA will notify Respondent in writing. Respondent shall submit to EPA a list of contractors, including the qualifications of each contractor that would be acceptable to them within 7 Days after receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Respondent may select any contractor from that list that is not disapproved and shall notify EPA of the name of the contractor selected within 7 Days of EPA's authorization to proceed.

40.     Respondent shall notify EPA of the name and qualifications of any other contractor or subcontractor proposed to perform Work under this Order at least 10 Days prior to commencement of such Work.

41.     EPA retains the right to disapprove of any, or all, of the contractors and/or subcontractors proposed by Respondent to conduct the Work. If EPA disapproves in writing of any of Respondent's proposed contractors to conduct the Work, Respondent shall propose a different contractor within 7 Days of receipt of EPA's disapproval.

42.     All plans and specifications shall be prepared under the supervision of, and signed/certified by, a licensed New Jersey professional engineer.

43.     Within 21 Days after the Effective Date, Respondent shall notify EPA, in writing, of the name and title of the proposed Project Coordinator, and alternate Project Coordinator, who may be employees of the Supervising Contractor. The Project Coordinator shall be responsible for the day to day management of all Work to be performed pursuant to the Order, knowledgeable at all times about all Work, and serve as the primary contact for EPA on all matters relating to the Work. The Project Coordinator should be available for EPA to contact during all working days. Respondent's Project Coordinator shall be subject to disapproval by EPA and shall have the technical expertise sufficient to adequately oversee all aspects of the Work. The Project Coordinator shall not be an attorney.

## X.     FAILURE TO ATTAIN PERFORMANCE STANDARDS

44.     If, based on the results of the soil monitoring, EPA believes that one or more of the Performance Standards specified in the ROD will not be reached in a reasonable time period, EPA may require the Respondent to implement contingency measures. Such measures may require the submittal of a report assessing alternate remedial strategies and/or a plan that sets forth contingency measures.

## XI.     EPA PERIODIC REVIEW

45.     Under Section 121 of CERCLA, 42 U.S.C. § 9621, and any applicable regulations, EPA may review the remedial action for the Site to assure that the Work performed pursuant to this Order adequately protects human health and the environment. Until such time as EPA certifies completion of the Work, Respondent shall conduct the requisite studies, investigations, or other response actions as determined necessary by EPA in order to permit EPA to conduct the review under Section 121 of CERCLA. As a result of any review performed under this Paragraph, Respondent may be required to perform additional response activities, or to modify Work previously performed.

## XII.     ADDITIONAL RESPONSE ACTIVITIES

8

46. EPA may determine that in addition to the Work identified in this Order and SOW, attached to this Order, additional response activities may be necessary to protect human health and the environment including meeting Performance Standards. If EPA determines that additional response activities are necessary, EPA may require Respondent to submit a work plan for additional response activities. EPA may also require Respondent to modify any plan, or other deliverable required by this Order, including any approved modifications.

47. Not later than 30 Days after receiving EPA's notice that additional response activities are required pursuant to this Section and request for a work plan, Respondent shall submit a work plan for the response activities to EPA for review and approval. Upon written approval by EPA, the work plan shall be incorporated into this Order as a requirement of this Order and shall be an enforceable part of this Order. Upon approval of the work plan by EPA, Respondent shall implement the work plan according to the standards, specifications, and schedule in the approved work plan. Respondent shall notify EPA of its intent to perform such additional response activities within 7 Days after receipt of EPA's notification of the need for additional response activities.

48. Any additional response activities that Respondent determines are necessary to protect human health and the environment shall be subject to written approval by EPA. If such additional response activities are authorized by EPA, then Respondent shall complete such response activities in accordance with plans, specifications, and schedules approved by EPA pursuant to this Order.

## XIII. ENDANGERMENT AND EMERGENCY RESPONSE

49. If any action or occurrence during the performance of the Work, causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, the Respondent shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release and shall immediately notify the National Response Center at (800) 424-8802 and the appropriate EPA Remedial Project Manager. If the Remedial Project Manager is unavailable, the Respondent shall notify the Chief of the Mega Projects Section of the Emergency and Remedial Response Division of EPA Region 2 at (212) 637-4310 of the incident or Site conditions. The Respondent shall take such actions in consultation with EPA's Remedial Project Manager, or other available authorized EPA officer, and in accordance with all applicable provisions of this Order, including, but not limited to, the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the SOW.

