ARCHER & GREINER
A Professional Corporation
One Centennial Square
Haddonfield, NJ  08033
(856) 795-2121
Attorneys for Plaintiff,
NL Industries, Inc.

By:     CHRISTOPHER R. GIBSON, ESQ.
        PATRICK M. FLYNN, ESQ.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NL INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>OLD BRIDGE TOWNSHIP, et al.,<br><br>Defendants. | Civil Action No.:  3:13-cv-03493-MAS-TJB<br><br>**Electronically Filed** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF
NL INDUSTRIES, INC.'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO DEFENDANT TOWNSHIP OF OLD BRIDGE**
_____

Pursuant to Local Civil Rule 56.1(a), Plaintiff NL Industries, Inc. ("NL") submits the following Statement of Undisputed Material Facts in support of its cross-motion for partial summary judgment as to Defendant Township of Old Bridge ("Old Bridge Township").

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*The Raritan Bay Slag Superfund Site*

1. In 1967, a private developer known as Sea-Land Development Corp. ("Sea-Land") acquired a portion of what is now the Raritan Bay Slag Superfund Site ("RBS Site") in the Laurence Harbor section in Middlesex County, New Jersey, identified on the Middlesex County tax map as Block 1, Lot 49.  (See Declaration of Christopher R. Gibson, Esq. ("Gibson Decl."), ¶ 12, Ex. G; see infra ¶¶ 19, 20.)

2. On September 11, 1968, a meeting was held which included representatives from Sea-Land, as well as officials from the State of New Jersey and Old Bridge Township (then known as "Madison Township").  (See NL's Second Amended Complaint ("Cmpl.") at Ex. A.) During the meeting, Sea-Land proposed to build a seawall (the "Seawall") on the Block 1, Lot 49 property using "slag".  (Id.)

3. Old Bridge Township entered into a contract with Sea-Land allowing Sea-Land to construct the Seawall and fill areas behind it.  (See Gibson Decl., Ex. O.)

4. During the late 1960's and early 1970's, Sea-Land used slag in the construction of the Seawall on a portion of the Block 1, Lot 49 property.  (See Gibson Decl., ¶ 13, Ex. H at 3.)

5. In a letter, dated September 29, 1972, from the Chairman of the Madison (Old Bridge) Township Conservation Commission, George Koehler, to Arthur W. Price, Chief of the New Jersey Department of Environmental Protection's ("NJDEP") Bureau of Solid Waste

1

Management, Mr. Koehler attached photographs of the lead-bearing slag being used by Sea-Land to construct the Seawall.  (See Cmpl. at Ex. D.)  In his letter, Mr. Koehler advised that the slag, which he indicated "would also contain other heavy metals and metal sulphates," was being placed in an area that "passed the high tide mark and the dumping is taking place right into Raritan Bay therefore these metals and their soluble salts pose an additional threat to increasing the pollution in the bay."  (Id.)

6. On October 3, 1972, The News Tribune newspaper published an article which stated that Mr. Koehler had reported that the NJDEP had "agreed to send a field representative to the Laurence Harbor beachfront to investigate the dumping of lead slag along the waterline." (See Cmpl. at Ex. E.)  The article recounted that according to Mr. Koehler, the slag being dumped at the beachfront posed an additional threat to increasing pollution in the bay.

7. On October 4, 1972, Charles E. Gingrich of the NJDEP's Bureau of Solid Waste Management and a colleague inspected the area of Laurence Harbor where the slag was being deposited by Sea-Land.  (See Cmpl. at Ex. F.)  On October 5, 1972, Mr. Gingrich wrote a letter to Mr. Koehler of the Madison (Old Bridge) Township Conservation Commission.  Mr. Gingrich advised:

> This site was inspected on October 4, 1972 by myself and another member of our staff.  Because of the nature of this material and where it is being deposited we have asked the cooperation of Mr. Charles M. Pike, Director of Water Resources and Mr. Richard D. Goodenough, Director of Marine Services.

(Id.)

8. On October 16, 1972, Mr. Koehler of the Madison (Old Bridge) Township Conservation Commission wrote a letter, on Madison (Old Bridge) Township letterhead, to

Charles M. Pike, Director of the NJDEP's Division of Water Resources, enclosing photographs of the lead-bearing slag being placed on the Laurence Harbor shoreline to build the Seawall and commenting on the effect of the presence of the slag on the waters of Raritan Bay. (See Cmpl. at Ex. H.)

