NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
NL INDUSTRIES, INC.,                :
                                    :
                    Plaintiff,      :
                                    :   Civil Action No. 13-3493 (MAS)(TJB)
            v.                      :
                                    :
OLD BRIDGE TOWNSHIP, *et al.*,      :   **MEMORANDUM OPINION**
                                    :
                    Defendants.     :
_____ :

**SHIPP, District Judge**

Plaintiff NL Industries, Inc. ("Plaintiff" or "NL") filed this lawsuit pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J. Stat. Ann. 58:10-23.11 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99-499, 100 Stat. 1613 (1986) ("SARA"), seeking cost recovery and contribution from twenty-five Defendants[1] for the cleanup of lead-bearing slag in Laurence Harbor, New Jersey.

The present matter comes before the Court upon twelve motions to dismiss, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), filed by Defendants. (Defs.' Mots., ECF Nos. 72, 112, 116, 118, 124, 128, 130-32, 138, 143, 154.) Plaintiff filed opposition to the motions (Pl.'s Opp'n, ECF Nos. 213-15) and filed a cross-motion for partial summary judgment against Defendant

---

[1] Plaintiff seeks relief from the following Defendants: Old Bridge Township, United States Army Corps of Engineers ("Army Corps"), Middlesex County, Auwite Construction Co. ("Auwite"), United States General Services Administration ("GSA"), Johnson Controls, Inc. ("JCI"), EnerSys, Inc. ("Enersys"), Exide Technologies, Yuasa Battery, Inc. ("Yuasa"), H. Bixon & Sons, Inc., E.I. Dupont de Nemours and Co. ("Dupont"), C&D Technologies, Inc., Honeywell International Inc. ("Honeywell"), Joe Krentzman & Son, Inc. ("JKS"), Carborundum Abrasive Products ("CAP"), Wimco Metals, Inc. ("Wimco"), Metallon Holdings Corp., Rio Tinto Minterals ("RTM"), East Penn Manufacturing Co., Tiffen Manufacturing Corp., RAE Storage Battery Co., Atlantic Battery Co., Inc. ("Atlantic Battery"), Gould Electronics, Inc., and Atlantic Richfield Co. ("Atlantic Richfield").

Old Bridge Township ("Old Bridge" or the "Township") (Pl.'s Mot., ECF No. 216). Certain Defendants replied. (Defs.' Replies, ECF Nos. 224-33, 235, 240.) Old Bridge filed opposition to Plaintiff's cross-motion for summary judgment (Twp. Opp'n, ECF No. 240) and, with the Court's permission, Plaintiff replied (Pl.'s Reply, ECF No. 275).

The Court has carefully considered the Parties' submissions and oral arguments heard on June 19, 2014. For the reasons stated below, and other good cause shown, Defendants' motions are GRANTED in part and DENIED in part. Plaintiff's cross-motion for summary judgment is DENIED without prejudice.

## I.     BACKGROUND & PROCEDURAL HISTORY[2]

### A.     The Shore Protection Project and the Raritan Bay Slag Superfund Site

The Raritan Bay Slag Superfund Site ("RBS Site") is the subject of this litigation and is "located in a recreation area on the shore of Raritan Bay, in the eastern part of Old Bridge Township within Laurence Harbor section in Middlesex County, New Jersey. A small portion of the western end of the site, the Western Jetty at the Cheesequake Creek Inlet, is located in the Borough of Sayreville." (5/23/13 U.S. EPA Record of Decision ("ROD"), ECF No. 124-3, at 3.) The RBS Site is split into three sectors: (1) the Seawall; (2) the Western Jetty; and (3) Margaret's Creek. (*Id.*) This litigation primarily concerns the use of slag in the construction and/or reinforcement of the Seawall and the Western Jetty.

---

[2] This section is comprised of allegations from the Second Amended Complaint ("SAC"); documents attached to the SAC; unattached, public documents integral to the allegations in the SAC; and public records available on the United States Environmental Protection Agency's ("U.S. EPA") website. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (a document "integral to or explicitly relied upon" in a complaint may be considered on a motion to dismiss); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1996 (3d Cir. 1993) (on a motion to dismiss, courts may generally consider allegations in the complaint, exhibits attached to the complaint, and the available public record); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009) (courts may consider public documents and prior judicial proceedings on a motion to dismiss) (citing *S. Gross Oversees Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999)).

