**ARCHER & GREINER, P.C.**
CHRISTOPHER R. GIBSON, ESQ.
cgibson@archerlaw.com
One Centennial Square
Haddonfield, NJ 08033
(856)795-2121 Main
(856)673-7077 Fax
Attorneys for Plaintiff
NL Industries, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NL INDUSTRIES, INC., | Civil Action No.:  3:13-cv-03493-MAS-TJB |
| Plaintiff, | |
| vs. | |
| OLD BRIDGE TOWNSHIP, UNITED STATES ARMY CORP OF ENGINEERS, MIDDLESEX COUNTY, AUWITE CONSTRUCTION CO., INC., UNITED STATES GENERAL SERVICES ADMINISTRATION, JOHNSON CONTROLS, INC., ENERSYS, INC., EXIDE TECHNOLOGIES, YUASA BATTERY, INC., H. BIXON & SONS, INC., E. I. DU PONT DE NEMOURS AND CO., C&D TECHNOLOGIES, INC., HONEYWELL INTERNATIONAL, INC., JOE KRENTZMAN & SON, INC., CARBORUNDUM ABRASIVE PRODUCTS, WIMCO METALS, INC., METALLON HOLDINGS CORP., RIO TINTO MINERALS, EAST PENN MANUFACTURING CO., TIFFEN MANUFACTURING CORP., RAE STORAGE BATTERY CO., ATLANTIC BATTERY CO., INC., GOULD ELECTRONICS, INC., ATLANTIC RICHFIELD CO., KANE STEEL COMPANY, CROWN BATTERY MANUFACTURING COMPANY, ATLANTIC BATTERY CORPORATION, PW ESQUIRE, CORP., INC., JOHN DOES 1-10, and JOHN DOES 11-20, | **Electronically Filed**<br><br>**SIXTH AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff NL Industries, Inc. ("NL"), by and through its attorneys, Archer & Greiner, P.C.,

alleges the following in its Sixth Amended Complaint against Defendants Old Bridge Township;

United States Army Corp of Engineers; Middlesex County; Auwite Construction Co. Inc.;

United States General Services Administration; Johnson Controls, Inc.; EnerSys, Inc.; Exide

Technologies; Yuasa Battery, Inc.; H. Bixon & Sons, Inc.; E. I. DuPont de Nemours and Co.;

C&D Technologies, Inc.; Honeywell International, Inc.; Joe Krentzman and Son, Inc.;

Carborundum Abrasive Products; Wimco Metals Inc.; Metallon Holdings Corp.; Rio Tinto

Minerals; East Penn Manufacturing Co.; Tiffen Manufacturing Corp.; RAE Storage Battery Co.;

Atlantic Battery Co., Inc.; Gould Electronics, Inc.; Atlantic Richfield Co.; Kane Steel Company;

Crown Battery Manufacturing Company; Atlantic Battery Corporation; PW Esquire, Corp., Inc.;

John Does 1-10; and John Does 11-20 (collectively "Defendants").

## SUMMARY OF THE ACTION

1.      The Record of Decision ("ROD") for the Raritan Bay Slag Superfund Site ("the

RBS Site") issued on May 23, 2013, requires a $79 million total off-site disposal remedy.  Since

the ROD was released, many have publicly insisted that the "polluter must pay" and pointed to a

single company selectively targeted by the United States Environmental Protection Agency

("USEPA").  NL brings this action to make sure that *all* "polluters" pay their fair and equitable

share of the cleanup costs, including those public entities that bear the lion's share of

responsibility for environmental issues at the RBS Site – Old Bridge Township and the United

States Army Corps of Engineers ("USACE") (collectively the "Public Polluter Defendants").

2.      Lead-bearing slag was not suddenly discovered at the RBS Site for the first time

in 2007, as press releases from the USEPA have implied.  Instead, during the late 1960's and

early 1970's, the Public Polluter Defendants knowingly allowed a private developer's use of slag

at the RBS Site to construct a seawall ("the Seawall") and refurbish a jetty ("the Western Jetty").

3.      It is well-documented that Old Bridge Township knew about, and allowed the use

of slag for construction of the Seawall, and even entered into a contract with the private

2

developer who built the Seawall.

4.      It is also well-documented that Old Bridge Township and the other Public Polluter Defendant knew that the slag used in these projects contained lead and posed potential environmental risks.  In the early 1970's, while the Seawall and Western Jetty at the Site were still being constructed and refurbished, respectively, communications between the Public Polluter Defendants, and newspaper articles that included photographs of the lead-bearing material, openly discussed the presence of lead-bearing slag at the RBS Site as well as the potential environmental problems that might flow from the use of that material in these projects. (See attached Exhibits D-I.)

5.      But the Public Polluter Defendants allowed the projects to proceed and allowed the lead-bearing slag to remain in the water.

6.      The conduct of Old Bridge Township is especially egregious.  In the 1980's, Old Bridge Township acquired ownership from the private developer of land on which the Seawall had been constructed and other related filling activities had occurred.  Despite Old Bridge Township's knowledge that lead-bearing slag had been used to construct the Seawall, and that lead-bearing material was now sitting unprotected in a marine environment, Old Bridge Township failed to remove the slag from the water and did absolutely nothing to prevent particles of the Seawall material from being mechanically broken down by wave action.

7.      Old Bridge Township instead sat by and did nothing for nearly thirty years, while the Seawall slowly broke down and lead-bearing particles were slowly spread by the near-shore current to soils and sediments throughout the RBS Site.

8.      In addition to allowing the initial placement of lead-bearing slag in the water, Old Bridge Township also allowed the upland portion of its property to be used as a dumping ground

for street sweepings (which generally contain lead) and other trash and debris.  Old Bridge

Township was cited for these violations of the environmental laws.

9.      In the ROD, the USEPA estimates that while there are approximately 11,000

cubic yards of slag and other source material at the RBS Site, there are more than 80,000 cubic

yards of additional contaminated soils and sediments at the RBS Site that exist because Old

Bridge Township, the other Public Polluter Defendant, and other property owners allowed lead-

bearing material to sit unprotected in the water for decades.

10.     Put simply, the Public Polluter Defendants not only caused the majority of the

problem at the RBS Site by allowing the use of lead-bearing slag in the Seawall and Western

Jetty in the first place, their subsequent inaction allowed the initial problem to become eight

times larger and much more expensive to address.

11.     NL's only connection to the RBS Site is that an NL facility in Perth Amboy might

have been one of the places where the private developers obtained material used to build the

Seawall and refurbish the Western Jetty.  NL never owned or leased any property at the RBS

Site, never operated there, never dumped any material there, and played no role in the decision of

the developers and the Public Polluter Defendants to place lead-bearing material in the water.

12.     Old Bridge Township and the other Public Polluter Defendant have approved

USEPA's selection of an all off-site disposal remedy that will cost tens of millions of dollars

more than on-site containment remedies that are also fully protective of public health and the

environment.  An all off-site disposal remedy is no more protective of human health, but

expenditure of the extra tens of millions of dollars to remove all material off-site will increase

the value of the property owned by Old Bridge Township and will minimize the maintenance

obligations of Old Bridge Township, the State of New Jersey (the "State"), and the USACE.  In

other words, the selection of the all off-site remedy provides special financial benefits to Old Bridge Township and the other Public Polluter Defendant that will not benefit other potentially responsible parties.

13.     Like NL, the Customer Defendants named in this action are liable based upon conduct not directly related to the creation of the Seawall or the refurbishment of the Western Jetty.  The Customer Defendants are liable under CERCLA because they sent lead-bearing material to the NL facility from which the USEPA alleges at least a portion of the lead-bearing slag originated, even though they did not play a role in approving the use of slag for the Seawall or Western Jetty and did not own or operate the Seawall or Western Jetty.

14.     The source material used in the construction or subsequent maintenance of the Seawall consisted not only of slag, but also of brick, concrete, rebar and other construction debris.  Other entities from which material used at the RBS Site originated, including other area smelters/sources of slag as well as local sources of construction debris, are included in this action as "John Doe" Defendants pending ascertainment of their identity through discovery.  NL has identified Atlantic Richfield Co. ("ARCO") as a successor in interest to The Anaconda Co. ("Anaconda") and International Smelting and Refining Co. ("International Smelting"), which owned and operated Raritan Copper Works, a facility from which material used to construct or maintain the Seawall, to refurbish or maintain the Western Jetty, or to fill other areas of the RBS Site originated.

15.     NL seeks cost recovery from each Defendant, as well as declaratory relief as to each Defendant, pursuant to Sections 107(a) and 113(g) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, 100 Stat. 1613

(1986), for costs that NL has incurred and will incur in responding to conditions of environmental contamination at the RBS Site.

16.     This action also seeks cost recovery and contribution from each Defendant under the New Jersey analog to CERCLA, the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11, et seq.