50. The Respondent shall submit a written report to EPA within 7 Days after each such release or threatened release, setting forth the events that occurred and the measures taken, or to be taken, to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. Within 30 Days after the conclusion of such an event, Respondent shall submit a final report setting forth all actions taken in response thereto. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. §9603(c), and Section 304 of the Emergency Planning and Community

9

Right-To-Know Act of 1986, 42 U.S.C. §11004, et seq.

51.     Nothing in the preceding Paragraphs or elsewhere in this Order shall be deemed to limit any authority of the United States to take, direct or order all appropriate action to protect human health and the environment or to prevent, abate or minimize an actual or threatened release of hazardous substances on, at or from the Site.

## XIV.  EPA REVIEW OF SUBMISSIONS

52.     After review of any deliverable, plan, report or other item which is required to be submitted for review and approval pursuant to this Order, EPA may: (a) approve the submission; (b) approve the submission with modifications; (c) disapprove the submission and direct Respondent to re-submit the document after incorporating EPA's comments; or (d) disapprove the submission and assume responsibility for performing all or any part of the response action. As used in this Order, the terms "approval by EPA," "EPA approval," or a similar term means the action described in (a) or (b) above.

53.     In the event of approval or approval with modifications by EPA, Respondent shall proceed to take any action required by the plan, report, or other item, as approved or modified by EPA.

54.     Upon receipt of a notice of disapproval or a request for a modification, Respondent shall, within 14 Days or such longer time as specified by EPA in its notice of disapproval or request for modification, correct the deficiencies and resubmit the plan, report, or other item for approval. Notwithstanding the notice of disapproval, or approval with modifications, Respondent shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission.

55.     If upon the first resubmission or upon any subsequent resubmission, the plan, report or other item is disapproved by EPA, Respondent shall be deemed to be out of compliance with this Order. In the event that a resubmitted plan, report or other item, or portion thereof, is disapproved by EPA, EPA may again require Respondent to correct the deficiencies, in accordance with the preceding Paragraphs of this Section. In addition, or in the alternative, EPA retains the right to amend or develop the plan, report or other item.

56.     All plans, reports, and other submittals required to be submitted to EPA under this Order shall, upon approval by EPA, be deemed to be incorporated in and an enforceable part of this Order. In the event that EPA approves a portion of a plan, report, or other item required to be submitted to EPA under this Order, the approved portion shall be deemed to be incorporated in and as an enforceable part of this Order.

57.     Respondent may request in writing that EPA approve modifications to EPA-approved reports, schedules, deliverables and other writings required under the terms of this Order at any time during the implementation of the Work required by this Order. Any and all such modifications under this Order must be approved in writing and signed by the Chief of the Special Projects Branch, Emergency and Remedial Response Division, EPA-Region 2.

a. EPA shall have the sole authority to make any such modifications under this Order.

b. EPA shall be the final arbiter in any dispute regarding the sufficiency or acceptability of all documents submitted and all activities performed pursuant to this Order. EPA may modify those documents and/or perform or require the performance of additional work unilaterally. EPA also may require Respondent to perform additional work unilaterally to accomplish the objectives set forth in this Order.

## XV.   **PROGRESS REPORTS**

58.    In addition to the other deliverables set forth in this Order, Respondent shall provide written monthly progress reports to EPA with respect to actions and activities undertaken pursuant to this Order. The progress reports shall be submitted on or before the 15th day of each month following the Effective Date. Respondent's obligation to submit progress reports continues until EPA gives Respondent written notice under Paragraph 102.

## XVI.   **COMPLIANCE WITH APPLICABLE LAWS**

59.    All activities carried out by Respondent pursuant to this Order shall be performed in accordance with the requirements of all federal and state laws and regulations. EPA has determined that the activities contemplated by this Order are consistent with the NCP.

60.    Except as provided in Section 121(e) of CERCLA and the NCP, no permit shall be required for any portion of the Work conducted entirely on-Site. Where any portion of the Work requires a federal or state permit or approval, Respondent shall submit timely applications and take all other actions necessary to obtain and to comply with all such permits or approvals.