9. On or around November 1972, another article appeared in a local newspaper, which recounted testimony given by Mr. Koehler of the Madison (Old Bridge) Township Conservation Commission at a public meeting on November 10, 1972. (See Cmpl. at Ex. I.) The article, accompanied by pictures of the Seawall, discussed environmental risks posed by the presence of lead-bearing slag on the shore of Raritan Bay. (Id.)

10. In February 1973, Old Bridge Township scheduled a public meeting for March 1, 1973 to discuss certain topics related to the Laurence Harbor shoreline, including, among others, "beach filling" and "beach erosion". (See Cmpl. at Ex. K.)

11. The Township Engineer, Harvey P. Goldie, sent notification of the upcoming public meeting to certain officials of the United States Army Corps of Engineers ("USACE"), the NJDEP, Old Bridge Township. (See Cmpl. at Ex. L.) Old Bridge Township officials who received the meeting notice included the Chairman of Old Bridge Township's Planning Board, the Township Attorney, and Mr. Koehler. (Id.) Mr. Goldie subsequently sent out a meeting agenda, to the same officials, which included among its topics the issue of whether the material that Sea-Land used to construct the Seawall and fill the area behind it "endanger[ed] [the] environment or ecology of [the] area." (See Cmpl. at Ex. K.)

12. The public meeting occurred on March 1, 1973. (See Cmpl. at Ex. M.) Township officials who attended included the Mayor, three members of the Township Council, the

Township Manager, the Township Attorney, the Township Engineer, and Mr. Koehler (Chair of the Township Conservation Commission). (Id.) The minutes of the meeting reflect that Sea-Land's construction of the Seawall using slag was discussed. (Id.)

13. A second meeting was held on March 27, 1973 at the offices of the NJDEP. (See Cmpl. at Ex. N.) Township officials who attended that meeting included the Township Manager, a Township Councilman, the Township Attorney, the Township Engineer, and Mr. Koehler. (Id.) Minutes of that meeting reflect that the subject of the "lead slag dumped by Sea Land" was discussed. (Id.)

14. In 2007, elevated levels of lead, antimony, arsenic, chromium, and copper were identified by the NJDEP in soils near the Seawall at the RBS Site. (See Gibson Decl., Ex. H at 4-5.)

15. In 2008, the USEPA received requests from the NJDEP to evaluate the RBS Site for a removal action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. (Id.)

16. In November 2009, the RBS Site was added to the National Priorities List. (Id.)

17. On May 23, 2013, the USEPA issued the Record of Decision ("ROD") for the RBS Site which determined that a total off-site disposal remedy is required for the RBS Site. (Id. at 70.)

18. According to the USEPA's Fact Sheet for the RBS Site, "approximately 2,500 feet of seawall have been contaminated." (See Gibson Decl., ¶ 14, Ex. I.) Huge "buttons" of slag – some weighing upwards of 400 pounds – make up much of the Seawall. (Id.)

4

*Old Bridge Township's Property Ownership at the RBS Site*

19. In 1983, Old Bridge Township acquired by deed the former Sea-Land property on which the Seawall construction and certain filing activities had taken place, identified on the Middlesex County tax map as Block 1, Lot 49. (See Gibson Decl., ¶ 15, Ex. J.) Old Bridge Township paid Sea-Land $498,000 to purchase the property. (Id.) The deed transferring the property from Sea-Land to Old Bridge Township was duly recorded in the land records for Middlesex County at Deed Book 3320, Pages 593-598. (Id.)

20. Old Bridge Township currently owns the property it acquired from Sea-Land in 1983. (See Gibson Decl., ¶ 16, Ex. K.)

21. The property Old Bridge Township acquired from Sea-Land in 1983 is part of the "Seawall Sector" of the RBS Site as described in the ROD for the RBS Site. (See id.; see also Gibson Decl., Ex. H at 3.)

22. When Old Bridge Township acquired the Block 1, Lot 49 property from Sea-Land, Old Bridge Township was aware of the presence of slag. (See Cmpl. at Exs. D-I; Gibson Decl., ¶ 15, Ex. J.)