1.     The Seawall

In the 1950s, Old Bridge Township (f/k/a Madison Township), New Jersey was plagued with a series of severe storms, which significantly eroded the shoreline of Laurence Harbor and the immediately adjacent area. (SAC, ECF No. 64, ¶ 53.) In response, Defendant Army Corps "recommended shore and hurricane protection for [Old Bridge] Township, including a beachfill [sic] protective structure for bluff protection in the Laurence Harbor area extending from Morgan Beach to Seidler Beach, and a levee to be built at the easterly end of the Site." (*Id.* ¶ 56.) The United States Congress authorized the implementation of this recommendation in the Flood Control Act of 1962. (*Id.* ¶ 57.) The Shore Protection Project was born from one or more agreements among the Army Corps, the State of New Jersey (the "State"), and the Township relating to the construction and maintenance of shore and hurricane protection for Old Bridge. (*Id.* ¶ 58.) As part of the Project, the Army Corps constructed the new beach fill structure, thereby creating a new beach in the Laurence Harbor area, which became property of the State. (*Id.* ¶¶ 66.) The Township received easements from the State so that it could maintain its responsibilities regarding the Project. (*Id.* ¶ 67.)

By 1968, a private developer named Sea-Land Development Corp. ("Sea-Land"), a now defunct corporation, acquired a portion of what is now known as the RBS Site. (*Id.* ¶ 69.) At the time, Sea-Land was interested in developing the Laurence Harbor area and proposed the construction of a seawall to replace the protective beach fill structure that had been constructed by the Army Corps as part of the Shore Protection Project. (*Id.* ¶¶ 69-70.) Sea-Land intended to use lead-bearing slag ("slag") to build the seawall. (*Id.* ¶¶ 72-73, Ex. A.)

A series of meetings were held and correspondence was exchanged amongst officials of the Township, the New Jersey Department of Environmental Protection ("NJDEP"), the State, and the Army Corps regarding Sea-Land's proposed construction of a fifteen-foot seawall composed of slag and clay core. (*Id.*; *see also id.* ¶¶ 76, 81.) According to Plaintiff, although the officials knew Sea-Land intended to use slag to build the seawall, and the health risks and hazards associated therewith,

they approved the construction of the seawall without objection. (*Id.* ¶¶ 3-4, 71, 74, 76, 83-85, 88, 90, 108.) Sea-Land and the Township entered into a contract, which allowed Sea-Land to build the seawall and to construct a public beach to abut it. (*Id.* ¶¶ 77, 85, 87; *see also id.* ¶¶ 78-79.) Sea-Land proceeded with the construction of the seawall and began filling the areas behind it to create the public beach on Sea-Land's portion of the RBS Site as well as a portion owned by the State. (*Id.* ¶ 89.)

During the construction of the seawall in the late 1960s and/or early 1970s, concerns were raised by several newspapers and Township and NJDEP officials regarding the use of slag to build the seawall and beach. (*Id.* ¶¶ 91-107, Exs. D-I, L.) According to one Township official, "[the] slag, probably from the lead melting operation of National Lead in Perth Amboy would also contain other heavy materials and metal sulphates normally associated with the raw material . . . . [T]he land fill has passed the high tide mark and the dumping is taking place right into Raritan Bay therefore[,] these metals and their soluble salts pose an additional threat to increasing the pollution in the bay." (*Id.*, Ex. D.)

In 1983, Old Bridge acquired the property upon which the seawall and the beach were constructed. (*Id.* ¶ 110.) Since its acquisition, Old Bridge has not taken any action to remove the slag from the water or mitigate the distribution of slag throughout the RBS Site. (*Id.* ¶ 111.) In 1998, Defendant Middlesex County entered into a ninety-nine year lease with the Township for the development of a Waterfront Park, which would be constructed by Middlesex County. (*Id.* ¶¶ 112-13.) The leased property includes the property Old Bridge acquired from Sea-Land and land adjacent thereto. (*Id.* ¶ 112.)

        2.    <u>The Western Jetty</u>

Around 1883, the Army Corps constructed the Western Jetty, which is a stone jetty located in the Cheesequake Creek Inlet in Laurence Harbor. (*Id.* ¶¶ 115-16; *see also* ROD at 4.) "[D]uring approximately the same time period that the Seawall was being constructed, lead-bearing slag was

placed on the Western Jetty and the adjacent land . . . in an effort to reinforce and supplement the Western Jetty[,] which had been damaged and reduced in size by storm activity." (SAC ¶ 118.) According to Plaintiff, the State and the Army Corps "were aware of, and allowed, the use of slag to refurbish the Western Jetty." (*Id.* ¶ 119.) The State owns a small portion of the Western Jetty and Defendant Auwite owns the remainder, including the adjacent land, after purchasing it in January 1995. (*Id.* ¶¶ 121-23.)

### B. NL's Slag Contribution

In 1928, NL purchased the United Lead Company and assumed direct operation of a secondary smelting facility in Perth Amboy, New Jersey (the "NL Facility"). (*Id.* ¶ 140; *see also* 1/30/14 Admin. Order, *In re Raritan Bay Superfund Site*, U.S. EPA Index No. CERCLA – 02-2014-2012, at 4.) "The operations of the NL Facility entailed extracting lead from a variety of items, including scrap metal, dross and other [lead containing materials]. These operations resulted in the generation of Waste Material containing [lead], such as furnace slag and hemispherical-shaped furnace mattes." (*Id.*; *see also* SAC ¶ 141.)