17.     This action further seeks declaratory relief under the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-50 et seq., as well as recovery for attorneys' fees, legal costs, pre-judgment interest and any such further and other relief as the Court may deem appropriate.

## PARTIES

18.     Plaintiff NL is a domestic business corporation organized and existing under the laws of the State of New Jersey and having an office for the transaction of business located at Three Lincoln Center, 5430 LBJ Freeway, Suite 1700, Dallas, Texas 75244.

### A.     Public Polluter Defendants

19.     Defendant Old Bridge Township (formerly known as Madison Township) is a municipal corporation in Middlesex County, New Jersey, maintaining offices located at 1 Old Bridge Plaza, Old Bridge, New Jersey 08857.

20.     Defendant USACE is an agency of the United States government headquartered at 441 G Street, NW, Washington, D.C. 20314.

### B.     Property Owner/Operator Defendants

21.     Defendant Middlesex County is a municipal corporation of the State of New Jersey, maintaining an administration building located at 75 Bayard Street, New Brunswick, New Jersey 08901.

22.     Upon information and belief, Defendant Auwite Construction Co., Inc. ("Auwite") is a corporation organized and existing under the laws of the State of New Jersey and

having an office for the transaction of business located at 55 Winged Foot Drive, Livingston, New Jersey 07039.

23.     Defendant PW Esquire, Corp., Inc. is a corporation organized and existing under the laws of New Jersey and having an office for the transaction of business located at Route 34 & Broad Street, P.O. Box 992, Matawan, New Jersey 07747.

**C.     Source Material Defendants**

**1.     NL Customer Defendants**

24.     Defendant United States General Services Administration is an agency of the United States government headquartered at 1800 F Street, NW, Washington, D.C. 20405.

25.     Upon information and belief, Defendant Johnson Controls, Inc. is a successor in interest to Globe-Union, Inc.  Johnson Controls, Inc. is a corporation organized and existing under the laws of the State of Wisconsin and having an office for the transaction of business located at 5757 N. Green Bay Avenue, P.O. Box 591, Milwaukee, Wisconsin 53201.

26.     Upon information and belief, Defendant EnerSys, Inc. is a successor in interest to Electric Storage Battery Co.  EnerSys, Inc. is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 2366 Bernville Road, Reading, Pennsylvania 19605.

27.     Upon information and belief, Defendant Exide Technologies is a successor in interest to Electric Storage Battery Co.  Exide Technologies is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 13000 Deerfield Parkway, Suite 200, Milton, Georgia 30004.

28.     Upon information and belief, Defendant Yuasa Battery, Inc. is a successor in interest to Electric Storage Battery Co.  Yuasa Battery, Inc. is a corporation organized and

existing under the laws of the Commonwealth of Pennsylvania and having an office for the transaction of business located at 2901 Montrose Avenue, Laureldale, Pennsylvania 19605.

29.     Defendant H. Bixon & Sons, Inc. is a corporation organized and existing under the laws of the State of Connecticut and having an office for the transaction of business located at 808 Washington Avenue, New Haven, Connecticut 06519.

30.     Defendant E. I. DuPont de Nemours and Co., is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 1007 Market Street, Wilmington, Delaware 19898.

31.     Upon information and belief, Defendant C&D Technologies, Inc. is a successor in interest to C&D Batteries.  C&D Technologies, Inc. a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 1400 Union Meeting Road, Blue Bell, Pennsylvania 19422.

32.     Upon information and belief, Defendant Honeywell International, Inc. is a successor in interest to C&D Batteries and Prestolite Batteries, Division of Eltra Corp. Honeywell International, Inc. is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 101 Columbia Road, Morristown, New Jersey 07960.

33.     Defendant Joe Krentzman & Son, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having an office for the transaction of business located at 3175 Black Maitland Road, Lewistown, Pennsylvania 17044.

34.     Defendant Carborundum Abrasive Products is a corporation organized and existing under the laws of the State of California and having an office for the transaction of business located at 1040 South Rockefeller Avenue, Ontario, California 91761.

35.     Defendant Wimco Metals, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having an office for the transaction of business located at 401 Penn Avenue, Pittsburgh, Pennsylvania 15221.

36.     Upon information and belief, Defendant Metallon Holdings Corp. is a successor in interest to Associated Metals & Minerals Corp.  Metallon Holdings Corp. is a corporation organized and existing under the laws of the State of Texas and having an office for the transaction of business located at 333 Westchester Avenue, Suite S101, White Plains, New York 10604.

37.     Upon information and belief, Defendant Rio Tinto Minerals is a successor in interest to Capper Pass & Son Ltd.  Rio Tinto Minerals is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 8051 East Maplewood Avenue, Greenwood Village, Colorado 80111.

38.     Defendant East Penn Manufacturing Co. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having an office for the transaction of business located at Deka Road, Lyon Station, Pennsylvania 19536.

39.     Defendant Tiffen Manufacturing Corp. is a corporation organized and existing under the laws of the State of Delaware and having an office for the transaction of business located at 90 Oser Avenue, Hauppauge, New York 11788.

40.     Defendant RAE Storage Battery Co. is a corporation organized and existing under the laws of the State of Connecticut and having an office for the transaction of business located at 51 Deming Road Berlin, Connecticut 06037.

41.     Defendant Atlantic Battery Co, Inc. is a corporation organized and existing under the laws of the State of Massachusetts and having an office for the transaction of business

located at 80 Elm Street, Watertown, Massachusetts 02472.

42.     Upon information and belief, Defendant Gould Electronics, Inc. is a successor in interest to Gould National.  Gould Electronics, Inc. is a corporation organized and existing under the laws of the State of Ohio and having an office for the transaction of business located at 34929 Curtis Boulevard, Willoughby, Ohio 44095.

43.     Upon information and belief, Defendant Kane Steel Company was a corporation organized and existing under the laws of the State of New Jersey with a principal place of business located at South 12th Street, Millville, New Jersey, 08332.

44.     Upon information and belief, Crown Battery Manufacturing Company is a corporation organized and existing under the laws of the State of Ohio with an office for the transaction of business located at 1445 Majestic Drive, Fremont, Ohio 43420.

45.     Upon information and belief, Atlantic Battery Corporation also doing business as, or the alter ego of, Atlantic Battery Systems, Inc.; Power Battery Co., Inc.; and Atlantic Battery Source is a corporation organized and existing under the laws of the State of New Jersey with an office for the transaction of business located at 548 East 42nd St., Paterson New Jersey 07513.

46.     Upon information and belief, John Does 1-10 are other entities that were customers of NL's Perth Amboy facility during the relevant time period, who delivered lead-bearing materials to NL's Perth Amboy facility, and whose lead-bearing materials ended up at the RBS Site.  The specific identity of these entities will be ascertained through discovery.

### 2.     Other Source Material Generator Defendants

47.     Upon Information and belief, Defendant Atlantic Richfield Co. is a successor in interest to Anaconda and International Smelting which owned and operated Raritan Copper Works.  Atlantic Richfield Co. is a corporation organized and existing under the laws of the State

of Delaware and having an office for the transaction of business located at 501 Westlake Park

Boulevard, Houston, Texas 77079.

48.     Upon information and belief, John Does 11-20 are area lead smelters, and area

generators of construction debris, whose waste materials ended up at the RBS Site and whose

specific identities will be ascertained through discovery.

## JURISDICTION AND VENUE

49.     This Court has original jurisdiction over this action pursuant to Section 107 of

CERCLA, 42 U.S.C. § 9607, and 28 U.S.C. §§1331 and 1367.

50.     This Court has jurisdiction to issue a declaratory judgment concerning the rights

and liabilities of the parties pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 9613(g)(2).

51.     This Court has supplemental jurisdiction over the state declaratory judgment and

Spill Act claims pursuant to 28 U.S.C. § 1367.

52.     Upon information and belief, all parties and/or their predecessors are conducting

business in the State of New Jersey and/or conducted business in the State of New Jersey during

the relevant time period, and have or had sufficient contacts with the State of New Jersey to be

subject to the jurisdiction of this Court.

53.     Venue is properly laid in the United States District Court for the District of New

Jersey by virtue of 42 U.S.C. §9613(b) and 28 U.S.C. §1391(b) because there have been releases

or threats of releases of hazardous substances onto real property situated in the District of New

Jersey, this is a judicial district in which a substantial part of the events or omissions giving rise

to the claims herein occurred, and the District of New Jersey is the location where a substantial

part of the property that is the subject of this action is situated.

## GENERAL ALLEGATIONS

**A.      The Shore Protection Project and the Public Polluter Defendants'
Responsibility for the Laurence Harbor Shoreline**

54.      In the 1950s, several severe storms (including two hurricanes in 1954) swept through Old Bridge Township (then called Madison Township) that significantly eroded the shoreline of Laurence Harbor and caused damage to the immediately adjacent area.