61.    This Order is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XVII.   **REMEDIAL PROJECT MANAGER**

62.    All communications, whether written or oral, from Respondent to EPA shall be directed to EPA's Remedial Project Manager. Respondent shall submit to EPA and NJDEP copies of all documents, including plans, reports, and other correspondence, which are developed pursuant to this Order, and shall send these documents by certified mail or overnight mail to the following addresses:

3 Copies to:

Chief, Special Projects Branch
Emergency and Remedial Response Division
U.S. Environmental Protection Agency

290 Broadway, 18th Floor
New York, New York 10007-1866
Attn: Raritan Bay Slag Superfund Site Remedial Project Manager

1 Copy (electronic) to:

New Jersey Superfund Branch
Office of Regional Counsel
U.S. Environmental Protection Agency
290 Broadway, 17th Floor
New York, New York 10007-1866
   Attn: Site Attorney, Raritan Bay Slag Superfund Site

63.    In the event that EPA requests more than the number of copies stated above of any report or other documents required by this Order for itself or the State, Respondent shall provide the number of copies requested. Upon request by EPA, Respondent shall submit in electronic form all or any portion of any deliverables Respondent is required to submit pursuant to the provisions of the Order.

64.    EPA has the unreviewable right to change its Remedial Project Manager. If EPA changes its Remedial Project Manager, EPA will inform Respondent in writing of the name, address, and telephone number of the new Remedial Project Manager.

65.    EPA's Remedial Project Manager shall have the authority lawfully vested in a Remedial Project Manager by the National Contingency Plan, 40 C.F.R. Part 300. EPA's Remedial Project Manager shall have authority, consistent with the National Contingency Plan, to halt any work required by this Order, and to take any necessary response action.

## XVIII.  ACCESS TO SITE NOT OWNED BY RESPONDENT

66.    If the Site, the off-Site area that is to be used for access, property where documents required to be prepared or maintained by this Order are located, or other property subject to or affected by the remedial action, is owned in whole or in part by parties other than those bound by this Order, Respondent will obtain, or use its best efforts to obtain, site access agreements from the present owners within 60 Days of the Effective Date. Such agreements shall provide access for EPA, its contractors and oversight officials, the State and its contractors, and Respondent and Respondent's authorized representatives and contractors, and such agreements shall specify that Respondent is not EPA's representatives with respect to liability associated with the activities to be undertaken. Copies of such agreements shall be provided to EPA prior to Respondent's initiation of field activities. Respondent's best efforts shall include providing reasonable compensation to any property owner. If access agreements are not obtained within the time referenced above, Respondent shall immediately notify EPA of its failure to obtain access. Subject to the United States' non-reviewable discretion, EPA may use its legal authorities to obtain access for Respondent, may perform those response actions with EPA contractors at the property in question, or may terminate the Order if Respondent cannot obtain access agreements. If EPA performs those tasks or activities with contractors and does not terminate the Order,

Respondent shall perform all other activities not requiring access to that property. Respondent shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.

## XIX.  SITE ACCESS AND DATA/DOCUMENT AVAILABILITY

67.    Respondent shall allow EPA and its authorized representatives and contractors to enter and freely move about all property at the Site and off-Site areas subject to or affected by the work under this Order or where documents required to be prepared or maintained by this Order are located, for the purposes of inspecting conditions, activities, the results of activities, records, operating logs, and contracts related to the Site or Respondent and its representatives or contractors pursuant to this Order; reviewing the progress of the Respondent in carrying out the terms of this Order; conducting tests as EPA or its authorized representatives or contractors deem necessary; using a camera, sound recording device or other documentary type equipment; and verifying the data submitted to EPA by Respondent. Respondent shall allow EPA and its authorized representatives to enter the Site, to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to work undertaken in carrying out this Order. Nothing herein shall be interpreted as limiting or affecting EPA's right of entry or inspection authority under federal law.

68.    Respondent may assert a claim of business confidentiality covering part or all of the information submitted to EPA pursuant to the terms of this Order under 40 C.F.R. 2.203, provided such claim is not inconsistent with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7) or other provisions of law. This claim shall be asserted in the manner described by 40 C.F.R. 2.203(b) and substantiated by Respondent at the time the claim is made. Information determined to be confidential by EPA will be given the protection specified in 40 C.F.R. Part 2. If no such claim accompanies the information when it is submitted to EPA, it may be made available to the public by EPA or the State of New Jersey without further notice to Respondent. Respondent shall not assert confidentiality claims with respect to any data related to Site conditions, sampling, or monitoring.

69.    Respondent shall maintain for the period during which this Order is in effect, an index of documents that Respondent claims contain confidential business information. The index shall contain, for each document, the date, author, addressee, and subject of the document. Upon written request from EPA, Respondent shall submit a copy of the index to EPA.

70.    As requested by EPA, Respondent shall participate in the preparation of such information for distribution to the public and in public meetings which may be held or sponsored by EPA to explain activities at or relating to the Site.