*Old Bridge Township's CERCLA Liability*

    *Old Bridge is a "Covered Person"*

23. Pursuant to Section 107 of CERCLA, "covered persons" include:

    (1) the owner and operator of a vessel or a facility,

    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

5

>(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
>(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

42 U.S.C. § 9607(a)(1)-(4).

24. Under Section 101 of CERCLA, an "owner or operator" is defined, in part, as:

>(i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel,
>
>(ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and
>
>(iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated, or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

42 U.S.C. § 9601(20)(A)(i)-(iii).

25. Pursuant to Section 101(9) of CERCLA, the term "facility" means:

>(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

26.    Old Bridge Township is an "owner and operator" of a "facility" (the RBS Site) as those terms are defined under Section 101 of CERCLA, 42 U.S.C. §§ 9601(9), (20).  (See Gibson Decl., Exs. J, K; see also Gibson Decl., Ex. H at 3.)

### *"Hazardous Substances Have Been "Released" at a Facility*

27.    Under Section 101 of CERCLA, "hazardous substances" are defined, in part, as:

> any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 USCS §§ 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606].

42 U.S.C. § 9601(14).

28.    Lead is designated as a "hazardous substance" pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act thereby qualifying as a "hazardous substance" as that term is defined under CERCLA § 101(14)(B), 42 U.S.C. § 9601(14).

29.    Pursuant to Section 101 of CERCLA, a "release" is defined, in part, as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing

>into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22).

30. The USEPA has stated that "[t]he initial activities that led to the site's National Priorities List ("NPL") listing began in the late 1960's and early 1970's, when slag, mostly in the form of blast furnace pot bottoms from a secondary lead smelter, was used in the construction of a seawall . . . ." (See Gibson Decl., Ex. H at 4-5.)

31. Recent sampling has included the collection of soil, sediment, water, biological, and slag samples from along the Seawall, the Western Jetty, and the beaches near these two locations. (Id.) USEPA and NJDEP analytical results from the sampling determined that significantly elevated levels of lead and other heavy metals are present in the soils, sediments and surface water in and around both the Seawall and the Western Jetty. (Id.)

32. Pursuant to Section 101 of CERCLA, "hazardous substances" have been "released" at the RBS Site, including on the property owned or operated by Old Bridge Township. (See Gibson Decl., Ex. H at 3-5; see supra ¶¶ 19-22, 27-31.)

### *Necessary Costs of Response Incurred by NL at the RBS Site*

33. Under CERCLA § 107(a), "covered persons" are liable for:

>(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
>(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
>
> (D) the costs of any health assessment or health effects study carried out under section 104(i) [42 USCS § 9604(i)].

42 U.S.C. § 9607(a)(4)(A)-(D).

34. Pursuant to CERCLA, the terms "respond" or "response" means "remove, removal, remedy, and remedial action; all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25).

35. The terms "remove" or "removal" are defined, in part, as:

> "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).

36. The terms "remedy" or "remedial action" are defined under CERCLA § 101 as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking

> containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

37. NL has incurred "necessary costs of response" that were consistent with the national contingency plan, pursuant to Section 107(a)(4)(B) of CERCLA, at Old Bridge Township's property on the RBS Site, for costs incurred for work completed by Christopher T. Reitman, P.E. of Advanced GeoServices Corp., including, but not limited to: (1) assisting the USEPA with investigation of the RBS Site and characterization of the nature, extent, and sources of contamination; (2) assisting the USEPA with evaluation of various response action alternatives (including the Engineering Evaluation/ Cost Analysis submitted to the USEPA on May 22, 2012); (3) assisting the USEPA's efforts to keep the local community informed and involved; (4) identifying other PRPs that may be liable to perform and/or pay for response actions (including development of information that the USEPA used as a basis to send CERCLA § 104(e) information requests to certain PRPs); and (5) developing approaches to implement the remedy selected in the ROD (including a study of magnetic separation technology for potential use in accomplishing the selected remedy). (See Affidavit of Christopher T. Reitman, P.E. ("Reitman Aff.") at ¶¶ 3-9; Gibson Decl. at ¶¶ 2-9.)