From 1969-1972, NL arranged or permitted Liberty Trucking Company ("LTC") to remove lead containing materials, including furnace slag, from its Facility. LTC then transported and deposited the lead containing materials to the Margaret's Creek sector of the RBS Site, which is located next to the seawall. (*Id.* at 4-5; *see also* SAC ¶¶ 145-46, 148.)

Notwithstanding, Plaintiff alleges that it did not direct the use of slag for use in the construction of the seawall and/or the renovation of the Western Jetty, and "was not a party to any contract providing for such use." (SAC ¶ 147.) In addition, Plaintiff alleges that Raritan Copper Works discharged arsenic into the Raritan River and Raritan Bay from its smelter facility, which also caused contamination of the soils and sediments of the RBS Site. (*Id.* ¶ 128.)

5

### C. U.S. EPA's May 23, 2013 Record of Decision and January 30, 2014 Order[3]

The U.S. EPA's investigation into the RBS Site began in April 2008 when it received a request from the NJDEP to evaluate the Laurence Harbor seawall for a removal action under CERCLA. (ROD at 4.) After collecting samples and analyzing the results, the U.S. EPA and the NJDEP "determined that significantly elevated levels of lead and other heavy materials are present in the soils, sediment and surface water in and around both the seawall in Laurence Harbor and the Western Jetty at the Cheesequake Creek Inlet." (*Id.* at 4.) Further findings lead to the conclusion that the presence of elevated lead levels proposed a health risk warranting a removal action to restrict access to the seawall, the first jetty, the Western Jetty, and the beaches between these areas. (*Id.* at 4-5.)

In June 2009, the NJDEP issued a Directive and Notice to insurers requiring that Plaintiff conduct a remedial investigation and then propose and implement a remedial action to address contamination at the RBS Site. (SAC ¶ 125.) On November 4, 2009, the RBS Site was added to the U.S. EPA's National Priorities List. (*Id.* ¶ 126.)

In 2013, the U.S. EPA completed a remedial investigation and feasibility study for the RBS Site and concluded, among other things, that "lead, at concentrations higher than human health and ecological risk-based levels, existed in the Seawall, in the Western Jetty, in Margaret's Creek and in the soil and sediment throughout the [RBS] Site." (Admin. Order at 3.)

On May 23, 2013, the U.S. EPA issued a ROD, which estimates there are 11,000 cubic yards of slag and 80,000 cubic yards of additional contaminated soils and sediments at the RBS Site. (SAC ¶ 9.) The ROD includes a "Selected Remedy" to reduce and remove the contamination at the RBS Site. The Selected Remedy, to occur over the course of two years, includes (1) excavating slag, battery casings, and associated wastes from the RBS Site; (2) monitoring the reduction of slag and

---

[3] The ROD and the Administrative Order are part of the Administrative Record for the RBS Site, which is publicly available at http://www.epa.gov/region2/superfund/npl/raritanbayslag/.

associated wastes from surface water after they are removed from the land; and (3) excavating and/or dredging of contaminated soils and sediment and disposal thereof at an appropriate off-site facility. (ROD at 70.) The cost of executing the Selected Remedy is approximately $78.7 million. (*Id.* at 73.)

On January 30, 2014, the U.S. EPA issued an Administrative Order directing Plaintiff to complete the "remedial design of and implement" the Selected Remedy and to secure financial assurance in the amount of $78.7 million. (Admin. Order at 1, 14.) Notably, the U.S. EPA concluded that NL is the responsible party under § 107(a)(3) of CERCLA for the conditions at the RBS Site. (*Id.* at 5.)

        **D.**    **The Second Amended Complaint**

            **1.**    <u>General Allegations</u>

Approximately two weeks after the ROD was issued, Plaintiff brought this action on June 6, 2013, "to make sure that all 'polluters' pay their fair and equitable share of the cleanup costs[.]" (SAC ¶ 1.) Plaintiff's primary contention is that NL has been "selectively targeted" by the U.S. EPA to bear the costs of cleaning up the RBS Site even though other "polluters" knowingly allowed the use of slag in the construction of the seawall and the renovation of the Western Jetty dating back to the 1960s. (*Id.* ¶¶ 1-2.)

Despite being "targeted" by the U.S. EPA, Plaintiff alleges that its connection to the contamination at the RBS Site is indirect and attenuated. Specifically, Plaintiff alleges that although its Perth Amboy Facility may have been one of the places where developers obtained materials to build the seawall and refurbish the Western Jetty, it "never owned or leased any property at the RBS Site, never operated there, never dumped any material there, and played no role in the decision of the developers and the [Defendants] to place lead-bearing material in the water." (*Id.* ¶ 11.)