55.      In response to the storms, in 1955, the State of New Jersey Department of Conservation and Economic Development ("NJDCED") (later merged into the New Jersey Department of Environmental Protection ("NJDEP")) applied to the USACE for the approval of a cooperative beach erosion study for the shorelines along the Raritan and Sandy Hook Bays.

56.      The USACE undertook the investigation and issued a report in 1961, which documented the conditions of the shoreline at that time and proposed shore and hurricane protection for the study areas.

57.      The USACE recommended shore and hurricane protection for Madison (Old Bridge) Township, including a beachfill protective structure for bluff protection in the Laurence Harbor area extending from Morgan Beach to Seidler Beach, and a levee to be built at the easterly end of the Site.

58.      The United States Congress authorized implementation of the recommended shore and hurricane protection in the Flood Control Act of 1962.

59.      In or around 1962 or 1963, the USACE, State of New Jersey, and Madison (Old Bridge) Township entered into one or more agreements relating to the construction and maintenance of shore and hurricane protection for Madison (Old Bridge) Township, memorializing local cooperation in the implementation of the USACE's Raritan Bay and Sandy

12

Hook Cooperative Hurricane and Shore Protection Project in the Madison (Old Bridge) Township area ("Shore Protection Project").

60.     Shore and hurricane protection structures, including the proposed beachfill protective structure and levee, were constructed in the Laurence Harbor area of Madison Township during 1965 and 1966 as part of the Shore Protection Project.

61.     The shore and hurricane protection for Madison (Old Bridge) Township was constructed under the auspices of the USACE and the NJDCED, with a significant portion of the work being funding by the federal government.

62.     As part of the federal-state-local cooperative arrangement for implementation of the Shore Protection Project, the State of New Jersey and Madison (Old Bridge) Township assumed responsibility for the maintenance, operation, and inspection of the beachfill and levee structures that had been constructed.

63.     The Commissioner of the NJDCED was designated as the Superintendent of the Shore Protection Project.

64.     On or around April 1967, the Commissioner of the NJDCED acknowledged acceptance of the completed Shore Protection Project and confirmed previous assurances that the State would maintain and operate the Shore Protection Project in accordance with USACE regulations.

65.     In a letter dated March 21, 1967, the NJDCED advised the USACE that much of the responsibility for operation and maintenance of the Shore Protection Project would be delegated to the Madison (Old Bridge) Township Engineer, the Township police department, and the Township Public Works Department under the direction of the Township Mayor.

66.     In August 1970, the USACE issued an Operation and Maintenance Manual for the

Shore Protection Project to assist the State and Madison (Old Bridge) Township to comply with USACE regulations for operation and maintenance of the Shore Protection Project.

67.     The new beach created in the Laurence Harbor area during the Shore Protection Project by the construction of the beachfill protective structure became the property of the State of New Jersey, which also owned the riparian property outshore of the mean high tide line.

68.     Madison (Old Bridge) Township received easements from the State of New Jersey for access to the new beach to fulfill its maintenance responsibilities with respect to the Shore Protection Project.

69.     The USACE retained jurisdiction over the Shore Protection Project and the associated property.

**B.     Approval From the Public Polluter Defendants for a Private Developer's Use of Lead-Bearing Slag to Construct the Seawall**

70.     By 1968, a private developer known as Sea-Land Development Corp. ("Sea-Land") had acquired ownership of a portion of what is now the RBS Site and was interested in developing the Laurence Harbor area.

71.     As part of the anticipated development, Sea-Land proposed to construct the Seawall to substitute for the beachfill protective feature that had been constructed by the USACE through the Shore Protection Project.

72.     Madison (Old Bridge) Township officials, as well as representatives of the NJDCED, NJDEP, and the USACE were aware of Sea-Land's intention to use slag in the construction of the Seawall and allowed Sea-Land to do so.

73.     During a meeting with State and Madison Township officials on or around September 11, 1968, Sea-Land advised that it proposed to build the Seawall using slag, that the Seawall would be 15' above mean sea level, and that Sea-Land would fill the area behind the

Seawall to the same elevation.  Attendees at that meeting included the Madison (Old Bridge) Township Engineer as well as James Rankin, Acting Chief Engineer of the Navigation Bureau of the NJDCED.

74.     The September 11, 1968 meeting was memorialized in a memorandum prepared by James Rankin of the NJDCED, dated October 23, 1968, a copy of which is attached as Exhibit A.  That memorandum recounts that at the meeting:

> *Sea Land propose[d] to build a seawall composed of slag and clay core* with stone revetment on outshore side and berm. . . . The seawall berm is to be 15' above mean sea level and Sea Land is to fill behind it to the same elevation.  The seawall would substitute for the protective feature of the beachfill placed at this location by the Army Engineers.

(Emphasis added.)

75.     Neither the State of New Jersey nor Madison (Old Bridge) Township objected to Sea-Land's proposed use of slag to construct the Seawall, despite knowing that the Seawall would be in contact with water in the Raritan Bay.

76.     In accordance with the USACE's jurisdiction over the Shore Protection Project, Sea-Land requested that the USACE issue a permit for the proposed Seawall.

77.     The USACE advised Sea-Land that no formal permit was required for them to place fill to construct the proposed Seawall.  The USACE did ***not*** prohibit Sea-Land's planned use of slag to construct the Seawall.

78.     Sea-Land entered into a contract with Madison (Old Bridge) Township allowing Sea-Land to construct the Seawall and fill areas behind it.  The contract required the construction to be performed consistent with USACE recommendations.

79.     State of New Jersey officials advised Sea-Land that as a condition of providing certain riparian grants to Sea-Land, the State would require easements in perpetuity for public

use of certain areas to satisfy a public recreation benefits requirement of the Shore Protection Project.

80. State of New Jersey officials also advised Sea-Land that the State would require placement of beachfill in front (outshore) of the Seawall, following its construction, to reestablish the beach area that had been created through the Shore Protection Project.

81. In or around 1968, Sea-Land filed an application with the State of New Jersey seeking a riparian grant from the State of New Jersey.

82. State of New Jersey officials conferred with USACE officials regarding Sea-Land's proposed Seawall project.

83. Sea-Land submitted plans for its contemplated work along the shoreline in the Laurence Harbor area to the USACE, State of New Jersey, and Madison (Old Bridge) Township for review.

84. On or around December 17, 1969, the Natural Resources Council of the NJDEP provisionally approved the riparian grant Sea-Land sought, contingent upon four conditions:

    a.    Sea-Land was to deed back its title to that portion of the grant dated December 18, 1922 covered by its deed.

    b.    Sea-Land was to convey a perpetual easement for a beach area of 2.808 acres of grant to be conveyed.

    c.    Sea-Land was to create a beach acceptable to the U.S. Army Corps of Engineers to replace one constructed under its coast protection project.

    d.    Sea-Land was to provide public access over its property to proposed beach area.

The Natural Resources Council of the NJDEP did *not* require, as a condition of approving the riparian grant for Sea-Land's project, that Sea-Land change its plans to use slag to construct the Seawall.

85. In or around December 1969, the State of New Jersey – with the approval of

Madison (Old Bridge) Township and the USACE – granted a permit to Sea-Land to proceed with its project to construct the Seawall and fill adjoining land.

86.     On May 19, 1970, State of New Jersey officials, including Chief Engineer of the NJDCED Navigation Bureau James Rankin, met with officials of the USACE at the USACE's New York District Office to discuss Sea-Land's proposed project.  During that meeting, as summarized in a memorandum prepared by Mr. Rankin the next day (attached as Exhibit B), the State of New Jersey and USACE reached agreements on a number of topics including:

- certain requirements for the new beach to be constructed by Sea-Land outshore of the Seawall;

- that the NJDCED Navigation Bureau would prepare contract drawings and specifications for the new beach, and submit them to the USACE for approval, and the beach project was to be considered an amendment to the Shore Protection Project, and would have to be formalized through appropriate amendments to the State of New Jersey's and Madison (Old Bridge) Township's local cooperation agreements with the USACE under which they acknowledged operation and maintenance responsibility for the Shore Protection Project;

- the State of New Jersey was to obtain from Sea-Land and provide to the USACE a perpetual easement covering a portion of the new beach area, and to have the Natural Resources Council take appropriate action to ensure the perpetual existence of a portion of the new beach as a public beach with title to remain vested in the State;

- following USACE approval of the drawings and specifications, the new beach was to be constructed by Sea-Land or the State of New Jersey at Sea-Land's cost without any federal participation;

- the new beach was to be maintained by the State of New Jersey and Madison (Old Bridge) Township pursuant to their contractual local cooperation arrangements for the Shore Protection Project, and the Seawall and lands rearward were to be maintained by the owner of that property; and

- the State of New Jersey was to obtain from Sea-Land an easement in perpetuity for public access across the property of Sea-Land to the new beach at three locations, compatible with Sea-Land's development plans and subject to federal and State approval and acceptance.