## XX.   RECORD PRESERVATION

71.    Respondent shall provide to EPA upon request, copies of all documents and information within its possession and/or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Order, including but not limited to sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing,

correspondence, or other documents or information related to the Work. Respondent shall also make available to EPA for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

72.     Until 10 years after EPA provides notice pursuant to Paragraph 102 of this Order, Respondent shall preserve and retain all records and documents in its possession or control, including the documents in the possession or control of its contractors and agents on and after the Effective Date that relate in any manner to the Site. At the conclusion of this document retention period, Respondent shall notify the United States at least 90 Days prior to the destruction of any such records or documents, and upon request by the United States, Respondent shall deliver any such records or documents to EPA.

73.     Within 90 Days after the Effective Date, Respondent shall submit a written certification to EPA's Remedial Project Manager and Site Attorney that it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability with regard to the Site since notification of potential liability by the United States or the State.

## XXI.  DELAY IN PERFORMANCE

74.     Any delay in performance of this Order that, in EPA's judgment, that is not properly justified by Respondent under the terms of this Section shall be considered a violation of this Order. Any delay in performance of this Order shall not affect Respondent's obligations to fully perform all obligations under the terms and conditions of this Order.

75.     Respondent shall notify EPA of any delay or anticipated delay in performing any requirement of this Order. Such notification shall be made by telephone and electronic mail to EPA's Remedial Project Manager within 48 hours after Respondent first knew or should have known that a delay might occur. Respondent shall adopt all reasonable measures to avoid or minimize any such delay. Within 7 Days after notifying EPA by telephone and electronic mail, Respondent shall provide written notification fully describing the nature of the delay, any justification for delay, any reason why Respondent should not be held strictly accountable for failing to comply with any relevant requirements of this Order, the measures planned and taken to minimize the delay, and a schedule for implementing the measures that will be taken to mitigate the effect of the delay. Increased costs or expenses associated with implementation of the activities called for in this Order is not a justification for any delay in performance.

## XXII.  ASSURANCE OF ABILITY TO COMPLETE WORK

76.     In order to ensure completion of the Work, Respondent shall secure financial assurance, initially in the amount of $78,700,000 ("Estimated Cost of the Work"). The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the sample documents available under "Financial Assurance" at http://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/index.cfm, and

satisfactory to EPA. Respondent may use multiple mechanisms if they are limited to trust funds, surety bonds guaranteeing payment, and/or letters of credit.

a.  A trust fund: (1) established to ensure that funds will be available as and when needed for performance of the Work in the event that Respondent fails to complete the Work required by this Order; (2) administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency; and (3) governed by an agreement that requires the trustee to make payments from the fund only as the Emergency and Remedial Response Division Director directs in writing to either: (A) reimburse Respondent from the fund for expenditures made by Respondent for Work performed in accordance with this Order; (B) pay any other person who has performed or will perform the Work in accordance with this Order; or (C) refund Respondent any funds that are no longer necessary to perform the Work in accordance with this Order.

b.  A surety bond, issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury, guaranteeing payment and/or performance in accordance with Paragraph 80 (Access to Financial Assurance);

c.  An irrevocable letter of credit, issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency, guaranteeing payment in accordance with Paragraph 80 (Access to Financial Assurance);

d.  A demonstration by Respondent that Respondent meets the financial test criteria and reporting requirements of 40 C.F.R. § 264.143(f) and this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

e.  A guarantee to fund or perform the Work executed by one of the following: (1) a direct or indirect parent company of Respondent; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Respondent; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction that it meets the financial test criteria and reporting requirements for owners and operators set forth in subparagraphs (1) through (8) of 40 C.F.R. § 264.143(f) and this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

77.  Within 90 Days after the Effective Date, Respondent shall submit all executed and/or otherwise finalized mechanisms or other documents required to the Remedial Project Manager.

78.  If Respondent provides financial assurance including a demonstration or guarantee under

Paragraph 76.d or 76.e, the Respondent shall also comply, and shall ensure that its guarantor(s) comply, with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) regarding these mechanisms unless otherwise provided in this Section, including: (a) the initial submission to EPA of required financial reports and statements from the affected entity's chief financial officer ("CFO") and independent certified public accountant ("CPA") no later than 60 Days after the Effective Date; (b) the annual resubmission of such reports and statements within 90 Days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 Days after any such entity determines that it no longer satisfies the financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" mean the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of the Work under this Order; (3) the terms "owner" and "operator" include the Respondent making a demonstration or obtaining a guarantee under Paragraph 76.d or 76.e; and (4) the terms "facility" and "hazardous waste management facility" include the Site.