38.     NL incurred "necessary costs of response" that were consistent with the National Contingency Plan, pursuant to Section 107(a)(4)(B) of CERCLA, for research that was conducted by NL's counsel in an effort to track-down additional potentially responsible parties ("PRP") for the RBS Site. (See Gibson Decl., ¶ 2.)

*Old Bridge Township's Spill Act Liability*

*Person "In Any Way Responsible" For a Hazardous Substance*

39.     The New Jersey Spill Compensation and Control Act ("Spill Act") provides that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1).

40.     A "'person' means public or private corporations, companies, associations, societies, firms, partnerships, joint stock companies, individuals, the United States, the State of New Jersey and any of its political subdivisions or agents." N.J.S.A. 58:10-23.11b.

41.     Old Bridge Township is a "person" as that term is defined under the Spill Act, N.J.S.A. 58:10-23.11b.

42.     The Spill Act defines "hazardous substances", in part, as:

> 'environmental hazardous substances' on the environmental hazardous substance list adopted by the department pursuant to section 4 of P.L.1983, c.315 (C.34:5A-4); such elements and compounds, including petroleum products, which are defined as such by the department, after public hearing, and which shall be consistent to the maximum extent possible with, and which shall include, the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to section 311 [33 U.S.C. 1321] of the Federal Water Pollution Control Act Amendments of 1972, Pub.L.92-500, as amended by the Clean

11

>   Water Act of 1977, Pub.L.95-217 (33 U.S.C. § 1251 et seq.); the list of toxic pollutants designated by Congress or the EPA pursuant to section 307 [33 U.S.C. 1317] of that act; and the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to section 101 of the "Comprehensive Environmental Response, Compensation and Liability Act of 1980," Pub.L.96-510 (42 U.S.C. § 9601 et seq.); provided, however, that sewage and sewage sludge shall not be considered as hazardous substances for the purposes of P.L.1976, c.141 (C.58:10-23.11 et seq.)

N.J.S.A. 58:10-23.11b.

43. Lead is designated as a "hazardous substance" pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, 33 U.S.C. 1321, thereby qualifying as a "hazardous substance" as that term is defined under the Spill Act, N.J.S.A. 58:10-23.11b.

44. As the current owner of property at the RBS Site that contains lead, a "hazardous substance", Old Bridge Township is a "person" that is "in any way responsible" for those hazardous substances. (See Gibson Decl., Ex. H at 3-5; see supra ¶¶ 19-22, 27-31.)

### *Cleanup and Removal Costs Incurred by NL at the RBS Site*

45. "Cleanup and removal costs" are defined under the Spill Act as:

>   all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to [N.J.S.A. 58:10B-2.1] associated with a discharge, incurred by . . . any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources . . . .

N.J.S.A. 58:10-23.11b.

46. NL has incurred "cleanup and removal costs", as defined under N.J.S.A. 58:10-

23.11b. of the Spill Act, at the property owned by Old Bridge Township at the RBS Site, including costs incurred for work completed by Christopher T. Reitman, P.E., including, but not limited to: (1) assisting the USEPA with investigation of the RBS Site and characterization of the nature, extent, and sources of contamination; (2) assisting the USEPA with evaluation of various response action alternatives (including the Engineering Evaluation/ Cost Analysis submitted to the USEPA on May 22, 2012); (3) assisting the USEPA's efforts to keep the local community informed and involved; (4) identifying other PRPs that may be liable to perform and/or pay for response actions (including development of information that the USEPA used as a basis to send CERCLA § 104(e) information requests to certain PRPs); and (5) developing approaches to implement the remedy selected in the ROD (including a study of magnetic separation technology for potential use in accomplishing the selected remedy).  (See Reitman Aff. at ¶¶ 3-9; Gibson Decl. at ¶¶ 2-9.)

47.     NL incurred "cleanup and removal costs", as defined under N.J.S.A. 58:10-23.11b. of the Spill Act, related to the property owned by Old Bridge Township at the RBS Site, for research that was conducted by NL's counsel in an effort to track-down additional PRPs for the RBS Site.  (See Gibson Decl., ¶ 2.)

                Respectfully submitted,

                ARCHER & GREINER, P.C.
                Attorneys for Plaintiff NL Industries, Inc.

                By:  /s/ Christopher R. Gibson
                  Christopher R. Gibson

Dated:  January 31, 2014

10679430v1