Furthermore, Plaintiff alleges that the conduct of Defendant Old Bridge has been particularly egregious over the years because the Township acquired the contaminated land from Sea-Land and failed to remove the slag from the water and the land. (*Id.* ¶¶ 6-7.)

2.     The Defendants

In its original Complaint, NL named over thirty Defendants. Currently, there are twenty-four Defendants remaining in the litigation and they are divided into three groups: (1) "Public Polluter Defendants," which include Defendants Old Bridge and the Army Corps. (SAC ¶¶ 19-20.) Plaintiff alleges these Defendants arranged for the deposit of "hazardous substances," as defined in CERCLA, by knowingly allowing Sea-Land to use slag to construct the seawall and refurbish the Western Jetty despite known health risks (*Id.* ¶¶ 2-10, 132-33); (2) "Current Property Owner/Operator Defendants," which include Defendants Middlesex County and Auwite. (*Id.* ¶¶ 22-23.) Plaintiff alleges these Defendants are or have been "owners or operators," as defined in CERCLA, of portions of the RBS Site where there has been a "release" or "threatened release" of hazardous substances (*Id.* ¶¶ 136-39); and (3) "Source Material Defendants,"[4] which include NL Customers and other source material generators. Plaintiff alleges these Defendants sent hazardous substances to the NL Facility for processing, which were then transported by LTC to the RBS Site to construct the seawall and refurbish the Western Jetty (*id.* ¶¶ 13, 142-146), or otherwise contributed slag and other material to construct or maintain the seawall, refurbish the Western Jetty, or fill other areas of the RBS Site (*Id.* ¶¶ 14, 149-50).

3.     Claims and Relief Sought

Plaintiff seeks to hold Defendants liable via CERCLA and the Spill Act, including a cost recovery action pursuant to CERCLA § 107(a), contribution pursuant to CERCLA § 113(f),[5]

---

[4] The Source Material Defendants include the GSA, JCI, EnerSys, Exide Technologies, Yuasa, H. Bixon & Sons, Inc., Dupont, C&D Technologies, Inc., Honeywell, JKS, CAP, Wimco, Metallon Holdings Corp., RTM, East Penn Manufacturing Co., Tiffen Manufacturing Corp., RAE Storage Battery Co., Atlantic Battery, Gould Electronics, Inc., and Atlantic Richfield. (SAC ¶¶ 24-47.)

[5] Count Two seeks contribution under CERCLA § 113(f) for any response costs incurred by NL. Plaintiff, in its motion papers and at oral argument, did not oppose dismissal of Count Two of the SAC without prejudice. Because Plaintiff has failed to allege that it has been sued pursuant to § 9607, or otherwise settled claims brought pursuant thereto, its claim for contribution is premature. The Court dismissed

contribution pursuant to the Spill Act, and declaratory judgment pursuant to CERCLA § 113(g)(2), the Federal Declaratory Judgment Act ("FDJA"), 28 U.S.C. § 2201, and the New Jersey Declaratory Judgment Act ("NJDJA"), N.J. Stat. Ann. 2A:16-50 *et seq.*

Plaintiff seeks to recover its response costs and costs of cleanup and removal pursuant to CERCLA and the Spill Act. Plaintiff also seeks attorneys' fees and costs. In addition, Plaintiff seeks a declaration that Defendants are strictly and jointly and severally liable for response, removal, and cleanup costs incurred by NL in connection with the RBS Site.

## II.     MOTIONS TO DISMISS

Defendants move to dismiss the SAC, or portions thereof, on multiple grounds, which the Court will address below.

### A.     Standard of Review

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any conclusory allegations

---

Count Two, without prejudice, on the record at the June 19, 2014 hearing. Plaintiff is not granted leave to re-plead because its claim has not accrued yet, though it may in the future.

proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that "the-defendant-unlawfully-harmed-me[.]" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 545). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

**B.     Count One – Cost Recovery under CERCLA § 107(a)**

CERCLA, as described by the Third Circuit, is a "broad and complex statute aimed at the dangers posed by hazardous waste sites." *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir. 1996). It is a strict liability statute, which imposes liability jointly and severally upon potentially responsible parties ("PRPs") "for costs associated with cleanup and remediation." *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999) ("*PPG*"). In Count One of the SAC, Plaintiff seeks recovery of "costs that NL has incurred and will incur in connection with actions it has taken in response to the release or threatened release of hazardous substances at the RBS Site" pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607. (SAC ¶ 155.)