The State of New Jersey and USACE did *not* challenge or question Sea-Land's proposed use of

lead-bearing slag to construct the Seawall despite requiring that Sea-Land construct a public beach to abut the planned Seawall.

87.     In October 1970, Sea-Land proposed to the State of New Jersey that Sea-Land be allowed to reimburse the USACE for its $55,000 expenditure in placement of the beachfill as part of the Shore Protection Project in lieu of creating a new beach outshore of the proposed Seawall.  In a memorandum dated October 19, 1970 from NJDCED Bureau of Navigation Chief James Rankin to Deputy Commissioner Joseph T. Barber (attached as Exhibit C), Mr. Rankin advised that in order to report the offer to the State's Natural Resources Council for decision, Madison (Old Bridge) Township would have to make a formal request and recommendation. Mr. Rankin also advised that a decision by the State's Natural Resources Council "would be subject to formal application to and approval by the Corps of Engineers."

88.     After several meetings between the State of New Jersey and Sea-Land in November and December 1970, it was determined that Sea-Land would accept the requirement of constructing a public beach outshore of the proposed Seawall.

89.     With knowledge that Sea-Land intended to use slag to construct the Seawall in a marine environment, where the Seawall would be subject to exposure to water and waves, Madison (Old Bridge) Township, the State of New Jersey, and the USACE allowed Sea-Land to proceed.

90.     During the late 1960's and early 1970's, Sea-Land engaged in filling activities, resulting in the construction of the Seawall and filling of areas behind it.  The filling activities took place not only on property then-owned by Sea-Land, but also – in anticipation of receipt of a riparian grant from the State of New Jersey, which had been applied for by Sea-Land and conditionally approved by the State's Natural Resources Council  – on the beach property

created by the Shore Protection Project, which was owned by the State of New Jersey.

C.   **Decision of the Public Polluter Defendants to Allow Lead-Bearing Slag to Remain Even After Concerns About Environmental Contamination Had Been Raised**

91.   Historical documents obtained by NL demonstrate that while the Seawall was still being constructed, Madison (Old Bridge) Township, the NJDCED, NJDEP, and the USACE had knowledge of the potential environmental contamination issues associated with Sea-Land's use of slag containing lead and other metals in the construction of the Seawall.

92.   In September 1972, while the Seawall was being constructed, the Chairman of the Madison (Old Bridge) Township Conservation Commission, George Koehler, contacted Arthur W. Price, Chief of the NJDEP's Bureau of Solid Waste Management by telephone and letter to raise concerns regarding Sea-Land's fill operations at what is now the RBS Site.

93.   In a letter to Mr. Price dated September 29, 1972 (attached as Exhibit D), on Madison (Old Bridge) Township letterhead, Mr. Koehler attached photographs of the lead-bearing slag being used by Sea-Land to construct the Seawall.  Mr. Koehler, in his letter, raised concerns that the slag, which he indicated "would also contain other heavy metals and metal sulphates," was being placed in an area that "passed the high tide mark and the dumping is taking place right into Raritan Bay therefore these metals and their soluble salts pose an additional threat to increasing the pollution in the bay."

94.   On October 3, 1972, The News Tribune newspaper published an article (attached as Exhibit E) that repeated the concerns raised in Mr. Koehler's September 29, 1972 letter.  The article also reported that the NJDEP had "agreed to send a field representative to the Laurence Harbor beachfront to investigate the dumping of lead slag along the waterline."

95.   On October 4, 1972, Charles E. Gingrich of the NJDEP's Bureau of Solid Waste

Management and a colleague inspected the area of Laurence Harbor where the slag was being

deposited by Sea-Land.

96.     On October 5, 1972, Mr. Gingrich wrote a letter to Mr. Koehler of the Madison

(Old Bridge) Township Conservation Commission (attached as Exhibit F).  Mr. Gingrich

advised:

> This site was inspected on October 4, 1972 by myself and another
> member of our staff.  Because of the nature of this material and
> where it is being deposited we have asked the cooperation of Mr.
> Charles M. Pike, Director of Water Resources and Mr. Richard D.
> Goodenough, Director of Marine Services.

(Exhibit F.)  Mr. Pike of the NJDEP's Division of Water Resources and Mr. Goodenough of the

NJDEP's Division of Marine Services (which was the former NJDCED now merged into the

NJDEP) were both listed as recipients of a copy of the letter.

97.     Mr. Gingrich also wrote a memorandum dated October 5, 1972 (attached as

Exhibit G) directly to Mr. Pike, in which he advised:

> Mr. Koehler, Chairman of the Madison Township Conservation
> Commission has brought to our attention the use of slag containing
> lead and other heavy metals in the construction of a sea wall along
> ½ mile of Laurence Harbor beach front and an access road to this
> sea wall through a tidal swamp.  Our Bureau has investigated this
> and we feel that because of the nature of this material and where it
> is being deposited that your sections of our Department would be
> vitally interested.

98.     On October 16, 1972, Mr. Koehler of the Madison (Old Bridge) Township

Conservation Commission wrote a letter, on Madison (Old Bridge) Township letterhead

(attached as Exhibit H) to Mr. Pike enclosing photographs of the lead-bearing slag being placed

on the Laurence Harbor shoreline to build the Seawall and again expressing his concerns

regarding the effect of the presence of the slag on the waters of Raritan Bay.

99.     On or around November 1972, another article (attached as Exhibit I) appeared in a

20

local newspaper, which recounted testimony given by Mr. Koehler of the Madison (Old Bridge) Township Conservation Commission at a public meeting on November 10, 1972.  The article, accompanied by pictures of the Seawall, discussed environmental risks posed by the presence of lead-bearing slag on the shore of Raritan Bay.

100.    On February 21 1973, the Madison (Old Bridge) Township Engineer, Harvey P. Goldie, sent letters to a number of USACE, NJDEP, and Madison (Old Bridge) Township officials inviting them to attend a public meeting of the Madison (Old Bridge) Township Council scheduled for March 1, 1973 to discuss issues involving beachfront filling activities and beach erosion, in response to citizen inquiries.  Notification of the meeting was sent to the following government officials:

**USACE**
Mr. F. Pagano, Chief, Engineering Division
Mr. Gilbert Nersesian, Chief, Beach Erosion & Hurricane
Mr. John Falkenbury, Regulatory Beach Permits
Mr. Pinata, Asst. Chief of Operation Division

**NJDEP**
Mr. James K. Rankin, Chief, Division of Marine Services, Bureau of Navigation
Mr. Harold J. Barker, Jr., Chief, Division of Marine Services, Bureau of Lands
        Management
Mr. Donald Graham, Supervisor of Permits & Licenses, Bureau of Navigation
Mr. Charles Gingrich, Bureau of Solid Waste Management

**Township and County**
Mr. Richard Dealy, Chairman, Madison (Old Bridge) Planning Board
Mr. Richard Plechner, Madison (Old Bridge) Township Attorney
Mr. George R. Koehler, Chairman Madison (Old Bridge) Township Conservation
        Commission
Mr. Ken Sandor, Director of Environmental Health & Protection, Middlesex County

(See Notification List attached as Exhibit J.)

101.    On February 23, 1973, Mr. Goldie followed up his initial February 21, 1973 letter with another letter to USACE, NJDEP, and Madison (Old Bridge) Township officials forwarding

an agenda for the March 1, 1973 meeting.  The agenda (attached as Exhibit K) listed a number of issues for discussion under the topic of "Beachfront Filling," including questions as to whether all necessary permits had been obtained, whether the filling encroached on wetlands or riparian lands, and whether necessary riparian grants had been obtained.  Under the subheading "Environmental aspects," the agenda posed questions as to "state requirements for land fill" and "does material in land fill endanger environment or ecology of area?"

102.    On February 23, 1973, Mr. Gingrich of the NJDEP's Bureau of Solid Waste Management, wrote a letter (attached as Exhibit L) responding to Mr. Goldie's initial letter, in which Mr. Gingrich stated:

> To be brief, *we do not feel that the Bureau of Solid Waste Management is involved in the construction of the sea wall along Cliffwood Beach front, as this construction is being made of inert inorganic material.*  It is possible that the Division of Water Resources of the Department of Environmental Protection may have some interest.
>
> Under these conditions we will not have a representative present at your meeting of March 1, 1973.

(Emphasis added.)