79.     Respondent shall diligently monitor the adequacy of the financial assurance. If Respondent becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Respondent shall notify EPA of such information within 30 Days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the Respondent of such determination. Respondent shall, within 30 Days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. Respondent shall follow the procedures of Paragraph 81 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Respondent's inability to secure and submit to EPA financial assurance for completion of the Work shall in no way excuse performance of any other requirements of this Order, including, without limitation, the obligation of Respondent to complete the Work in accordance with the terms of this Order.

80.     Access to Financial Assurance.

a.     In the event EPA determines that Respondent (a) has ceased implementation of any portion of the Work, (2) is seriously or repeatedly deficient or late in their performance of the Work, or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Performance Failure Notice") to both Respondent and the financial assurance provider regarding the affected Respondent's failure to perform. Any Performance Failure Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Respondent a period of 10 Days within which to remedy the circumstances giving rise to EPA's issuance of such notice. If, after expiration of the 10 Day notice period specified

16

in this Paragraph, Respondent has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Performance Failure Notice, EPA may at any time thereafter, draw fully on the funds guaranteed under the then-existing performance guarantee.

b.  If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and the Respondent fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 Days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with Paragraph 80.a.

c.  EPA reserves the right to bring an action against Respondent under Section 107 of CERCLA for recovery of any costs incurred as a result of EPA's takeover of all or any portion(s) of the Work that are not paid for by financial assurance provided pursuant to this Section.

81.  Modification of Amount, Form, or Terms of Financial Assurance.  Respondent may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with Paragraph 77, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance.  EPA will notify Respondent of its decision to accept or reject a requested reduction or change pursuant to this Paragraph.  Respondent may reduce the amount of the financial assurance mechanism only in accordance with EPA's approval.  Within 30 Days after receipt of EPA's approval of the requested modifications pursuant to this Paragraph, Respondent shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with Paragraph 77.

82.  Release, Cancellation, or Discontinuation of Financial Assurance.  Respondent may release, cancel, or discontinue any financial assurance provided under this Section only (a) if EPA issues a Certification of Completion of the Work; or (b) in accordance with EPA's approval of such release, cancellation, or discontinuation.

83.  At least 7 Days prior to commencing any work at the Site pursuant to this Order, Respondent shall submit to EPA a certification that Respondent or its contractors and subcontractors have adequate insurance coverage or have indemnification for liabilities for injuries or damages to persons or property which may result from the activities to be conducted by or on behalf of Respondent pursuant to this Order.  Respondent shall ensure that such insurance or indemnification is maintained for the duration of the Work required by this Order.

## XXIII.  UNITED STATES NOT LIABLE

84.  The United States and EPA, by issuance of this Order, or by issuance of any approvals pursuant to this Order, assume no liability for any injuries or damages to persons or property resulting from acts or omissions by Respondent, or its directors, officers, employees, agents,

representatives, successors, assigns, contractors, or consultants in carrying out any action or activity pursuant to this Order, or Respondent's failure to perform properly or complete the requirements of this Order. Neither the United States nor EPA may be deemed to be a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, assigns, contractors, or consultants in carrying out any action or activity pursuant to this Order, and Respondent shall not represent to anyone that the United States or EPA is or may be a party to any such contract.

85.     Respondent shall save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, or representatives from any and all claims or causes of action or other costs incurred by the United States including but not limited to attorney fees and other expenses of litigation and settlement arising from or on account of acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on behalf or under its control, in carrying out activities pursuant to this Order, including any claims arising from any designation of Respondent as EPA's authorized representatives under Section 104(e) of CERCLA.

## XXIV.   ENFORCEMENT AND RESERVATIONS

86.     Nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

87.     Nothing in this Order shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or C.F.R. § 300.700(d).

88.     No action or decision by EPA pursuant to this Order shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

89.     EPA reserves the right to bring an action against Respondent under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of any response costs incurred by the United States related to this Order and/or for any other response costs which have been incurred or will be incurred by the United States relating to the Site. This reservation shall include, but not be limited to past costs, direct costs, indirect costs, the costs of oversight, the costs of compiling the cost documentation to support oversight cost demand, as well as accrued interest as provided in Section 107(a) of CERCLA.

90.     Notwithstanding any other provision of this Order, at any time during the response action, EPA may perform its own studies, complete the response action (or any portion of the response action) as provided in CERCLA and the NCP, and seek reimbursement from Respondent for its costs, or seek any other appropriate relief.