Section 107(a) allows "CERCLA plaintiffs . . . [to] spend some money responding to an environmental hazard . . . then go to court and obtain reimbursement for their initial outlays[.]" *In re Dant & Russell, Inc.*, 951 F.2d 246, 249-50 (9th Cir. 1991). The purpose of requiring a plaintiff to take some action before filing a complaint is to ensure "the dispute will be ripe for judicial review."

*Id.* at 250. To assert a viable claim under § 107(a), a plaintiff must plead facts establishing the following four elements: (1) that hazardous substances were disposed of at a facility; (2) that a "release" or "threatened release" of a hazardous substance from the facility into the environment has occurred; (3) that the "release" or threatened release" has caused plaintiff to incur necessary response costs that are consistent with the National Contingency Plan ("NCP"); and (4) that the defendant falls within one of the four classes of PRPs set forth in § 107(a). *PPG*, 197 F.3d at 103-04. The four classes of people liable for response costs are: the facility's current owner or operator; any person who owned or operated the facility "at the time of disposal" of a hazardous substance; any person who arranged for disposal or arranged for transport for disposal of a hazardous substance; and any person who accepts hazardous substances for transport. 42 U.S.C. § 9607(a)(1)-(4).

Defendants[6] focus their motions to dismiss on the third and fourth elements, arguing that the SAC fails to plead facts, which, if assumed to be true, would plausibly establish that Plaintiff has incurred necessary response costs and that they fall within one of the four categories of PRPs.

The Court finds that NL's allegations provide Defendants with sufficient notice of Plaintiff's claims. After considering the allegations in the SAC coupled with the ROD, the Administrative Order, and oral arguments, the Court finds that a reasonable inference can be drawn that Plaintiff has incurred at least one response cost in connection with its efforts to remedy the contamination at the RBS Site and has sufficiently alleged that Defendants fall into one of the PRP categories as arrangers or owner/operators. (*See* SAC ¶¶ 129-31, 155-57; ROD at 9, § 2.3 ("Enforcement"); 6/19/14 Hr'g Rough Tr. ("Rough Tr.") 24-25.) At oral argument, it was clear that Defendants are on notice of Plaintiff's claims, but seek proof, which is inappropriate at this early stage in the litigation and on a motion to dismiss. Judging by the tenor of the oral arguments and Defendants' respective briefs, the Court finds that it would be more appropriate for the Parties to engage in discovery before issuing a

---

[6] Moving Defendants include RTM, Yuasa, Middlesex County, Enersys, Army Corps, GSA, Wimco, JKS, Old Bridge, and Atlantic Battery.

ruling on the merits as to Count One. Discovery would especially be appropriate regarding the fact-intensive inquiries related to the PRP allegations.

Accordingly, Defendants' motions to dismiss Count One are denied.

### C.     Count Five – Contribution under the Spill Act

NL also seeks to impose liability on Defendants pursuant to the New Jersey Spill Act.

#### 1.     Legal Standard

Similar to CERCLA, the Spill Act provides a private cause of action for reimbursement of environmental remediation costs. *See* N.J. Stat. Ann. 58:10–23.11g. It provides that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." *See* N.J. Stat. Ann. 58:10–23.11g(c).

The Spill Act provides, in pertinent part:

> dischargers or persons [who] clean[ ] up and remove[ ] a discharge of a hazardous substance . . . shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal[7] of that discharge of a hazardous substance.

N.J. Stat. Ann. § 58:10–23.11f(2)(a). "To adequately plead a claim under the Spill Act, a plaintiff must allege that (1) a defendant was 'in any way responsible' for the discharge of a hazardous substance; and (2) that the plaintiff engaged in clean-up or removal of the hazardous substance."

---

[7] The Spill Act defines "cleanup and removal costs," in relevant part, as

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property . . . .

N.J. Stat. Ann. 58:10–23.11b.

*Preferred Real Estate Invs., Inc. v. Edgewood Props., Inc.*, 2007 WL 81881, at *2 (D.N.J. Jan. 9, 2007).

### 2. Parties' Positions

Defendants[8] move to dismiss Plaintiff's Spill Act claim arguing that, because Plaintiff has not performed any cleanup or incurred any "cleanup and removal costs" as defined in the Spill Act, N.J. Stat. Ann. 58:10-23.11f(a)(2)(a), it fails to make a *prima facie* claim under the Spill Act. Plaintiff asserts that it has incurred costs, including costs for a remedial investigation, as alleged in the following allegations:

> 125. In June 2008, the NJDEP issued a Directive and Notice to Insurers requiring that NL conduct a remedial investigation and then propose and implement a remedial action to address contamination at the Site. The NJDEP subsequently referred the Site to the USEPA.
>
> 129. NL and the USEPA have incurred and will continue to incur substantial costs associated with the investigation of arsenic contamination at the RBS Site.
>
> 181. The costs incurred, and to be incurred, by NL in connection with the RBS Site are "cleanup and removal costs" within the meaning of N.J. [Stat. Ann.] 58:10-23.11b.