103.    The proposed March 1, 1973 meeting of the Madison (Old Bridge) Township Council to discuss beachfront filling and beach erosion issues occurred as scheduled.  Attendees included the following persons:

**USACE (New York District)**
Mr. Phillip McGrade, Acting Chief, Construction Permit Section
Mr. Thomas Maisano, Chief, Discharge Section
Mr. Stanley Maisel, Chief of Planning, Engineering Division

**Township**
Mayor English
Councilmen Fuhrmen, Murphy, and Wenng
Manager L. A. Kenyon
Attorney Richard Plechner
Engineer Harvey Goldie

Chairman of Conservation Commission, George Koehler

104.     The minutes of the March 1, 1973 Madison (Old Bridge) Township Council

meeting are attached as Exhibit M.  Phillip McGrade of the USACE reported that no formal

permit was required for Sea-Land's fill operations at Laurence Harbor because the project

originated before May 27, 1970, when the USACE had first instituted its permit requirements for

projects involving work beyond the mean high tide line.  However, Sea-Land's project was still

subject to federal regulations governing navigable waters.  Mr. McGrade advised that "the

enforcement of any of these regulations had to be done by the Corps and that local authorities

should not act in their behalf on enforcement.  They should merely report any suspected

violations and the Corps would send an inspector."

105.     The minutes of the March 1, 1973 meeting reflect that Stanley Maisel, Chief of

Planning for the Engineering Division of the USACE, New York District

> pointed out that the Sealand project actually improves the
> effectiveness of the Hurricane Project, rather than endangering it;
> therefore, they would not have required a permit in connection
> with the Township's and State's contractual obligations to
> maintain and protect this project once it was built.  ***He indicated
> that, while the rubble in the fill used by Sealand might not be
> proper material for a beach recreational area, there was no
> indication that the Township's Hurricane Project was done for
> recreational purposes or that there was any contractual
> obligations in this respect.***

(Emphasis added.)

106.     No one from the State of New Jersey attended the March 1, 1973 meeting.

However, a separate meeting was scheduled to occur on March 27, 1973 between officials of the

USACE, the State of New Jersey, and Madison (Old Bridge) Township.

107.     On March 27, 1973, a meeting was held in Trenton, New Jersey at the offices of

the NJDEP to discuss concerns relating to the Laurence Harbor beachfront.  Attendees at that

23

meeting included:

**USACE**
Stanley Maisel, Chief of Planning, Engineering Division

**NJDEP**
James K. Rankin, Chief Liaison Officer, Division of Marine Services
Bernard J. Moore, Supervisor, Shore Protection
Peter C. Newson, Supervisor, Wetlands
John P. Marron, Division of Marine Services
Donald T. Graham, Supervisor, Permits & Licenses
James R. Tolinson, Supervisor, Riparian Section
Harold Barker, Chief, Marine Lands Management

**Township**
Manager L. A. Kenyon
Councilman Fuhrman
Attorney Richard Plechner
Engineer Harvey Goldie
Chairman of Conservation Commission, George Koehler
Mr. Quail

108.    The minutes of the March 27, 1973 meeting (attached as Exhibit N) reflect that

the State of New Jersey acknowledged its ownership of the beach that had been created by the

Shore Protection Project, upon which a portion of Sea-Land's filling activities had taken place.

Also, the NJDEP promised to supply a report from its Bureau of Water Pollution Control "re:

lead slag dumped by Sea Land."

109.    Despite the knowledge of Madison (Old Bridge) Township, State of New Jersey,

and USACE officials that slag containing lead and other metals were being used in the

construction of the Seawall, they did not prevent construction of the Seawall with slag or take

other measures to prevent or remediate any associated release or threatened release of hazardous

substances into the environment from the slag.

110.    In 1975, Madison Township changed its name to the Old Bridge Township.

111.    In 1983, Old Bridge Township acquired by deed the former Sea-Land property on

24

which Seawall construction and filling activities had taken place.

112.    In the three decades since it took ownership of the Sea-Land property, Old Bridge Township has taken no actions to remove the lead-bearing slag from the water, or to in any way limit the mechanical separation and distribution of lead particles throughout the RBS Site.

113.    In 1993, P.W. Esquire Corp., Inc. purchased certain real property at the RBS Site that was, upon information and belief, already contaminated with some amount of lead-bearing material.  On February 11, 1997, Old Bridge Township acquired the property at issue from P.W. Esquire Corp., Inc. by means of tax foreclosure.  USEPA has alleged that the property at issue is contaminated with lead.

114.    In 1998, Middlesex County entered into a ninety-nine year lease (the "Lease Agreement") with Old Bridge Township through which Middlesex County leases certain lands adjacent to the Raritan Bay, including the Old Bridge Township property acquired from Sea-Land, in order to develop a waterfront recreational facility (the "Waterfront Park").

115.    Pursuant to the Lease Agreement, Middlesex County was responsible for the design and construction of the Waterfront Park.  As part of the Lease Agreement, Old Bridge Township retained the right to review and approve the design plans and specifications, which were required to include, among other things, beach and storm protection.

116.    Pursuant to the Lease Agreement, upon completion of the Waterfront Park, Middlesex County was responsible for the maintenance of the park and the facilities located therein.

**D.**    **Use of Lead-Bearing Slag to Refurbish the Western Jetty**

117.    In June 1880, the USACE obtained authorization from Congress to construct a stone jetty at the Cheesequake Creek Inlet, in Laurence Harbor, identified on the Middlesex

County tax map as Block 551, Lot 1.01 (the "Western Jetty").

118.    As described in the 1882 Annual Report of the Chief of Engineers, U.S. Army, a survey was conducted in 1879 that identified the need for improvements to the Cheesequake Creek outlet because accumulations of sand formed by waves and currents forced the outlet to run nearly parallel with the beach.  (Exhibit O.)  As part of the improvements, the USACE planned to dredge the way for a new outlet and install two parallel jetties of stone.

119.    Because the dredging of the outlet would encroach upon certain private property, in 1880 David Noble Rowan transferred his interest in the land needed for the project to the federal government.  (Exhibit P at 10.)

120.    The transfer of land needed for the project to the federal government was subsequently recorded.  Specifically, the 1882 Annual Report states:  "As dredging the way for the new outlet would involve encroachment of private property, the owner, Mr. David Noble Rowan, voluntarily offered the land to the government for the purpose of the improvement, *and the papers in the case have been lately finished and recorded*."  (Exhibit O) (emphasis added).

121.    The Western Jetty originally was constructed by the USACE in or around 1883.

122.    Nearly forty years later, the Report of the Chief of Engineers, U.S. Army, for fiscal year ending June 30, 1922, later confirmed that "Mr. David Noble Rowan, voluntarily offered and gave the land to the Government."  (Exhibit Q.)

123.    In a letter from the Secretary of War to the 59th Congress, Second Session, submitting abstracts of proposals for the fiscal year 1906, there was an "abstract of proposals for repairing United States Government jetties at Cheesequake Creek New Jersey, received in response to circular notice dated February 21, 1906, by Col. W. R. Livermore, Corps of Engineers."  (Exhibit R.)

124.    A New Jersey statute from approximately 1907 relating to clams and oysters in the Raritan Bay and Cheesequake creek defines certain oysterbeds using the "government jetty at Cheesequake creek" as a point of reference.  (Exhibit S.)

125.    The USACE since has undertaken operation and maintenance of the Western Jetty.  (Exhibit T.)

126.    Upon information and belief, during approximately the same time period that the Seawall was being constructed, lead-bearing slag was placed on the Western Jetty and the adjacent land (identified on the Middlesex County tax map as Block 551, Lot 1) in an effort to reinforce and supplement the Western Jetty which had been damaged and reduced in size by storm activity.

127.    Upon information and belief, the USACE and State of New Jersey were aware of, and allowed, the use of slag to refurbish the Western Jetty.

128.     A report created by the USACE in 1988 entitled "Inventory of Training Structures in Estuaries" includes the Cheesequake jetties in the USACE's property inventory. (Exhibit U at 37.)

129.    The USACE's current real estate management inventory database (REMIS) lists "2 STONE JETTIES AND SHEET PILE DIKE" at the Cheesequake Creek Channel as "Government Asset[s]" and "Federal Government Owned Property" confirming the USACE's current ownership of the Western Jetty.  (Exhibit V.)

130.    During the period in which the Western Jetty and the adjacent land were being reinforced and supplemented, certain riparian land at or near the Western Jetty and the adjacent upland area were owned by Ramble Realty Co.

131.    Upon information and belief, the State of New Jersey had an ownership interest in

a small portion of the Western Jetty and/or surrounding riparian land that had not been transferred through a riparian grant, during the time when the jetty was being reinforced and supplemented with slag.

132.    Upon information and belief, the State of New Jersey currently has an ownership interest in a small portion of the Western Jetty and/or surrounding riparian land.

133.    Auwite Construction Co., Inc. is the current owner of most of the riparian land surrounding the Western Jetty (aside from the portion owned by the State of New Jersey) and the adjacent upland area, having acquired it in January 1995.

134.    The USACE has owned and operated the Western Jetty since its construction in or around 1883 and is still the owner of the Western Jetty today.