91.     Nothing in this Order shall preclude EPA from taking any additional enforcement actions, including modification of this Order or issuance of additional Orders, and/or additional

remedial or removal actions as EPA may deem necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA, 42 U.S.C. § 9606(a), *et seq*., or any other applicable law. Respondent shall be liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for the costs of any such additional actions.

92.     Notwithstanding any provision of this Order, the United States hereby retains all of its information gathering, inspection and enforcement authorities and rights under CERCLA, RCRA, and any other applicable statutes or regulations.

93.     Nothing in this Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person for any liability it may have arising out of or relating in any way to the Site.

94.     If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated by the court's order.

95.     Except as specifically provided in this Order, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring the Respondent(s) in the future to perform additional activities pursuant to CERCLA or any other applicable law. EPA reserves the right to bring an action against Respondent(s) under section 107 of CERCLA, 42 U.S.C. Section 9607, for recovery of any response costs incurred by the United States related to this Order or the Site and not reimbursed by Respondent.

96.     Notwithstanding any other provision of this Order, failure of Respondent to comply with any provision of this Order may subject Respondent to civil penalties of up to thirty-seven thousand five hundred dollars ($37,500) per violation per Day, as provided in Section 106(b) (1) of CERCLA, 42 U.S.C. § 9606(b) (I), and the Debt Collection and Improvement Act of 1996 (see civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19). Respondent also may be subject to punitive damages in an amount at least equal to but not more than three times the amount of any costs incurred by the United States as a result of such failure to comply with this Order, as provided in Section 107(c) (3) of CERCLA, 42 U.S.C. § 9607(c) (3). Should Respondent violate this Order or any portion thereof, EPA may carry out the required actions unilaterally, pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604, and/or may seek judicial enforcement of this Order pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606. If EPA elects to take over the performance of all or any portion(s) of the Work pursuant to this provision, EPA shall have the right to enforce performance by the issuer of the relevant financial assurance mechanism and/or immediately access any financial assurance mechanisms provided pursuant to Section XXII (Assurance of Ability To Complete Work) of this Order.

## XXV. **ADMINISTRATIVE RECORD**

97.     Upon request by EPA, Respondent shall submit to EPA all documents related to the implementation of the Work for possible inclusion in the administrative record file.

## XXVI. **EFFECTIVE DATE AND COMPUTATION OF TIME**

98.     The Effective Date of this Order shall be 7 Days following the Day that this Order is signed by the Director, Emergency and Remedial Response Division, EPA Region 2, unless a conference is timely requested pursuant to Paragraph 99, below. If such conference is timely requested, the Effective Date of this Order shall be 3 Days following the date the conference is held, unless EPA otherwise modifies the Effective Date in writing. All times for performance of ordered activities shall be calculated from this Effective Date.

## XXVII. **OPPORTUNITY TO CONFER**

99.     Respondent may, before the Effective Date, request a conference with EPA to discuss this Order. If requested, the conference shall occur within 7 Days of Respondent's request for a conference.

100.     The purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which Respondent intends to comply with this Order. This conference is not an evidentiary hearing, and does not constitute a proceeding to challenge this Order. It does not give Respondent a right to seek review of this Order, or to seek resolution of potential liability, and no official stenographic record of the conference will be made. At any conference held pursuant to Respondent's request, Respondent may appear in person or by an attorney or other representative.

101.     Requests for a conference must be by telephone followed by written confirmation sent by overnight mail and electronic mail that Day to:

> Frank X. Cardiello
> Assistant Regional Counsel
> Office of Regional Counsel
> U.S. Environmental Protection Agency
> 290 Broadway, 17th Floor
> New York, N.Y. 10007-1866
> Telephone: (212) 637-3148
> cardiello.frank@epa.gov

## XXVIII. **TERMINATION AND SATISFACTION**

102.     This Order may be terminated by EPA if Respondent demonstrates in writing and

certifies to the satisfaction of EPA that all Work and activities required under this Order, including any additional work required by EPA, have been performed fully in accordance with this Order and EPA concurs in writing with the certification. Such an approval by EPA, however, shall not relieve Respondent of any remaining obligations under the Order, including those requirements set forth in Section XX regarding record preservation, or applicable law.

So Ordered, this _30th_ Day of ___January___, 2014.

By: _____

Walter E. Mugdan, Director
Emergency and Remedial Response Division
U.S. Environmental Protection Agency-Region 2

21