(SAC ¶¶ 125, 129, 181.) The parties also dispute what incurred costs (*i.e.*, "indirect costs" or all costs) must be approved by the NJDEP before a plaintiff is permitted to bring a Spill Act claim.

### 3. Discussion

At the outset, the Court agrees with Defendants that Plaintiff has not alleged it engaged in the cleanup or removal of a hazardous substance, which is a threshold requirement of a Spill Act claim. *Sandvik, Inc. v. Hampshire Partners Fund VI, L.P.*, 2014 WL 1343081, at *8 (Apr. 4, 2014) ("A Spill Act contribution claim accrues only after the cleanup and removal of hazardous substances has commenced.") (citing *See Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883,

---

[8] Moving Defendants include Honeywell, Dupont, Wimco, JKS, Yuasa, Atlantic Richfield, JCI, CAP, East Penn Manufacturing Co., Tiffen Manufacturing Corp., Middlesex County, Enersys, Old Bridge, RTM, and Atlantic Battery.

911 (S.D. Ohio 2012); *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 480 (D.N.J. 1992) *aff'd*, 19 F.3d 642 (3d Cir. 1994)); *see also Hatco Corp. v. W.R. Grace & Co.-Conn.*, 836 F. Supp. 1049, 1093 (D.N.J. 1993) ("To qualify as a contribution plaintiff [under the Spill Act], [plaintiff] must demonstrate that it has cleaned up and removed a discharge of a hazardous substance"); *Dalton v. Shayna Lynn Corp.*, 2012 WL 1345073, at *5 (N.J. Super. Ct. App. Div. Apr. 19, 2012) ("The plain meaning of the statutory language is that one must first cleanup and remove the discharge in order to recover for discharge of a hazardous substance.") (citing *Bonnieview*, 655 F. Supp. 2d at 504).

And, even assuming that Plaintiff has engaged in cleanup and removal activities, it only alleges indirect costs, such as costs for the investigation into the arsenic contamination, which require NJDEP approval. *See Bonnieview*, 655 F. Supp. 2d at 504 (for a party to seek reimbursement for indirect costs, it "must obtain written approval from the NJDEP for these costs"); *see also Player v. Motiva Enters. LLC*, 2006 WL 166452, at *15 (D.N.J. Jan. 20, 2006) ("[T]he party must have obtained 'written approval from the department,' for example, in a memorandum of agreement, prior to incurring the cost."); *see also Magic Petroleum Corp. v. Exxon Mobil Corp.*, 2011 WL 3047808, at *7 (N.J. Super. Ct. App. Div. July 26, 2011). Plaintiff has not alleged that it has received written approval from the NJDEP for any indirect costs that it incurred and, therefore, even if taken as true, Plaintiff's Spill Act claim cannot survive a motion to dismiss.

Accordingly, Plaintiff's Spill Act claim is dismissed without prejudice with leave to re-plead.

> D.   **Counts Three and Four – Declaratory Judgment under the Federal Declaratory Judgment Act ("FDJA"), CERCLA § 113(g), and the New Jersey Declaratory Judgment Act ("NJDJA")**

Defendants move to dismiss Plaintiff's claims for declaratory judgment pursuant to CERCLA[9], the NJDJA[10], and the FDJA[11]. As an initial matter, Plaintiff's claim for declaratory

---

[9] Moving Defendants include RTM, Yuasa, Middlesex County, EnerSys, Army Corps, GSA, and Old Bridge.

relief pursuant to the NJDJA (Count Four) cannot survive, as Plaintiff's Spill Act claim has been dismissed. Therefore, Count Four is dismissed without prejudice.

As to Count Three, Plaintiff concedes that CERCLA § 113(g) preempts the FDJA with regard to Plaintiff's § 107(a) claim. (Rough Tr. 32.) However, Plaintiff argues that it plead the FDJA as an alternative to the NJDJA claim as a means to obtain declaratory judgment for the Spill Act claim. (*Id.*) Based on Plaintiff's assertion, its claim pursuant to the FDJA must be dismissed because the Spill Act has been dismissed. The Court declines to opine, at this juncture, on the issue of whether the FDJA is applicable to the Spill Act claim.

Accordingly, Defendants' motions to dismiss Count Three are granted as to the FDJA, but denied as to CERCLA § 113(g). Defendants' motions to dismiss Count Four are granted.

### E.  Sovereign Immunity

In the SAC, Plaintiff does not allege that the Army Corps or the GSA are current owners or operators of the RBS Site. As such, the Army Corps and GSA move to dismiss Counts Four and Five, Plaintiff's Spill Act and NJDJA claims as barred by the doctrine of sovereign immunity. Plaintiff disagrees and asks the Court to find that sovereign immunity has been waived for these claims.