**E.    Listing of the RBS Site on the NPL**

135.    In 2007, NL received a Request for Information from the NJDEP regarding the site.

136.    In 2008, the NJDEP issued a Directive and Notice to Insurers requiring that NL conduct a remedial investigation and then propose and implement a remedial action to address contamination at the Site.

137.    NL undertook remedial investigation activities at the request and authorization of the NJDEP pursuant to the 2008 Directive and Notice to Insurers.  NL incurred costs in preparing and submitting a Remedial Action Workplan to NJDEP on July 18, 2008.  The workplan incorporated several investigations completed by NL.

138.    The NJDEP indicated that it did not consider the Remedial Action Workplan sufficient to fully satisfy the June 17, 2008 Directive and Notice to Insurers, but the NJDEP suggested that NL implement the workplan as an Interim Remedial Measure.

28

139.    In 2008, the NJDEP asked the USEPA to pursue and oversee investigation and remediation activities at the RBS Site.  The request from the NJDEP to the USEPA was made in writing.  On April 24, 2008, the USEPA's Removal Action Branch received a letter from the NJDEP requesting that the USEPA evaluate the Seawall for a removal action under CERCLA.

140.    On November 3, 2008, the NJDEP forwarded an amended request to the USEPA's Removal Action Branch to include the Western Jetty in the overall site.  And, in March 2009, a 47-acre property located near Margaret's Creek was also included in the overall site through a request made to the USEPA's Remedial Program.

141.    In April 2009, the USEPA proposed the RBS Site for listing on the National Priorities List and began a sampling program at the RBS Site.  The USEPA reported that its sampling detected elevated levels of lead and other metals in soils, beach sand, and sediment in various areas of the RBS Site.  On November 4, 2009, the Site was added to the National Priority List by the USEPA.

142.    The USEPA has alleged that leaching of various hazardous substances, including lead, from the Seawall and the Western Jetty has occurred.

143.    The NCP provides that "EPA shall encourage states to participate in Fund-financed response in two ways.  Pursuant to § 300.515(a), states may either assume the lead through a cooperative agreement for the response action or may be the support agency in EPA-lead remedial response."  40 C.F.R. § 300.500(b).

144.    The NCP provides that "[f]or EPA-lead Fund-financed remedial planning activities, including, but not limited to, remedial investigations, feasibility studies, and remedial designs, the state agency acceptance of the support agency role during an EPA-lead response shall be documented in a letter, SMOA, or cooperative agreement."  40 C.F.R. § 300.515(a)(2).

145.   Upon information and belief, the NJDEP submitted to the USEPA written documentation of the NJDEP's acceptance of the support agency role at the RBS Site.

146.   Under CERCLA § 122(e)(6), "once a Federally-approved RI/FS has been initiated at a site, no PRP may undertake any remedial action at the site unless the remedial action has been authorized by EPA.  Thus, State-ordered PRP remedial actions may not proceed post-Federally-approved RI/FS without EPA authorization."  OSWER Directive # 9831.9, at 3.

147.   The USEPA entered into an Interagency Agreement with the USACE to conduct the Remedial Investigation/Feasibility Study (i.e., the RI/FS).  Remedial Investigation (RI) field activities were conducted from September 2010 through June 2011.  See USEPA Fact Sheet for the RBS Site, available at http://www.epa.gov/region2 /superfund/npl/0206276c.pdf.

148.   In 2011, the USEPA, the NJDEP and NL participated in several meetings together to discuss potential investigatory steps at the RBS Site, including the potential preparation of an Engineering Evaluation/ Cost Analysis ("EE/CA") by NL.

149.   Following those meetings, on December 5, 2011, the USEPA approved in writing NL's preparation of an EE/CA as part of the investigation that the NJDEP had asked the USEPA to perform at the RBS Site.

150.   After receiving that written approval from the USEPA, NL prepared the EE/CA. The EE/CA was later submitted to USEPA on May 22, 2012.

151.   In February 20, 2012, NL submitted comments in writing to the USEPA's Remedial Investigation Report for the RBS Site.

152.   On March 2, 2012, the USEPA issued a Feasibility Study for the RBS Site.

153.   The USEPA submitted its proposed remedial action to the USEPA National Remedy Review Board ("NRRB") and invited NL to participate in the review process by

submitting written comments with suggestions to improve the proposed remedial approach and ensure its consistency with the NCP.

154.    The proposed remedial action included the removal of certain sediments that contained arsenic above a threshold level, but which had not been impacted by slag or other source material at the Site.

155.    NL had engaged contractors to gather samples of slag, battery casings, and impacted sands and sediments from the RBS Site to evaluate, inter alia, whether certain arsenical sediments had been impacted by slag or other source material.  NL did not return to the Site the impacted material it removed from the Site as part of the investigation.

156.    Among other things, NL explained in its March 12, 2012 comments to the NRRB that the erroneous inclusion of unrelated arsenical sediments would render the remedy at issue non-compliant with the NCP.

157.    Following its consideration of NL's written comments, in an effort to ensure that the remedial action for the RBS Site would be consistent with the NCP, the USEPA revised its feasibility study and proposed a new remedial action that no longer included removal of the arsenical sediments addressed by NL's comments.

158.    In September 2013, the USEPA issued its revised proposed plan for the RBS Site.

159.    On May 8, 2013, the Assistant Administrator of the NJDEP submitted a written "concurrence," approving on behalf of NJDEP all elements of USEPA's remedial action plan for the RBS Site as well as the process used to select the remedy.  (See Exhibit W.)

160.    On May 23, 2013, the USEPA issued a ROD indicating its belief that certain areas within the RBS Site require environmental response activities.

161.    NL and the USEPA have incurred and will continue to incur substantial costs

associated with the investigation of arsenic contamination at the RBS Site.

162.   NL has incurred and will continue to incur substantial costs in performing response activities at the RBS Site.

163.   The USEPA also has incurred costs associated with the investigation and remediation of environmental contamination at the RBS Site which it may seek to recover from NL.

164.   NL has incurred and will continue to incur substantial direct "cleanup and removal costs", within the meaning of N.J.S.A. 58:10-23.11b, and costs of "response", as defined under CERCLA, at the RBS Site.  Costs already incurred include, but are not limited to:

  a. Assisting the NJDEP and the USEPA with investigation of the RBS Site and characterization of the nature, extent, and sources of contamination. NL's environmental consultants completed in-the-field investigations at the RBS Site or in the vicinity, including the July 13, 2009 investigation to characterize contamination at the Seawall, the June 22, 2012 investigation of background conditions in the vicinity of the RBS Site, and the July 12, 2012 sampling to analyze metal concentrations and physical characteristics of the slag at the RBS Site.  These investigations were completed by NL's environmental consultants at an approximate cost of $110,000;

  b. Assisting the USEPA with the evaluation of various response action alternatives, including the EE/CA submitted to the USEPA on May 22, 2012.  At the request and encouragement of the USEPA, NL's environmental consultants completed the EE/CA in order to evaluate interim measures designed to address the sources of lead at the RBS Site. The approximate cost incurred by NL for this work was $75,000;

  c. Assisting the USEPA's efforts to keep the local community informed and involved.  NL's environmental consultants prepared for and participated in numerous public meetings of the USEPA-sponsored Raritan Bay Slag Community Advisory Group.  As part of the meetings, NL's consultants answered questions from community members and obtained feedback on various potential remedial alternatives being discussed for the RBS Site. This work was completed by NL's environmental consultants at an approximate cost of $35,000;

  d. Identifying other Potentially Responsible Parties ("PRPs") that may be liable to perform and/or pay for cleanup and removal costs (including

development of information that the USEPA used as a basis to send information requests to certain PRPs pursuant to Section 104(e) of CERCLA. This work included reviewing historical maps, photographs, deeds, and regulatory files and discussing the history of the RBS Site with various former regulators and officials from the State of New Jersey. The work included researching the former owners of portions of the RBS Site. Research was completed in order to identify smelting and associated industrial operations conducted in and around the RBS Site. Numerous public records information requests were submitted to state and federal government agencies in order to gather information related to PRPs. Research also was completed related to former customers of NL's secondary lead smelting facility in Perth Amboy, New Jersey. This work was completed by NL's environmental consultants as well as NL's counsel at a cost in excess of $125,000; and

e.   Developing approaches to implement the remedy selected in the ROD, including a study of magnetic separation technology for potential use in accomplishing the selected remedy. The Study evaluated whether magnetic separation treatment technology could be used in the remediation of the RBS Site in order to reduce the amount of material requiring off-site disposal, reduce the amount of material which needed to be imported to backfill site excavations, and reduce the amount of material which needed to be placed in off-site landfills. The Magnetic Separation Study was completed by NL's environmental consultants at the suggestion and with the USEPA's encouragement at an approximate cost of $27,000.

165.   All costs incurred, and to be incurred, by NL in connection with the RBS Site are necessary "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b, said costs being, to the greatest extent possible, incurred in accordance with the National Contingency Plan.