#### 1.  Legal Standard

"[W]aivers of sovereign immunity must be 'unequivocally expressed' in the statutory text" and construed in the favor of the United States. *United States v. Idaho*, 508 U.S. 1, 6-7 (1993); *see*

---

[10] Moving Defendants include Honeywell, Dupont, Wimco, JKS, Yuasa, Atlantic Richfield, JCI, CAP, East Penn Manufacturing Co., Tiffen Manufacturing Corp., Middlesex County, Enersys, Old Bridge, Atlantic Battery, and RTM.

[11] Moving Defendants include Honeywell, Dupont, Wimco, JKS, Yuasa, Atlantic Richfield, JCI, CAP, East Penn Manufacturing Co., Tiffen Manufacturing Corp., Middlesex County, Enersys, Atlantic Battery, and Old Bridge.

*also White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010). Section 9620(a)(4) provides that "State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States[.]" 42 U.S.C. § 9620(a)(4).

        2.      <u>Parties' Positions</u>

The Army Corps and GSA maintain that § 9620(a)(4) does not waive the agencies' sovereign immunity as to Plaintiff's state law claims pursuant to the Spill Act unless it is the current owner or operator of the RBS Site. Relying on the holding in *Tenaya Assocs. Ltd. P'ship v. United States Forest Serv.*, 1993 WL 13719146 (E.D. Cal. May 19, 1993), Plaintiff argues that the plain language of § 9620(a)(4) does not include the word "currently" and, therefore, Defendants' sovereign immunity has been waived based on past ownership or operation.

        3.      <u>Discussion</u>

The Court finds that the doctrine of sovereign immunity bars Plaintiff from asserting state claims pursuant to the Spill Act against the Army Corps and GSA.

Section 9620(a)(4) has been consistently interpreted as meaning agencies, departments, or instrumentalities of the United States that *currently* own or operate facilities waive their right to sovereign immunity. *See Redland Soccer Club v. Dep't of the Army*, 801 F. Supp. 1432, 1436 (M.D. Pa. 1992) (holding, where plaintiff argued § 9620(a)(4) is phrased in the past tense to include past owners or operators, that "[c]ommon sense and the rules of grammar belie such an assertion"); *see also GMC v. Hirschfield Steel Serv. Ctr.*, 402 F. Supp. 2d 800, 804 (E.D. Mich. 2005) (liability is triggered for remediation under Section 107, 42 U.S.C. § 9607, only for facilities currently owned or operated by an agency of the federal government); *Rospatch Jessco Corp. v. Chrysler Corp.*, 829 F. Supp. 224, 227 (W.D. Mich. 1993) (agreeing with the ruling in *Redland Soccer Club* because it is "closer to what Congress meant in enacting [S]ection 9620(a)(4)"); *Miami-Dade Cnty. v. United States*, 345 F. Supp. 2d 1319, 1354 (S.D. Fla. 2004).

The sole case cited by Plaintiff, *Tenaya*, does not persuade this Court to deny Defendants' motion. In *Tenaya*, the court rejected the holding in *Redland Soccer Club* and held that § 9620(a)(4) clearly waives immunity because "the waiver expressed therein is meant to include all actions brought against the United States for harms which occur during a time when the United States owns or operates a facility." *Tenaya*, 1993 WL 13719146, at *2. However, *Tenaya* has not been followed in this Circuit and has been criticized by district courts in the Ninth Circuit. *See City of Fresno v. United States*, 709 F. Supp. 2d 888, 909 (E.D. Cal. 2010) (declining to adopt the holding in *Tenaya*).

The SAC does not allege that sovereign immunity has been waived for Spill Act claims against the Army Corps and GSA nor does it allege that Defendants are current owners or operators of the RBS Site. Accordingly, Defendants' motion to dismiss Counts Four and Five is granted. These counts are dismissed, without prejudice, as barred by the doctrine of sovereign immunity.

F.  **Successor Liability**

As an alternative ground for dismissal, Defendants RTM, Enersys, and Yuasa move to dismiss the SAC based on insufficient allegations of successor liability. Plaintiff disagrees. The SAC alleges that "[u]pon information and belief" Defendant RTM and Defendants EnerSys and Yuasa are successors-in-interest to Capper Pass & Sun Ltd. and Electric Storage Battery Co., respectively. (SAC ¶¶ 26, 28, 37.)