166.   All costs incurred, and to be incurred, by NL in connection with the RBS Site are costs of "response" as defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601 (25).

F.   **Responsibility of Public Polluter Defendants and Property Owner/Operator Defendants**

167.   Through their roles in the design, approval, permitting and/or maintenance of the Seawall, Defendants USACE and Old Bridge Township arranged for the deposit of "hazardous substances" at the RBS Site within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(3).

33

168.   Upon information and belief, through its role in the design, approval, supplementation, reinforcement and/or maintenance of the Western Jetty, Defendant USACE arranged for the deposit of "hazardous substances" at the RBS Site within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(3).

169.   Defendant the USACE was an owner and operator of the Western Jetty at the time it was supplemented and reinforced, and therefore is a person who owned a "facility" at which "hazardous substances" were disposed of under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(2).

170.   Defendant the USACE is a current owner and operator of the Western Jetty where there has been a "release" or "threatened release" of "hazardous substances" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

171.   Upon information and belief, Defendant Auwite is a current owner of the portion of the RBS Site which includes the Western Jetty, the surrounding riparian land, and the adjacent upland area where there has been a "release" or "threatened release" of "hazardous substances" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

172.   Upon information and belief, Old Bridge Township is a current owner of the portion of the RBS Site which includes the Seawall where there has been a "release" or "threatened release" of "hazardous substances" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

173.   Upon information and belief, Middlesex County is an operator of the portion of the Site which includes the Seawall where there has been a "release" or "threatened release" of "hazardous substances" under Section 101(20) of CERCLA, 42 U.S.C. §§ 9601(20) and Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

174.     Upon information and belief, P.W. Esquire Corp., Inc. is an "owner" of a portion of the RBS Site under Section 101(20)(iii) of CERCLA, 42 U.S.C. § 9601(20)(iii).

175.     Upon information and belief, Defendants Middlesex County, Old Bridge Township, the USACE, Auwite, and PW Esquire, Corp., Inc. are or have been "owners or operators" of portions of the RBS Site as defined under Section 101(20) of CERCLA, 42 U.S.C. §§ 9601(20) and described under Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a)(1), (2).

**G.     Responsibility of NL Customer Defendants**

176.     NL purchased the United Lead Company in 1928 and assumed direct operation of a secondary lead smelting facility at 1050 State Street in Perth Amboy, New Jersey (the "Perth Amboy facility").  NL's lead smelting operations at the Perth Amboy facility continued through 1975.

177.     The secondary lead smelter at NL's Perth Amboy facility extracted and processed lead from various lead-containing materials, including but not limited to scrap metal, dross, and lead battery plates removed from lead/acid storage batteries.  The by-products of this process included furnace slag that contained lead and other metals, as well as battery casings that had lead and other metals adhering to them.

178.     Customers of NL's Perth Amboy facility sent used batteries, scrap metals, converted antimonial lead, furnace buttons, and other waste materials containing lead and other metals to the Perth Amboy facility for reclamation and disposal.

179.     Upon information and belief, Defendants (or their predecessors) United States General Services Administration, Johnson Controls, Inc., EnerSys, Inc., Exide Technologies, Yuasa Battery, Inc., H. Bixon & Sons, Inc., E. I. DuPont de Nemours and Co., C&D Technologies, Inc., Honeywell International, Inc., Joe Krentzman and Son, Inc., Carborundum

Abrasive Products, Wimco Metals Inc., Metallon Holdings Corp., Rio Tinto Minerals, East Penn Manufacturing Co., Tiffen Manufacturing Corp., RAE Storage Battery Co., Atlantic Battery Co. Inc., Gould Electronics, Inc., Kane Steel Company, Crown Battery Manufacturing Company, Atlantic Battery Corporation, and John Does 1-10 (collectively, "NL Customer Defendants") arranged for the disposal of waste material at NL's Perth Amboy facility including, but not limited to, lead, chromium, antimony and arsenic pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(3).

180.    Lead, chromium, antimony, arsenic, and other substances contained in the waste materials sent by the NL Customer Defendants to the Perth Amboy facility for processing are "hazardous substances" as defined within the meanings of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and N.J.S.A. 58:10-23.11b.

181.    NL hired the Liberty Trucking Co. ("Liberty") of Fords, New Jersey, to dispose of certain waste materials from the Perth Amboy lead smelting operations, including furnace slag generated at the Perth Amboy facility.

182.    Upon information and belief, the waste materials Liberty removed from NL's Perth Amboy facility were transported to Liberty's property on Route 35 in Old Bridge Township, New Jersey.

183.    To the extent that any furnace slag or other waste material from NL's Perth Amboy facility was used in the construction of the Seawall or associated filling activities, or was placed on the Western Jetty or the adjacent land, NL did not direct such use and was not a party to any contract providing for such use.

184.    The USEPA now alleges that waste materials (including slag and battery casings containing "hazardous substances" as defined pursuant to Section 101(14) of CERCLA, 42

U.S.C. § 9601(14) and N.J.S.A. 58:10-23.11b) taken from the Perth Amboy facility for disposal by Liberty were subsequently deposited at the RBS Site.

**H.    Responsibility of Other Source Material Generator Defendants**

185.    Upon information and belief, ARCO is a successor in interest to Anaconda and International Smelting, which owned and operated Raritan Copper Works, a facility from which material used to construct or maintain the Seawall, to refurbish or maintain the Western Jetty, or to fill other areas of the RBS Site originated.  Upon information and belief, the waste materials Liberty removed from the Raritan Copper Works facility were transported to the RBS Site. ARCO's predecessors Anaconda and International Smelting arranged for the disposal of waste material containing "hazardous substances" at the RBS Site within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(3).

186.    Upon information and belief, some of the source material deposited at the RBS Site to construct or maintain the Seawall, to refurbish or maintain the Western Jetty, or to fill other areas of the RBS Site originated from entities other than NL or the Raritan Copper Works. These other area smelters and sources of construction debris, named in this action as John Does 11-20, arranged for the disposal of waste material containing "hazardous substances" at the RBS Site within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(3).

**COUNT I**

**COST RECOVERY UNDER CERCLA § 107(a)**

187.    NL repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

188.    The RBS Site is a "facility" as that term is defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

189.    There has been a "release" or "threatened release" of "hazardous substances" at

the RBS Site as those terms are defined in Sections 101(22) and (14) of CERCLA, 42 U.S.C. §§ 9601(14) and (22).

190.    Each Defendant is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

191.    The costs that NL has incurred and will incur in connection with actions it has taken in response to the release or threatened release of hazardous substances at the RBS Site are costs of "response" as defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601 (25).

192.    NL's costs of "response" at the RBS Site include those costs associated with its "removal" actions as defined by Section 101(23), "remedial actions" as defined by Section 101(24) and "response" actions as defined by Section 101(25) of CERCLA, 42 U.S.C. §§ 9601 (23), (24) and (25).

193.    All costs that NL has incurred or will incur at the RBS Site, including attorney's fees, are, and will be, necessary costs of response consistent with the National Contingency Plan ("NCP"), 40 C.F.R. § 300, et seq.

194.    NL has satisfied any conditions precedent to the incurrence of response costs and to the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

195.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Defendants are jointly and severally liable for all response costs incurred by NL for activities conducted at the RBS Site.

196.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), NL is entitled to recover interest on the response costs it has incurred.

WHEREFORE, NL seeks judgment in its favor against Defendants:

      a.    finding that Defendants are strictly jointly and severally liable under CERCLA for response costs incurred by NL in connection with the RBS

      Site;

b.  ordering Defendants to reimburse NL in an amount equal to the response costs incurred by NL in connection with the RBS Site;

c.  awarding NL costs of suit; and

d.  awarding NL such other relief as the Court deems appropriate.

**COUNT II**

**DECLARATORY JUDGMENT UNDER CERCLA § 113**

197.  NL repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

198.  Pursuant to 28 U.S.C. § 2201(a), this Court "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

199.  An actionable, legal controversy exists between NL and the Defendants whereby NL seeks a judicial declaration of its rights and legal relationships with the Defendants pursuant to 28 U.S.C. § 2201.  NL contends that the Defendants are strictly liable under CERCLA and are obligated to reimburse NL for its contributory share of past, current and future costs for response actions at the RBS Site.

200.  Pursuant to §113(g)(2) of CERCLA, 42 U.S.C. §9613(g)(2), NL is entitled to a declaratory judgment on the Defendants' liability for response costs or damages, including future response costs or damages.

201.  Accordingly, a declaratory judgment should be entered holding the Defendants liable for future response costs as defined under CERCLA, which NL has sustained or will sustain in connection with hazardous substances disposed of, released at, and/or impacting the

RBS Site.