The Court finds that Plaintiff has sufficiently pled a claim for successor liability against Defendants RTM, EnerSys, and Yuasa. CERCLA does not directly address the issue of successor liability, but the Third Circuit has concluded "that CERCLA incorporates common law principles of indirect corporate liability, including successor liability." *United States v. Gen. Battery Corp.*, 423 F.3d 294, 298 (3d Cir. 2005). However, CERCLA does not expand the "fundamental" common law principles determining indirect corporate liability. *See United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998). A plaintiff is not required to set forth legal theories and legal arguments in its pleadings, but

pleadings must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

In this case, Plaintiff's successor liability allegations are enough to satisfy the Rule 8 pleading standard. Defendants are on notice of the claim made against them by NL for successor liability regarding the hazardous substances deposited at the RBS Site. Although Defendants contend Plaintiff's "bald pleading provides no insight in the theory it is asserting," *Twombly* makes it clear that Plaintiff does not have to set forth legal arguments. Taking these allegations as true and drawing reasonable inferences therefrom, the SAC does sufficiently allege facts that Defendants are liable as successors. Moreover, dismissing Defendants at this early stage of the litigation would be inappropriate as the information Plaintiff needs to substantiate its claims of successor liability are likely in the possession of Defendants.

Accordingly, Defendants' motions are denied on this basis.

### G.     Attorneys' Fees and Costs

Defendants[12] move to dismiss Plaintiff's request for attorneys' fees, arguing that they are not recoverable under CERCLA. At oral argument, Plaintiff represented that it is not seeking litigation-related expenses. (Rough Tr. 25.) Rather, it is seeking expenses incurred by attorneys in the performance of duties that are closely related to the cleanup of the RBS Site consistent with the Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809, 819-20 (1994). (*Id.*)

Defendants' motions are based on the assumption that Plaintiff was seeking ordinary attorneys' fees and costs related to the litigation. The Supreme Court's decision in *Key Tronic* does

---

[12] Moving Defendants include Honeywell, Dupont, Wimco, JKS, Yuasa, Atlantic Richfield, JCI, CAP, East Penn Manufacturing Co., Tiffen Manufacturing Corp., Middlesex County, Enersys, Atlantic Battery, and Old Bridge.

not foreclose Plaintiff's ability to recover attorneys' expenses closely related to the cleanup. Therefore, Defendants' motions are denied.

### III. CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

In response to the Township's motion to dismiss, Plaintiff cross-moved for partial summary judgment as to the § 107(a) claim under CERCLA and the Spill Act claim.

#### A. Standard of Review

Summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A district court considers the facts drawn from the "materials in the record, including depositions, documents, electronically stored information, affidavits . . . or other materials" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c)(1)(A); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the non-moving party. *Id.* at 248-49. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48.

#### B. Parties' Positions

Plaintiff asserts that Old Bridge is strictly liable, as a matter of law, for response costs consistent with the NCP because it is a current owner of the RBS Site. In response, Old Bridge asserts that it intends to invoke the innocent owner defense and, in any event, discovery (which has been stayed) is necessary before granting a motion for summary judgment.

### C. Discussion

As an initial matter, the Court has already dismissed Plaintiff's Spill Act claim as to the Township, so the only remaining claim is Plaintiff's claim for cost recovery under CERCLA. After considering the Parties' motion papers and oral arguments, the Court finds that granting Plaintiff's motion for partial summary judgment would be inappropriate at this stage in the proceedings. The Parties have not engaged in discovery and there are at least genuine issues regarding Defendant's affirmative defense. *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 845 (3d Cir.1992) (holding that an "incomplete state of discovery alone should have precluded summary judgment on the merits"). Therefore, Plaintiff's motion for partial summary judgment is denied without prejudice.[13]

## IV. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted in part and denied in part. Plaintiff's cross-motion for partial summary judgment is denied without prejudice. An Order consistent with this Opinion will be entered.

                                                                     /s/ Michael A. Shipp
                                                                     MICHAEL A. SHIPP
                                                                     UNITED STATES DISTRICT JUDGE

Dated: June 30, 2014

---

[13] At the June 19, 2014 hearing, the Court granted Plaintiff's April 8, 2014 request (ECF No. 245) to file a reply in support of its cross-motion for partial summary judgment. In Plaintiff's initial request, it attached a proposed reply and attachments, which the Court had reviewed and used as the basis for granting Plaintiff's request. It was brought to the Court's attention, by the Township (ECF No. 276), that the Reply filed by Plaintiff on June 23, 2014 (ECF No. 275) is materially different than the proposed reply it had attached to its initial request. After reviewing both the proposed reply and the Reply that was subsequently filed, the Court agrees with Old Bridge's assessment. The Court observed that entirely new sections were added to the brief, language was changed (*e.g.*, Old Bridge "should have known" was changed to Old Bridge "was aware" in several places), and Plaintiff attached entirely new exhibits. As such, the Court did not consider the portions of Plaintiff's reply that were not included in its proposed brief in determining the outcome for the partial motion for summary judgment. *See Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 n.2 (D.N.J. 1999) (Greenaway, J.) ("A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief.").