WHEREFORE, NL requests that judgment be entered in its favor against Defendants as follows:

   a. declaring Defendants liable for future response costs to be incurred by NL in connection with the RBS Site pursuant to and as provided by CERCLA; and

   b. awarding NL such other relief as the Court deems appropriate.

## COUNT III

## DECLARATORY RELIEF UNDER THE NEW JERSEY DECLARATORY JUDGMENT ACT

202. NL repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

203. NL requires a declaratory judgment against Defendants under the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-50 et seq., declaring Defendants' liability for response costs or damages, including future response costs or damages, that will be binding in any subsequent action.

204. An actual, substantial and justiciable controversy exists between NL and Defendants regarding their respective rights and obligations for the remediation of the RBS Site and the costs and/or damages that have been and will be incurred by NL.

205. A declaratory judgment is necessary for the purpose of settling and affording relief from uncertainty with respect to Defendants' liability to NL.

206. Accordingly, a declaratory judgment should be entered pursuant to N.J.S.A. 2A:16-50 et seq., holding the Defendants liable for response costs or damages that NL has sustained or will sustain in connection with hazardous substances disposed of, released at, and/or impacting the RBS Site.

WHEREFORE, NL seeks declaratory judgment in its favor against Defendants:

    a.    finding that Defendants are liable for response costs or damages incurred and future response costs or damages to be incurred by NL in connection with the RBS Site; and

    b.    awarding NL such other relief as the Court deems appropriate.

## COUNT IV

## COST RECOVERY AND CONTRIBUTION UNDER THE SPILL ACT

207.    NL repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

208.    "Hazardous substances" have been "discharge[d]" at the RBS Site as defined by N.J.S.A. 58:10-23.11b.

209.    As a result of the discharge of hazardous substances, NL has engaged, and will continue to engage, in "cleanup and removal" activities at the RBS Site.

210.    NL has incurred costs as a result of its performance of such cleanup and removal activities at the RBS Site.

211.    Prior to the transition of the Site to the USEPA, NL completed investigation activities at the direction and with the prior written approval of the NJDEP.

212.    NL incurred costs in completing investigation activities at the Site.  Those costs are "direct" cleanup and removal costs as defined under the Spill Act.

213.    To the extent that the NJDEP has or may bill NL for "indirect" cleanup and removal costs at the RBS Site, those costs also were incurred with the prior written approval of the NJDEP.

214.    After the USEPA completed the RI/FS, the NJDEP could not directly authorize any remedial action at the RBS Site.  However, the USEPA could authorize investigation and cleanup actions at the Site, and the NJDEP provided written concurrence.

215.    The NJDEP's written concurrence included not only work completed with the approval of the USEPA after May 2013, but also work completed at the USEPA's direction prior to that date.  The EE/CA NL completed for the RBS Site falls into this category of recoverable "direct" costs incurred with prior written approval from the NJDEP.  The EE/CA was prepared by NL's consultants at the written direction of the USEPA and evaluated interim remedial measures designed to address the principal sources of lead located in Old Bridge, where source remediation activities would have the greatest impact in reducing risks at the RBS Site.

216.    The costs incurred by NL to perform the EE/CA, to perform, document and present the magnetic separation pilot to the USEPA, and other investigation activities at the RBS Site, including costs paid to environmental contractors to physically investigate site conditions, to physically remove contaminated material from the site for sampling and analysis, to review and evaluate sampling results in laboratories, to evaluate different remedial alternatives, and to present remedial alternatives to the USEPA and the public are all recoverable "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b, said costs being, to the greatest extent possible, incurred in accordance with the NCP.

217.    Pursuant to N.J.S.A. 58:10-23.11b, "cleanup and removal costs" "means all direct costs associated with a discharge and, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L. 2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal or hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare . . . ."

218.    Costs incurred in the remediation of a contaminated site are "direct" costs under the Spill Act.

219.    "'Remediation' or 'remediate' means all necessary actions defined as such pursuant to the Technical Requirements for Site Remediation Rules, at N.J.A.C. 7:26E-1.8."

220.    Under the Technical Requirements for Site Remediation Rules, "'Remediation' or 'remediate' *means all necessary actions to investigate and cleanup or respond* to any known, suspected, or threatened discharge, including, as necessary, the *preliminary assessment, site inspection, remedial investigation* and remedial action; provided however, that 'remediation' or 'remediate' shall not include the payment of compensation for damage to, or loss of, natural resources." N.J.A.C. 7:26E-1.8 (emphasis added).

221.    Site investigation costs are included under the definition of "remediation" and therefore are "direct" costs under the Spill Act.

222.    The excavation and removal of material at a particular site is but one step in the remediation process.  A discharge cannot be addressed until the contaminants are defined and the extent of the environmental contamination is indentified through investigation.

223.    The person responsible for conducting the remediation must meet mandatory remediation timeframes which start with conducting a "preliminary assessment" (i.e., investigation) and continue on to require the completion of other types of work such as the "remedial action".  N.J.A.C. 7:26C-3.3(a)1-6.

224.    Under Technical Requirements for Site Remediation Rules, "preliminary assessment" means the "*first phase in the process of identifying areas of concern and determining whether contaminants are or were present at a site* or have migrated or are migrating from a site, and shall include the initial search for and evaluation of, existing site specific operational and environmental information, both current and historic, to determine if further investigation concerning the documented, alleged, suspected or latent discharge of any

contaminant is required."  N.J.A.C. 7:26E-1.8 (emphasis added).

225.    Such costs for site assessment and investigation are "direct" costs within the meaning of the Spill Act.

226.    NL's site investigation costs are "direct" costs under the Spill Act's definition of "cleanup and removal costs".

227.    "Indirect" costs are costs such as office rent, utilities, clerical support, benefits, management salaries, program indirect salaries and related expenses (personnel, fiscal and general support staff), operating and oversight expenses, and other overhead costs.  See e.g., N.J.A.C. 7:26C-4.5(d), N.J.A.C. 7:26C-4.7(e).  Upon information and belief, NJDEP and USEPA have in their possession and control guidance, correspondence, training manuals and other documents that establish the type of costs that are considered "indirect" costs versus "direct" costs for purposes of the Spill Act and CERCLA.

228.    CERCLA was modeled after the Spill Act.  CERCLA also distinguishes between direct and indirect costs.  Indirect costs are associated with the general operation of the response action and include expenditures for rent, utilities, administrative offices, personnel, supplies, and equipment.

229.    Under the Spill Act, a PRP can incur "indirect" costs for certain work, including, for example, costs for work completed by a PRP's in-house employees or the costs for the use of PRP-owned equipment employed to cleanup a particular site.

230.    Pursuant to Section 120 of CERCLA, "[s]tate laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States or facilities that are the subject of a deferral under subsection (h)(3)(C) of this section

when such facilities are not included on the National Priorities List."  42 U.S.C. § 9620(a)(4).

231.    The United States owns part of the RBS Site and has thereby waived its sovereign immunity against claims brought against it under the Spill Act.  42 U.S.C. § 9620(a)(4).

232.    Upon information and belief, Defendant the USACE was an owner of the Western Jetty at the time it was supplemented and reinforced, and therefore is a person who owned a "facility" at which "hazardous substances" were disposed of under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(2).  Upon information and belief, Defendant the USACE is a current owner of the Western Jetty where there has been a "release" or "threatened release" of "hazardous substances" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

233.    Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

234.    Each Defendant is a person "in any way responsible for" the hazardous substances present of the RBS Site, within the meaning of N.J.S.A. 58:10-23.11g(c)(1).

235.    Pursuant to N.J.S.A. 58:10-23.11g(c), Defendants are jointly and severally liable for cleanup and removal costs incurred or to be incurred by NL in connection with the RBS Site.

WHEREFORE, NL seeks judgment in its favor against Defendants:

    a.    finding that Defendants are strictly jointly and severally liable under the Spill Act, without regard to fault, for cleanup and removal costs incurred by NL in connection with the RBS Site;

    b.    ordering Defendants to reimburse NL in an amount equal to the cleanup and removal costs incurred by NL in connection with the RBS Site;

    c.    declaring that Defendants are strictly jointly and severally liable under the Spill Act, without regard to fault, for all future cleanup and removal costs to be incurred by NL in connection with the RBS Site;

    d.    awarding NL pre-judgment interest;

    e.    awarding NL costs of suit; and

    f.    awarding NL such other relief as the Court deems appropriate.

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that the matter in controversy is the subject of an action pending in the New Jersey Superior Court, Middlesex County, Law Division, Docket No. MID-L-1296-14.  The only parties to the above-referenced state court action are NL Industries, Inc. and the State of New Jersey.

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
(856) 795-2121 Main
(856) 673-7077 Fax
Attorneys for Plaintiff
NL Industries, Inc.

Dated:  July 18, 2016        By:   *s/ Christopher R. Gibson*
                                    CHRISTOPHER R. GIBSON

114241000v1